UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:19-cv20195-JLK

ORGANIZATION OF PROFESSIONAL
AVICULTURISTS, INC.,

       Plaintiff,

       v.

MARGARET EVERSON, in her official
capacity as Principal Deputy Director
Exercising the Authority of the Director of
U.S. Fish and Wildlife Service, et al.;

       Defendants.
_____/

## DECLARATION OF CATHY WILLIS

Pursuant to 28 U.S.C. 1746, I declare and state as follows:

1.      I am the Acting Freedom of Information Act ("FOIA") Officer for the U.S. Fish

& Wildlife Service ("FWS"), which is within the U.S. Department of the Interior. I assumed this

role in March 2019. All information provided in this declaration is based on my review of the

official files and records of the Department, my personal knowledge, information acquired by me

through the performance of my official duties, or a combination of these. As such, the statements

contained in this declaration are based upon my personal knowledge, upon information given to

me in my professional capacity, and upon conclusions and determinations reached and made in

accordance therewith.

### HISTORY OF REQUESTS FWS-2019-00157; FWS-2019-00158; FWS-2019-00160; and FWS-2019-00161 – U.S. FISH AND WILDLIFE SERVICE INTERNATIONAL AFFAIRS DIVISION OF SCIENTIFIC AUTHORITY

2.      On October 15, 2018, and on October 18, 2018, the Organization of Professional Aviculturists ("OPA") filed two requests each day, respectively, on the Department of Interior FOIA Request Form Internet web page (doi-webforms@ios.doi.gov). The requests sought the following information relating to the Wild Bird Conservation Act of 1992 ("WBCA"):

(1) "all information and internal guidance relating to USFWS interpretation of sections 4905 and 4906 of the Wild Bird Conservation Act" (FWS-2019-00157);

(2) "all information relating to FWS procedures for considering a petition under section 4909 of the Wild Bird Conservation Act" (FWS-2019-00158);

(3) "all documents relating to [FWS's] interpretation of its obligations under the WBCA " (FWS-2019-00160); and

(4) "all information related to FWS's obligations to issue regulations under the Wild Bird Conservation Act" (FWS-2019-00161).

3.      On November 2, 2018, the four FOIA requests (FWS-2019-00157; FWS-2019-00158; FWS-2019-00160; FWS-2019-00161) were forwarded to the FWS International Affairs, Division of Scientific Authority at the FWS's headquarters in Falls Church, VA for processing. The U.S. Fish and Wildlife Service's International Affairs Program coordinates domestic and international efforts to protect, restore, and enhance the world's diverse wildlife and their habitats with a focus on species of international concern. The mission of the Division of Scientific Authority ("DSA") is to serve as the U.S. Scientific Authority for the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). If records responsive to OPA's requests referenced in paragraph 2 above existed, it was determined that such records could be identified by, or would be in the possession of, DSA.

4.      Patricia Ford has the responsibility for reviewing incoming requests for information under the FOIA and responding to these requests as appropriate for DSA.  As the staff person who has the lead for FOIA requests for DSA, Ms. Ford's responsibilities include managing new and existing FOIA requests submitted to the DSA, providing the acknowledgement of DSA FOIA's receipt of FOIA requests, liaising with DSA Chief and Branch Chiefs, and staff to initiate searches, and preparing and reviewing responses to FOIA requests to DSA, and providing policy guidance with regard to FOIA.

5.      As the DSA FOIA staff person, Ms. Ford processed the FOIA requests referenced above. The four requests were discussed with the DSA subject matter experts, the DSA Division Chief, the DSA Branch Chief of Consultation and Monitoring, and the DSA biologist who works on WBCA issues.

6.      DSA's subject matter experts explained that DSA implements the WBCA according to the language of the Act itself and the Code of Federal Regulations (CFR) Title 50 CFR Wildlife and Fisheries, Part 15: Wild Bird Conservation Act for the FWS.  The DSA does not have any internal documents, memoranda, policy manuals, guidance, etc., relating to the FWS's interpretation of sections 4905, 4906, and 4909 of the WBCA.

7.      DSA staff did a thorough search of DSA's electronic and paper filing systems pertaining to the WBCA to locate the records identified by the DSA subject matter experts as responsive to OPA's FOIA request: the WBCA of 1992; 50 CFR Part 15 regulations; three Federal Register notices that are final rules implementing the WBCA; and a FWS fact sheet titled: *Wild Bird Conservation Act Summary of Regulations & Effects*.  The FWS fact sheet was provided to OPA as a URL.

8.     Accordingly, in its final determinations on Requests FWS-2019-00157; FWS-2019-00158; FWS-2019-00160; FWS-2019-00161 on December 11, 2018, the DSA provided the requester with these records which included three Internet URL addresses for the (1) 50 CFR Part 15, (2) the WBCA of 1992; and (3) a FWS WBCA fact sheet; and provided electronic copies of three Federal Register documents (41 pages) on December 11, 2018.

## HISTORY OF REQUESTS FWS-2019-00156; FWS-2019-00159; FWS-2019-00162; FWS-2019-00163; and FWS-2019-00443 – U.S. FISH AND WILDLIFE SERVICE INTERNATIONAL AFFAIRS DIVISION OF MANAGEMENT AUTHORITY

9.     On October 15, 2018, the OPA made four FOIA requests, and on October 18, 2018, it made one request on the Department of Interior FOIA Request Form Internet web page (doi-webforms@ios.doi.gov).  The requests sought information relating to:

(1) "the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon" (FWS-2019-00156);

(2) "the approval of permits for consortium/cooperative breeding agreements. 1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species" (FWS-2019-00159);

(3) "the approval of permits for personal pets" (FWS-2019-00162);

(4) "all internal documents, memoranda, policy manuals, guidance , training manuals, etc. relating to the approval of permits for import or export of exotic avian species into or out of the United States" (FWS-2019-00163); and

(5) "[FWS's] interpretation of its obligations under WBCA" (FWS-2019-00443).

10.     These five FOIA requests were forwarded to the FWS International Affairs, Division of Management Authority Branch of Permits ("BoP") at the FWS's headquarters in Falls Church, VA for processing. The Division of Management Authority ("DMA") implements domestic laws and international treaties to promote long-term conservation of global fish and wildlife resources. If records responsive to OPA's requests referenced in paragraph 9 above existed, it was determined that such records could be identified by, or would be in the possession of, DMA.

11.     Brenda Tapia, Program Analyst/Data Management, has the responsibility for FOIA within DMA BoP. Ms. Tapia has been in this position since 2004.

12.     As the FOIA staff person for DMA, Ms. Tapia's responsibilities include managing new and existing FOIA requests submitted to the DMA, providing the acknowledgement of DMA FOIA's receipt of FOIA requests, liaising with DMA Chief and Branch Chief of BoP, and staff to initiate searches, preparing and reviewing responses to FOIA requests to DMA, and providing policy guidance with regard to FOIA.

13.     As the DMA FOIA staff person, Ms. Tapia processed the FOIA requests that were forwarded for processing by DMA.

14.     With regard to request FWS 2019-00156, which sought records regarding "the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon," Ms. Tapia discussed the request with the relevant subject matter expert, a biologist within the DMA's Wildlife Trade and Conservation Branch ("WTCB").  The subject matter expert searched all of WTCB's WBCA records in all forms available to the subject matter expert.  The subject matter expert provided a copy of a Federal Register document (80 FR 79300, December 12, 2015) and a copy of the letter DMA sent to the Argentinian CITES

Management Authority.  The subject matter expert did not have access to a copy of the response letter from the Argentinian CITES Management Authority, or a copy of the English translation of the response letter.

15.     To obtain a copy of the response letter from the Argentinian CITES Management Authority, and a copy of the English translation of the response letter, BoP sent a request to the Department of the Interior's eMail Enterprise Records and Document Management System (eERDMS) FWS representative to search emails of former DMA Chief, Mr. Roddy Gabel, who has retired from the FWS.  Through eERDMS, the response letter from the Argentina CITES Management Authority and the English translation of the response letter from Argentina were retrieved.  Copies of the Federal Register document, the letter DMA sent to the Argentinian CITES Management Authority, the Argentinian response letter, and the English translation of the response letter were provided to the requester.

16.     With regard to request FWS-2019-00159, which sought records concerning "the approval of permits for consortium/cooperative breeding agreements," Ms. Tapia discussed the request with the relevant subject matter expert, a biologist within WTCB. The subject matter expert searched the International Affairs shared electronic folders, which house the relevant program information (DMA program folders, cooperative breeding program folder, which contains all cooperative breeding programs approved for Appendix-I species). The subject matter expert searched all of WTCB's WBCA Appendix I records in all forms available to the subject matter expert. The subject matter expert identified a total of 29 pages of responsive records, which were then provided to the requester. The documents that were provided include FWS's responses to applicants.

17.     Request FWS-2019-00162 very broadly sought "all information, relating to the approval of permits for personal pets."  By email dated November 19, 2018, the requester narrowed/clarified the request to "The OPA limits its requests to guidance for approving the export of CITES-listed avian species from the U.S. under the Personal Pet exemption. Specifically, what criteria are used by the Service to determine whether an export is 'commercial.'" Ms. Tapia discussed the narrowed request with the subject matter expert, the Chief of DMA's Branch of Permits, who indicated that "DMA follows applicable law/treaty/regulation for approving export of CITES-listed avian species, including the CITES implementing regulations at 50 CFR part 23." FWS advised OPA accordingly in its written response to the request.  DMA also provided four publicly accessible URL links to CITES regulations and FWS permit web pages containing information relating to personal pet permits.

18.     With regard to request FWS-2019-00163, which sought "all internal documents, memoranda, policy manuals, guidance, training manuals, etc. relating to the approval of permits for import or export of exotic avian species into or out of the United States," the DMA provided the Internet URL address for 50 CFR 15 regulations, which are the regulations that implement the WBCA.  According to the Chief of DMA's Branch of Permits, DMA does not have any internal documents, memoranda, policy manuals, guidance, or training manuals, relating to the approval of permits for import or export of exotic avian species into or from the United States. The DMA implements the WBCA according to the language of the Act of 1992 and the regulations of 50 CFR Wildlife and Fisheries, Part 15: Wild Bird Conservation Act to determine and guide the process and approval of WBCA permits. Accordingly, the requester was provided with Internet URL addresses for the 50 CFR Part 15 and the WBCA of 1992.

19.     With regard to request FWS-2019-00443, which sought records regarding "[FWS's] interpretation of its obligations under WBCA," Ms. Tapia discussed the request with the subject matter expert, a senior DMA biologist.  The subject matter expert explained that DMA does not have any written internal documents concerning its interpretation and obligations under the WBCA, as DMA follows the WBCA and CFR regulations for the issuance of permits under the WBCA.  Accordingly, the requester was provided with Internet URL addresses for the 50 CFR Part 15 and the WBCA of 1992.

20.     The DMA provided OPA its final determination on Requests 2019-00159, 2019-00162, 2019-00163, and 2019-00443 on March 4, 2019 and Request 2019-00156 on March 12, 2019.

21.     The searches described above were calculated to identify and locate any records in the possession of FWS responsive to each of the nine FOIA requests at issue.  In each instance, the FOIA personnel tasked with processing the requests consulted the appropriate subject matter expert within the FWS component determined to be the likeliest repository of the information to ascertain whether responsive documents existed.  As indicated above, the search for records regarding how FWS interprets and implements the WBCA yielded no records beyond the statute itself and the agency regulations promulgated thereunder. Where requests sought more specific information about a particular matter, as did the request regarding the Argentine CITES authority's petition for permission to import the blue front amazon, or as did the request for records regarding the approval of permits for consortium/cooperative breeding agreements, FWS identified responsive records and produced them to the requester. For the foregoing reasons, I believe FWS has complied in all material respects with the requirements of FOIA.

22.     A copy of each of OPA's nine FOIA requests referenced in the complaint are attached hereto as composite Exhibit "A." A copy of FWS's responses to each of OPA's nine FOIA requests is attached hereto as composite Exhibit "B." FWS's responses explained OPA's right to administrative appeal of FWS's determinations. FWS has no record of receiving from OPA or its representatives any appeals of FWS's determinations.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of April, 2019

_____
Cathy Willis
U.S. Fish and Wildlife Service
U.S. Department of the Interior

# Exhibit A



Tapia, Brenda <brenda_tapia@fws.gov>

## New Request (1, 12/18); Fwd: FOIA from: David A. Garcia

**FOIA, FWHQ** <fwhq_foia@fws.gov>                                    Thu, Oct 18, 2018 at 3:35 PM
To: dgarcia@pradaurizar.com
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 18, 2018.   We have forwarded your request to our Division of Management Authority (DMA) for processing.  You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Thu, Oct 18, 2018 at 11:35 AM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Thursday, October 18, 2018 - 11:35am
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? Yes
If so, who are you filing the request on behalf of? Organization of Professional Aviculturists
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description: The OPA request all information relating to the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification:

Please select the appropriate statement: I am requesting a waiver or reduction of fees.

I agree to pay fees up to this particular amount: $10

To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use

Affiliated Organization: This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.

Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.

Please explain why your request for a waiver of fees or a reduction in fees is justified.: e OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.

The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/478677

--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041



Ford, Patricia <patricia_ford@fws.gov>

# Fwd: New Request (3) 12/18; Fwd: FOIA from: David A. Garcia
1 message

**Tapia, Brenda** <brenda_tapia@fws.gov>  Fri, Nov 2, 2018 at 4:16 PM
To: Patricia Ford <patricia_ford@fws.gov>, "Williams, Sheri" <sheri_s_williams@fws.gov>

Per our conversation, I am forwarding the FOIA request from Mr. Garcia concerning interpretation of section 4905 and 4906 of the WBCA. I have not created an entry in EFTS.
Thanks,
Brenda

---------- Forwarded message ---------
From: **FOIA, FWHQ** <fwhq_foia@fws.gov>
Date: Thu, Oct 18, 2018 at 3:38 PM
Subject: New Request (3) 12/18; Fwd: FOIA from: David A. Garcia
To: <dgarcia@pradaurizar.com>
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 18, 2018. We have forwarded your request to our Division of Management Authority (DMA) for processing. You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA 22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Thu, Oct 18, 2018 at 12:26 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Thursday, October 18, 2018 - 12:26pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? Yes
If so, who are you filing the request on behalf of? Organization of Professional Aviculturists

11/2/2018
DEPARTMENT OF THE INTERIOR Mail - Fwd: New Records Submitted for FOIA: DOI-FWS-2019-003264 from David A Garcia
Case 1:19-cv-20195-JLK Document 8-1 Entered on FLSD Docket 04/19/2019 Page 14 of 130

Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that that person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.

Bureau/Office: Fish & Wildlife Service (FWS)

Relevant park, refuge, site or other location:

Request Description: The OPA is requesting all information and internal guidance relating to USFWS interpretation of sections 4905 and 4906 of the Wild Bird Conservation Act

Requester's Communication Preferences: Electronic communication via email

Document Disclosure Preferences: Electronic copies via email

Select the applicable reason why you are requesting expedited processing:

Justification for Expedited Processing:

Expedited Processing Certification:

Please select the appropriate statement: I am requesting a waiver or reduction of fees.

I agree to pay fees up to this particular amount: $10

To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use

Affiliated Organization: Organization of Professional Aviculturist (OPA)

Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.

Please explain why your request for a waiver of fees or a reduction in fees is justified.:
 The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.


The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/478696


--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041


--

Thank you,
Brenda Tapia
Program Analyst/Data Management
U.S. Fish and Wildlife Service
Division of Management Authority (DMA)
Branch of Permits, MS: IA
5275 Leesburg Pike
Falls Church, VA 22041
Ph: 800-358-2104 x.1989 or 703-358-2104 x.1989
Fax: 703-358-2280
*Sign up for our e-newsletter to learn how we're working around the globe to protect species and their habitats!*



**Ford, Patricia <patricia_ford@fws.gov>**

---

## Fwd: New Request (2) 12/18; Fwd: FOIA from: David A. Garcia
1 message

**Tapia, Brenda** <brenda_tapia@fws.gov>                                     Fri, Nov 2, 2018 at 4:15 PM
To: Patricia Ford <patricia_ford@fws.gov>, "Williams, Sheri" <sheri_s_williams@fws.gov>

Per our conversation, I am forwarding the FOIA request from Mr. Garcia concerning petition under 4909 of the WBCA.  I have not created an entry in EFTS.

This request and the previous one are two different requests.  I made a mistake when I wrote the request.

Thanks,
Brenda

---------- Forwarded message ---------
From: **FOIA, FWHQ** <fwhq_foia@fws.gov>
Date: Thu, Oct 18, 2018 at 3:37 PM
Subject: New Request (2) 12/18; Fwd: FOIA from: David A. Garcia
To: <dgarcia@pradaurizar.com>
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>


Dear David A. Garcia,


The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 18, 2018.   We have forwarded your request to our Division of Management Authority (DMA) for processing.  You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Thu, Oct 18, 2018 at 11:38 AM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>


Submitted on Thursday, October 18, 2018 - 11:38am
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)

Are you filing the request on behalf of another party? Yes
If so, who are you filing the request on behalf of? Organization of Professional Aviculturists
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description: All information relating to FWS procedures for considering a petition under section 4909 of the Wild Bird Conservation Act.
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification:
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $10
To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use
Affiliated Organization: Organization of Professional Aviculturist (OPA)
Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: e OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.


The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/478678




--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041


--

Thank you,
Brenda Tapia
Program Analyst/Data Management
U.S. Fish and Wildlife Service
Division of Management Authority (DMA)
Branch of Permits, MS: IA
5275 Leesburg Pike
Falls Church, VA 22041
Ph: 800-358-2104 x.1989 or 703-358-2104 x.1989
Fax: 703-358-2280
*Sign up for our e-newsletter to learn how we're working around the globe to protect species and their habitats!*



Tapia, Brenda <brenda_tapia@fws.gov>

## New Request (2); Fwd: FOIA from: David A. Garcia

**FOIA, FWHQ** <fwhq_foia@fws.gov>                                      Wed, Oct 17, 2018 at 9:49 AM
To: dgarcia@pradaurizar.com
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 15, 2018.   We have forwarded your request to our Division of Management Authority (DMA) for processing.  You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 12:56 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Monday, October 15, 2018 - 12:56pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? No
If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description:
1) The OPA is also requesting all information, relating to the approval of permits for consortium/cooperative breeding agreements.

1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species.

Requester's Communication Preferences: Electronic communication via email

Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification:
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $100
To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use
Affiliated Organization: This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.
Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.

The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/477981

--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

BISON CONNECT

**Ford, Patricia <patricia_ford@fws.gov>**

# Fwd: New Request (6); Fwd: FOIA from: David A. Garcia

1 message

**Tapia, Brenda** <brenda_tapia@fws.gov> Fri, Nov 2, 2018 at 4:10 PM
To: Patricia Ford <patricia_ford@fws.gov>, "Williams, Sheri" <sheri_s_williams@fws.gov>

Hello Pat,

Per our conversation, I am forwarding the FOIA request from Mr. Garcia concerning WBCA. I have not created an entry in EFTS.

Thanks,
Brenda

---------- Forwarded message ---------
From: **FOIA, FWHQ** <fwhq_foia@fws.gov>
Date: Wed, Oct 17, 2018 at 9:56 AM
Subject: New Request (6); Fwd: FOIA from: David A. Garcia
To: <dgarcia@pradaurizar.com>
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 15, 2018. We have forwarded your request to our Division of Management Authority (DMA) for processing. You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA 22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 1:03 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Monday, October 15, 2018 - 1:03pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)

Are you filing the request on behalf of another party? No
If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description: The OPA requests from FWS all documents relating to its interpretation of its obligations under WBCA.
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification: I certify that the above statement(s) concerning expedited processing are true and correct to the best of my knowledge and belief.
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $100
To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use
Affiliated Organization: This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.
Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in your commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.


The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/477985




--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041


--

Thank you,
Brenda Tapia
Program Analyst/Data Management
U.S. Fish and Wildlife Service
Division of Management Authority (DMA)
Branch of Permits, MS: IA
5275 Leesburg Pike
Falls Church, VA 22041
Ph: 800-358-2104 x.1989 or 703-358-2104 x.1989
Fax: 703-358-2280

Case 1:19-cv-20195-JEK   Document 8-1   Entered on FLSD Docket 04/19/2019   Page 21 of 130



Ford, Patricia <patricia_ford@fws.gov>

___

## Fwd: New Request (1); Fwd: FOIA from: David A. Garcia
1 message

**Tapia, Brenda** <brenda_tapia@fws.gov>                                      Fri, Nov 2, 2018 at 4:20 PM
To: Patricia Ford <patricia_ford@fws.gov>, "Williams, Sheri" <sheri_s_williams@fws.gov>

    ---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 12:54 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>


Submitted on Monday, October 15, 2018 - 12:54pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address: dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? No

If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description:
1) The OPA is requesting all information related to FWS's obligations to issue regulations under the Wild Bird Conservation Act. Particularly, we are requesting information relating to the agencies failure to include additional species on the approved list for captive-bred species.


Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification:
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $100
To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use
Affiliated Organization: This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.
Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.


The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/477980




--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041


--

Thank you,
Brenda Tapia
Program Analyst/Data Management
U.S. Fish and Wildlife Service
Division of Management Authority (DMA)
Branch of Permits, MS: IA
5275 Leesburg Pike
Falls Church, VA 22041



Tapia, Brenda <brenda_tapia@fws.gov>

## New Request (3); Fwd: FOIA from: David A. Garcia

**FOIA, FWHQ** <fwhq_foia@fws.gov>                               Wed, Oct 17, 2018 at 9:51 AM
To: dgarcia@pradaurizar.com
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 15, 2018.   We have forwarded your request to our Division of Management Authority (DMA) for processing.  You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 12:57 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Monday, October 15, 2018 - 12:58pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? No
If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description: The OPA is requesting all information, relating to the approval of permits for personal pets.
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification:
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $100

To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use
Affiliated Organization:

This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.

Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.


The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/477982



--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041



Tapia, Brenda <brenda_tapia@fws.gov>

## New Request (4); Fwd: FOIA from: David A. Garcia

**FOIA, FWHQ** <fwhq_foia@fws.gov>                                  Wed, Oct 17, 2018 at 9:53 AM
To: dgarcia@pradaurizar.com
Cc: Brenda Tapia <brenda_tapia@fws.gov>, Mary Cogliano <mary_cogliano@fws.gov>

Dear David A. Garcia,

The United States Fish and Wildlife Service (FWS) Headquarters FOIA Office received your request dated October 15, 2018.   We have forwarded your request to our Division of Management Authority (DMA) for processing.  You will receive a formal acknowledgement shortly; which will include DMA contact information in case you have any questions or concerns regarding this FOIA request.

Respectfully,

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 12:59 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>

Submitted on Monday, October 15, 2018 - 1:00pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? No
If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. § 2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description:  The OPA requests from FWS all internal documents, memoranda, policy manuals, guidance, training manuals, etc. relating to the approval of permits for import or export of exotic avian species into or out of the United States.
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification: I certify that the above statement(s) concerning expedited processing are true and

correct to the best of my knowledge and belief.

Please select the appropriate statement: I am requesting a waiver or reduction of fees.

I agree to pay fees up to this particular amount: $100

To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial use

Affiliated Organization:

This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional aviculturist have a positive impact on the future of avian species.

Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.

Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.

The results of this submission may be viewed at:

https://www.doi.gov/node/11498/submission/477983

--

United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041



**Tapia, Brenda <brenda_tapia@fws.gov>**

---

## Fwd: FOIA from: David A. Garcia

**FOIA, FWHQ** <fwhq_foia@fws.gov>                                                    Tue, Feb 19, 2019 at 8:45 AM
To: Brenda Tapia <brenda_tapia@fws.gov>, Patricia Ford <patricia_ford@fws.gov>
Cc: Carrie Hyde-Michaels <carrie_hyde-michaels@fws.gov>

This is the 5th one. Is DMA working on this one or DSA? What is the EFTS number?

---------- Forwarded message ---------
From: **U.S. Department of the Interior** <doi-webforms@ios.doi.gov>
Date: Mon, Oct 15, 2018 at 1:03 PM
Subject: FOIA from: David A. Garcia
To: <fwhq_foia@fws.gov>


Submitted on Monday, October 15, 2018 - 1:03pm
Submitted by anonymous user: [10.156.8.158]
Submitted values are:
Your Name: David A. Garcia
Mailing Address: 3191 Coral Way Ste. 607
City: Miami
State or Country: FL
Zip or Postal Code: 33145
Address Type: Business
Daytime Phone Number: 3055109312
Fax Number:
E-mail Address: dgarcia@pradaurizar.com
Confirm E-mail Address : dgarcia@pradaurizar.com
Your Organization: Organization of Professional Aviculturist (OPA)
Are you filing the request on behalf of another party? No
If so, who are you filing the request on behalf of?
Contact Information Certification: I certify that the above statement(s) concerning who I am filing the request on behalf of
are true and correct to the best of my knowledge and belief. If I want to receive greater access to records about a person I
represent, I will submit proof that the person consents to the release of the records to me, as discussed in 43 C.F.R. §
2.9.
Bureau/Office: Fish & Wildlife Service (FWS)
Relevant park, refuge, site or other location:
Request Description: The OPA requests from FWS all documents relating to its interpretation of its obligations under
WBCA.
Requester's Communication Preferences: Electronic communication via email
Document Disclosure Preferences: Electronic copies via email
Select the applicable reason why you are requesting expedited processing:
Justification for Expedited Processing:
Expedited Processing Certification: I certify that the above statement(s) concerning expedited processing are true and
correct to the best of my knowledge and belief.
Please select the appropriate statement: I am requesting a waiver or reduction of fees.
I agree to pay fees up to this particular amount: $100
To assist in determining my requester category to assess fees, you should know that I am: affiliated with an educational or
noncommercial scientific institution and this request is made for a scholarly or scientific purpose and not for commercial
use
Affiliated Organization: This information is being solicited by the Organization of Professional Aviculturist (OPA). The OPA
is a non-profit organization that supports and advocates for the conservation of avian species by encouraging cooperation
between in situ conservationists and ex situ production of specimens. It is our goal to ensure that actions of professional
aviculturist have a positive impact on the future of avian species.
Check the boxes to the right to confirm that you meet the Department's fee waiver criteria:
 - Disclosure of the information is in the public interest because it is likely to contribute significantly to public
understanding of the operations or activities of the Government.
 - Disclosure of the information is not primarily in my commercial interest.
Please explain why your request for a waiver of fees or a reduction in fees is justified.: The OPA is requesting information

regarding the Wild Bird Conservation Act and relevant agency actions so as to determine if the agency is complying with its obligations under the statute and to further determine if legal action is needed to ensure that agency appropriately complies with its obligations. This information is not for a commercial purpose but is research undertaken by the OPA to determine what actions the agency has so far taken to comply with its obligations under WBCA and what actions the OPA will take in light of those actions. This information is necessary to provide the public with a greater understanding of the government's actions and will be publicized by the OPA, without a commercial gain on our part.

The results of this submission may be viewed at:
https://www.doi.gov/node/11498/submission/477985

--
United States Fish and Wildlife Service
Headquarters Freedom of Information Act Office
MS: IRTM
5275 Leesburg Pike
Falls Church, VA  22041

# Exhibit B



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041



IN REPLY REFER TO:
FWS-2019-00156

March 12, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 18, 2018, received on October 18, 2018, and assigned control number FWS-2019-00156. You requested the following information:

> "....all information relating to the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon."

Per the electronic email of November 19, 2018, you narrowed/clarified the request to "The OPA is specifically requesting information as to why the final proposed rule relating to the listing of wild harvested Blue Fronted Amazons published in the Federal Register at 68 FR 46559 on August 6, 2003 was never finalized or issued. And why it was ultimately withdrawn on December 21, 2015, 80 FR 79300."

Please see the attached 7 pages of responsive records, which are being released to you in their entirety. All information under the FOIA and Privacy Act regulations (43 CFR 2) has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. See _43 C.F.R. § 2.37(g)_. Therefore, there is no billable fee for the processing of this request

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

2

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA and Privacy Act Appeals Officer.  You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels, at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.**  If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703-358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

**CARRIE HYDE-MICHAELS**
Digitally signed by CARRIE HYDE-MICHAELS
Date: 2019.03.11 17:04:37 -04'00'

Carrie Hyde-Michaels
FWS FOIA Officer

Attached

In Reply Refer To:
FWS/IA/DMA


Lic. Pablo Edgardo Mesa
Director Nacional de Ordenamiento Ambiental y Conservación de la Biodiversidad
Subsecretaría de Planificación y Política Ambiental
Secretaría de Ambiente y Desarrollo Sustentable
San Martín 451
piso 2, oficina 261
1104 Buenos Aires
Argentina


*By e-mail to* [pemesa@ambiente.gov.ar](mailto:pemesa@ambiente.gov.ar)


Dear Mr. Mesa:

I am contacting you in order to obtain current information on the status of Project Elé, which involves the removal of live specimens of *Amazona aestiva* from the wild for export.  For over 10 years we have had under consideration a petition from the Government of Argentina to approve this project to allow imports under the U.S. Wild Bird Conservation Act (WBCA). Under the WBCA, we may approve imports from a country for species subject to a sustainable-use management plan that meets specific criteria established in our regulations.

Unfortunately, we have been unable to approve the program and allow the import of birds derived from it.  However, we also have not rejected the petition.  Because the approval of a program under the WBCA is a regulatory action, this has remained as a pending action for several years, and we must now conclude the action by either approving or disapproving Argentina's program.  It is very unlikely that we could approve the program based on the information we have on file.  Furthermore, it is likely that the program has continued to evolve so that the information we have is no longer current.  Therefore, we suggest that the petition from Argentina be withdrawn.  If the petition is withdrawn, it prevents us from taking a negative action (disapproving the petition).  Please note that withdrawal of the current petition does not prevent the submission of a new petition; indeed, a revised petition with up-to-date information could be submitted for consideration.

Please advise as to whether you wish to withdraw the petition for approval of imports of *Amazona aestiva* into the United States or if you prefer that we take a decision on this matter.  If you are not the appropriate person to respond on this matter, please refer it to the correct office.

We look forward to your response and thank you for your attention to this matter.

Sincerely,

Robert R. Gabel, Chief
Division of Management Authority



*Jefatura de Gabinete de Ministros*
*Secretaría de Ambiente y Desarrollo Sustentable*

*"2014 - Año de Homenaje al Almirante Guillermo Brown,*
*en el Bicentenario del Combate Naval de Montevideo"*

BUENOS AIRES,
NOTA Nº 409

SEÑOR ROBERT R. GABEL.
JEFE DE LA DIVISIÓN DE AUTORIDAD ADMINISTRATIVA.
SERVICIO DE PESCA Y VIDA SILVESTRE.
4401 N. Fairfax Drive, Room 212.
ARLINGTON, VIRGINIA  22203-3247, U.S.A.
S                          /                          D.

Estimado Sr. Gabel:

Tengo el agrado de dirigirme a Ud. en relación a su nota referida a la petición presentada por nuestro país respecto de las exportaciones de *Amazona aestiva* en el marco del Proyecto *Elé*.

Sobre el particular, le informo que hemos decidido retirar la petición para la exportación de especímenes vivos de la especie mencionada en el marco de las regulaciones de la U.S. Wild Bird Consevation Act (WBCA).

Tal como lo señala en su nota, en nuestro país se están reformulando los programas de uso sustentable de la fauna silvestre. En particular, *Amazona aestiva* está incluida dentro de aquellas especies que requieren certificar, previo a su exportación, que provienen de predios con planes de manejo del bosque. Esto ha implicado el desarrollo de mecanismos administrativos y técnicos basados en una mirada ecosistémica que va más allá del criterio tradicional de manejo de las especies sometidas a uso sustentable.

Finalmente, entiendo que la presente es notificación suficiente para el procedimiento de retiro de la petición.

Sin otro particular, saluda a Ud. atentamente.

Lic. PABLO E. MESA
DIRECTOR NACIONAL ORDENAMIENTO AMBIENTAL
Y CONSERVACION DE LA BIODIVERSIDAD
SECRETARIA AMBIENTE Y DESARROLLO SUSTENTABLE

Argentina letter translation:  Paraphrased
Jorgenson/DSA:  October 24, 2014

Chief of the Cabinet of Ministers
Ministry of the Environment of Sustainable Development

Buenos Aires
Reference No. 409
[undated]

Mr. Robert R. Gabel
Chief of the Division of Management Authority
U.S. Fish and Wildlife Service
4401 N Fairfax Drive, Room 212
Arlington, Virginia 22203-3247 USA

Dear Mr. Gabel:

I would like to take this opportunity to address your comments made in response to the petition presented by my country with regard to the export of *Amazona aestiva* in the context of the Elé Project.

In this regard, I would like to inform you that we have decided to withdraw the petition for the exportation of live specimens of this species that is mentioned in the context of the regulations for the U.S. Wildlife Bird Conservation Act (WBCA).

As was mentioned in your note, in our country programs for the sustainable use of wildlife are being reformulated.  Specifically, *Amazona aestiva* is included among those species that must be certified prior to exportation that they originate from properties with forestry management plans.  This has generated the development of administrative and technical mechanisms based on an ecosystem perspective that go much beyond the traditional sustainable management criteria for species.

Finally, my understanding is that this letter is sufficient notification for the withdrawal of the petition.

Sincere greetings,

/s/

Lic. Pablo E. Mesa
National Director of Environmental Management
        and Biodiversity Conservation
Ministry of the Environment of Sustainable Development

**LEGAL STATUS**

**LEGAL STATUS**

Wild Bird Conservation Act; Blue-Fronted Amazon Parrots From Argentina's Sustainable-Use Management Plan

A Proposed Rule by the Fish and Wildlife Service on 12/21/2015

**DOCUMENT DETAILS**

**Printed version:**
PDF (https://www.govinfo.gov/content/pkg/FR-2015-12-21/pdf/2015-32054.pdf)

**Publication Date:**
12/21/2015 (/documents/2015/12/21)

**Agencies:**
Fish and Wildlife Service (https://www.federalregister.gov/agencies/fish-and-wildlife-service)

**Dates:**
This document is withdrawn as of December 21, 2015.

**Document Type:**
Proposed Rule

**Document Citation:**
80 FR 79300

**Page:**
79300-79301 (2 pages)

**CFR:**
50 CFR 23

**Agency/Docket Numbers:**
Docket No. FWS-HQ-IA-2015-0035
96300-1671-0000-R4

**RIN:**
1018-AH89 (https://www.federalregister.gov/regulations/1018-AH89/importation-of-exotic-wild-birds-adding-blue-fronted-amazon-parrots-from-argentina-s-approved-sustai)

**Document Number:**
2015-32054

**DOCUMENT DETAILS**

**DOCUMENT STATISTICS**

**Page views:**
89
as of 02/25/2019 at 2:15 pm EST

**DOCUMENT STATISTICS**

**ENHANCED CONTENT**

regulations.gov

**Docket Number:**
FWS-HQ-IA-2015-0035 (https://www.regulations.gov/docket?D=FWS-HQ-IA-2015-0035)

**Docket Name:**
Wild Bird Conservation Act; Withdrawal of Proposed Rule to Add Blue-Fronted Amazon Parrots from Argentina's Sustainable-Use Management Plan

**Docket RIN**

1018-AH89 (https://www.federalregister.gov/regulations/1018-AH89/importation-of-exotic-wild-birds-adding-blue-fronted-amazon-parrots-from-argentina-s-approved-sustai)

**ENHANCED CONTENT**

PUBLISHED DOCUMENT

# AGENCY:

Fish and Wildlife Service, Interior.

# ACTION:

Proposed rule; withdrawal.

# SUMMARY:

We, the U.S. Fish and Wildlife Service (Service, or we), withdraw a 2003 proposed rule to approve a sustainable-use management plan developed by the Management Authority of Argentina for blue-fronted amazon parrots *(Amazona aestiva),* under the Wild Bird Conservation Act of 1992. We are taking this action because Argentina has withdrawn their application. As a result, we will no longer consider allowing importation of this species from Argentina under this plan.

# DATES:

This document is withdrawn as of December 21, 2015.

# FOR FURTHER INFORMATION CONTACT:

Craig Hoover, Chief, Division of Management Authority, U.S. Fish and Wildlife Service Headquarters, MS: IA; 5275 Leesburg Pike, Falls Church, VA 22041-3803; telephone 703-358-2095; facsimile 703-358-2298. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800-877-8339.

# SUPPLEMENTARY INFORMATION:

## Background

The Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) is an international treaty designed to regulate international trade in certain animal and plant species that are now, or may become, threatened with extinction. These species are listed in the Appendices to CITES, which are available on the CITES Secretariat's Web site at *http://www.cites.org/eng/app/appendices.php (http://www.cites.org/eng/app/appendices.php).* Currently 180 countries and the European Union have ratified, accepted, approved, or acceded to CITES; these 181 entities are known as Parties. The U.S. Fish and Wildlife Service has been delegated authority to carry out U.S. responsibilities under CITES.

The Wild Bird Conservation Act of 1992 (WBCA) limits or prohibits import into the United States of exotic bird species to ensure that their wild populations are not harmed by international trade. It also encourages wild bird conservation programs in countries of origin by ensuring that all imports of such species are biologically sustainable and not detrimental to the survival of the species.

## Previous Federal Actions

On November 16, 1993, we published a final rule in the **Federal Register** (58 FR 60524) that implemented the prohibitions stipulated in the WBCA and provided permit requirements and procedures for some allowed exemptions. In that rule, we informed the public that imports of all CITES-listed birds (as defined in the rule) were prohibited, except for (a) species included in an approved list; (b) specimens for which an import permit has been issued; (c) species from countries that have approved sustainable-use management plans for those species; or (d) specimens from approved foreign captive-breeding facilities. Criteria for approval of sustainable-use management plans are in title 50 of the Code of Federal Regulations at 50 CFR 15.32 (/select-citation/2015/12/21/50-CFR-15.32).

Argentina petitioned the Service to allow the import into the United States of blue-fronted amazon parrots *(Amazona aestiva)* removed from the wild in Argentina under an approved sustainable-use management plan. Consequently, on August 10, 2000, we published a notice of receipt of application for approval in the **Federal Register** (65 FR 49007 (/citation/65-FR-49007)) that announced the receipt of a petition from the CITES Management Authority of Argentina, Dirección de Fauna and Flora Silvestre, for approval of a sustainable-use management plan for the blue-fronted amazon parrot in Argentina. On January 8, 2003, we

published a notice in the **Federal Register** (68 FR 1066 (/citation/68-FR-1066)) announcing the availability of a draft environmental assessment of the addition of blue-fronted amazon parrots from a sustainable-use management plan in Argentina to the approved list of non-captive-bred birds under the WBCA.

Later that year, on August 6, 2003, we published a proposed rule in the **Federal Register** (68 FR 46559 (/citation/68-FR-46559)) to approve a sustainable-use management plan developed by the CITES Management Authority of Argentina for blue-fronted amazon parrots under the WBCA. The proposed rule would add blue-fronted amazon parrots from Argentina's program to the approved list of non-captive-bred (wild-caught) species contained at 50 CFR 15.33 (/select-citation/2015/12/21/50-CFR-15.33)(b).    The public comment period on the proposed rule was open for 60 days.

<div style="float:right">Start Printed<br>Page 79301</div>

On March 29, 2005, we published a notice in the **Federal Register** (70 FR 15798 (/citation/70-FR-15798)) reopening the comment period on the proposed rule for 30 days to enter into the record Dr. Jorge Rabinovich's 2004 study, "Modeling the Sustainable Use of the Blue-Fronted Parrot *(Amazona aestiva)* in the Dry Chaco Region of Argentina," and to accept comments related to the relationship of this study to the proposed addition of blue-fronted amazon parrots from Argentina's program to the approved list of non-captive-bred (wild-caught) species under the WBCA. On May 24, 2005, we published a notice in the **Federal Register** (70 FR 29711 (/citation/70-FR-29711)) reopening the comment period for an additional 45 days.

## Reason for Withdrawal of Proposed Rule

We reviewed the public comments received during the open comment periods for the notice and the proposed rule and new information that became available after the publication of the proposed rule. We also reevaluated information in our files, our proposed rule, and Argentina's request, in accordance with our approval criteria in 50 CFR 15.32 (/select-citation/2015/12/21/50-CFR-15.32). As a result, we determined that it was unlikely that we would be able to make a positive finding for the sustainable-use management plan developed by Argentina for blue-fronted amazon parrots under the WBCA. Subsequently, Argentina determined that the best course of action would be to withdraw their application. Argentina withdrew its application by letter (undated) from the CITES Management Authority of Argentina (Ministry of the Environment of Sustainable Development); therefore, we are withdrawing our proposed rule of August 6, 2003 (68 FR 46559 (/citation/68-FR-46559)).

## Author

The primary author of this document is Clifton A. Horton, Division of Management Authority, U.S. Fish and Wildlife Service (see **FOR FURTHER INFORMATION CONTACT**).

## Authority

The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 (https://api.fdsys.gov/link?collection=uscode&title=16&year=mostrecent&section=1531&type=usc&link-type=html) *et seq.*).

Dated: December 9, 2015.

Stephen Guertin,

Acting Director, U.S. Fish and Wildlife Service.

[FR Doc. 2015-32054 (/a/2015-32054) Filed 12-18-15; 8:45 am]

BILLING CODE 4333-15-P

**PUBLISHED DOCUMENT**



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

**5275 Leesburg Pike, MS: IRTM**
**Falls Church, VA 22041**



December 11, 2018

In Reply Refer To:
FWS/AIA/DSA/FOIA: 2019-00157

David A. Garcia
Organization of Professional Aviculturists
3191 Coral Way, Suite 607
Miami, Florida 33145
E-mail address: dgarcia@pradaurizar.com

Dear Mr. Garcia:

The U.S. Fish and Wildlife Service Headquarters FOIA Office received your Freedom of
Information Act (FOIA) request, dated October 18, 2018, and assigned it control number: FWS-
2019-00157. Please cite this number in any future communications with our office regarding
your request. You requested the following:

> *"The OPA is requesting all information and internal guidance relating to USFWS
> interpretation of sections 4905 and 4906 of the Wild Bird Conservation Act."*

With regard to Section 4905 of the Wild Bird Conservation Act (WBCA), the Code of Federal
Regulations (CFR) for the Fish and Wildlife Service (Service) to implement the WBCA, 16
U.S.C. Section 4905 List of approved species, is Title 50: Wildlife and Fisheries, Part 15: Wild
Bird Conservation Act Subpart D-Approved List of Species Listed in the Appendices to the
Convention:

- §15.31 Criteria for including species in the approved list for captive-bred species;
- §15.32 Criteria for including species in the approved list for non-captive-bred species;
  and
- §15.33 Species included in the approved list.

The sections above are available on the Internet at: https://www.ecfr.gov/cgi-
bin/retrieveECFR?gp=&SID=df97a004f5ffdae40d4a4f7bcf9afcac&mc=true&n=pt50.1.15&r=P
ART&ty=HTML.

With regard to Section 4906 of the WBCA, the CFR is: 50 CFR Subpart E §15.41 Criteria for
including facilities as qualifying for imports. [Reserved] After a thorough search of our files, it
has been determined that the Service has no records responsive to your request regarding section
4906 of the WBCA.

All requested information under the FOIA and Privacy Act regulations has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request.

We use Multitrack Processing to process FOIA requests. The Simple track is for requests that can be processed in one to five workdays. The Normal track is for requests that can be processed in six to twenty workdays. The Complex track is for requests that can be processed in twenty-one to sixty workdays. The Exceptional/Voluminous track is for requests requiring more than sixty workdays for processing. The Expedited track is for requests that have been granted expedited processing. Within each track, requests are usually processed on a first-in, first-out basis. We placed your request into the Complex processing track.

You may appeal this response to the Department's FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email. All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the USFWS' response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS' response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

*DOI FOIA/Privacy Act Appeals Office Contact Information*

Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240

Attn: FOIA/Privacy Act Appeals Office

Telephone: 202- 208-5339
Fax: 202-208-6677

Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect your right to pursue litigation.  You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA & Privacy Act Appeals Officer.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.**  If you have questions relating to this response, please contact Ms. Pat Ford, Division of Scientific Authority, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (phone: 703-358-2494; e-mail: patricia_ford@fws.gov).

Sincerely,

CARRIE HYDE-MICHAELS

Digitally signed by CARRIE HYDE-MICHAELS
Date: 2018.12.11 11:02:04 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer



**United States Department of the Interior**

FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IRTM
Falls Church, VA 22041



December 11, 2018

In Reply Refer To:
FWS/AIA/DSA/FOIA: 2019-00158

David A. Garcia
Organization of Professional Aviculturists
3191 Coral Way, Suite 607
Miami, Florida 33145
E-mail address: dgarcia@pradaurizar.com

Dear Mr. Garcia:

The U.S. Fish and Wildlife Service Headquarters FOIA Office received your Freedom of
Information Act (FOIA) request, dated October 18, 2018, and assigned it control number: FWS-
2019-00158. Please cite this number in any future communications with our office regarding
your request. You requested the following:

> "*All information relating to FWS procedures for considering a petition under
> section 4909 of the Wild Bird Conservation Act.*"

The Code of Federal Regulations (CFR) for the Fish and Wildlife Service to implement the Wild
Bird Conservation Act (WBCA), 16 U.S.C. Section 4909 Petitions, is Title 50: Wildlife and
Fisheries, Part 15: Wild Bird Conservation Act Subpart E-Qualifying Facilities Breeding Exotic
Birds in Captivity:§15.41 Criteria for including facilities as qualifying for imports. [Reserved];
and Subpart F—List of Prohibited Species Not Listed in the Appendices to the Convention
§15.51 Criteria for including species and countries in the prohibited list. [Reserved] After a
thorough search of our files, it has been determined that the Service has no records responsive to
your request regarding section 4909 of the WBCA.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because
the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*.
Therefore, there is no billable fee for the processing of this request.

We use Multitrack Processing to process FOIA requests. The Simple track is for requests that
can be processed in one to five workdays. The Normal track is for requests that can be processed
in six to twenty workdays. The Complex track is for requests that can be processed in twenty-
one to sixty workdays. The Exceptional/Voluminous track is for requests requiring more than
sixty workdays for processing. The Expedited track is for requests that have been granted
expedited processing. Within each track, requests are usually processed on a first-in, first-out
basis. We placed your request into the Complex processing track.

You may appeal this response to the Department's FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email. All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the USFWS' response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS' response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

*DOI FOIA/Privacy Act Appeals Office Contact Information*

Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240

Attn: FOIA/Privacy Act Appeals Office

Telephone: 202- 208-5339
Fax: 202-208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770

Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA & Privacy Act Appeals Officer.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.** If you have questions relating to this response, please contact Ms. Pat Ford, Division of Scientific Authority, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (phone: 703-358-2494; e-mail: patricia_ford@fws.gov).

Sincerely,

CARRIE
HYDE-
MICHAELS

Digitally signed by
CARRIE HYDE-MICHAELS
Date: 2018.12.11 11:01:31
-05'00'

Carrie Hyde-Michaels
FWS FOIA Officer



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041



IN REPLY REFER TO:
FWS-2019-00159

March 4, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 17, 2018 and received October 15, 2018, for the following information:

> "....1) The OPA is also requesting all information, relating to the approval of permits for consortium/cooperative breeding agreements.
>
> 1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species."

Per the electronic email of November 19, 2018, you narrowed/clarified the request to *"will limit its requests to the time period since 10/05/2016 - 11/01/2018. Agreement letters would be acceptable. A spreadsheet would also be acceptable if it lists all submitted requests and their outcomes within the proposed period, as well as processing times. The OPA would also like to know whether the cooperative breeding agreements ultimately approved by the Service resulted from negotiated agreements or were approved as submitted. Also requested are any non-publically available guidance related to how the Service decides to approve such agreements. The information requested is limited to agreements for approval of CITES Appendix 1 species."*

We have enclosed 29 pages of records responsive to your FOIA request, which we are releasing to you in part. Portions of these materials are being withheld under FOIA Exemption 6; See *5 U.S.C. § 552 (b)(6)*.

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).   We are withholding 4 pages in part under Exemption 6.

The phrase "similar files" covers any agency records containing information about a particular individual that can be identified as applying to that individual.  To determine whether releasing records containing information about a particular individual would constitute a clearly unwarranted invasion of personal privacy, we are required to balance the privacy interest that would be affected by disclosure against any public interest in the information.

Under the FOIA, the only relevant public interest to consider under the exemption is the extent to which the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.  The burden is on the requester to establish that disclosure would serve the public interest.  When the privacy interest at stake and the public interest in disclosure have been determined, the two competing interests must be weighed against one another to determine which the greater result of disclosure is: the harm to personal privacy or the benefit to the public.  The purposes for which the request for information is

made do not impact this balancing test, as a release of information requested under the FOIA constitutes a release to the general public.

The information that has been withheld under Exemption 6 consists of personal information such as mailing street addresses and zip codes; we have determined that the individuals to whom this information pertains have a substantial privacy interest in withholding it. Additionally, you have not provided information that explains a relevant public interest under the FOIA in the disclosure of this personal information and we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties. Because the harm to personal privacy is greater than whatever public interest may be served by disclosure, release of the information would constitute a clearly unwarranted invasion of the privacy of these individuals and we are withholding it under Exemption 6.

We reasonably foresee that disclosure would harm an interest protected by one or more of the nine exemptions to the FOIA's general rule of disclosure.

Carrie Hyde-Michaels, FWS FOIA Officer, is responsible for this partial denial. Larry Mellinger and Russell Husen, Attorney-Advisors, in the Office of the Solicitor were consulted.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request and there is no need for us to address your request for a fee waiver.

You may appeal this response to the U.S. Department of Interior's (Department) FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email. All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the U.S. Fish and Wildlife Service's (USFWS) response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS's response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

DOI FOIA/Privacy Act Appeals Office Contact Information
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240
Attn: FOIA/Privacy Act Appeals Office

Telephone: (202) 208-5339
Fax: (202) 208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA and Privacy Act Appeals Officer.  You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.**  If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703-358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

CARRIE HYDE-
MICHAELS

Digitally signed by
CARRIE HYDE-MICHAELS
Date: 2019.03.01
15:41:31 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer

Attached



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA  22041-3803

IN REPLY REFER TO:
FWS/DMA/CB004

JAN 2 3 2018

Ms. Bethany McMartin
(b) (6)
Port Angeles, Washington (b) (6)

Dear Ms. McMartin:

This letter is formal notification that your application for renewal of the Washington Falconers Association Cooperative Breeding Program (CB004) under the Wild Bird Conservation Act of 1992, dated December 8, 2016, has been approved under 50 CFR Section 15.26, as outlined below.  This approval will be effective for two (2) years from the date of this letter.  Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program.

We are denying your request to include Gary Maul as a member in the request dated December 17, 2014, as sufficient documentation has not been provided.  In your e-mail dated October 5, 2017, you have stated that Gary Maul is a non-member.  According to information you provided, Gary Maul is in possession of birds in violation of the conditions for this cooperative and these birds need to be returned to approved members of the cooperative.  **Please respond within sixty days of the date of this letter regarding the disposition of the program birds in his possession.  Failure to comply with our request may jeopardize the continued approval for this cooperative.**

We are approving your request in your letter dated September 24, 2017, to transfer five Aplomado falcons (Peru Band #'s 209, 226, 238, 352, 469) to Robert Probst.  We also are approving your request to transfer four Aplomado falcons (Peru Band #'s 071, 074, 085, 179) in your later dated November 26, 2017, to James Seaman.  We find that your reasons for wishing to remove these nine birds from the cooperative breeding program (i.e., age) are justified, and therefore, we approve your request.

**Cooperative Breeding Program Name:** Washington Falconers Association Cooperative Breeding Program

**Oversight Organization:** Washington Falconers Association

**Cooperative breeding program application #:** CB004

Ms. Bethany McMartin                                                                                     2

**Species:** Eurasian sparrowhawk (*Accipiter nisus*), northern goshawk (*Accipiter gentilis*), aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*), Barbary falcon (*Falco pelegrinoides)* (synonymous with *Falco peregrinus babylonicus*), ornate hawk-eagle (*Spizaetus ornatus*).

**Program Members**: Lester Boyd, Brian Sullivan, Jim Nelson, Barry Ollette, Doug Alton, Dan Pike, Ron Tokar, Chuck Arnold, Brad Wood, Danny Ertsgaard, Matthew Mitchell, Wayne Lippert, Dave Knutson, Jeff Rossey, Geoff Hirschi, Bill Meeker, Brad Felger, Dave Baker, Gregg Zerbe, Dennis Grisco, Thomas Coulson, Jennifer Coulson, Bill Murphy, John Brenan, Jim Adamson, Troy Morris, Jim Ingram, Tim Hickok, Connie Stanger, Jeff Novak, Christopher Lynn, Jimmy Bathke, Jason Hausman, Raul Ramirez, Keith Hix, Darryl Perkins, Jeff Kisak, Patrick Rummins, Joe Terry, Justin Rondeau, Bethany Rondeau, and Justin Stoval.

**Falconry Members**: Harry McElroy, Tom Gleason, Aaron Smith, Jeremy Roselle, Cliff Robinson, Randy Landis, Phil Smith, Simone Cook, and Marilyn Musser.

This approval is subject to the general conditions below **and** the conditions in the enclosed Division of Scientific Authority finding. We have determined that all of the issuance criteria contained in 50 CFR Section 15.26 have been met, therefore amendment of this program has been granted.

Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15.

**Conditions:** Please be aware that, since *Falco pelegrinoides* is listed in Appendix 1 of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of that species may only be imported for commercial purposes from a CITES-registered breeding operation. Also, Migratory Bird Treaty Act (MBTA) authorization is required in order to import, possess, and sell specimens of *Falco femoralis femoralis*, *Falco femoralis pichinchae*, *Accipiter gentilis*, and *Falco pelegrinoides*. Additional information on the MBTA can be found at http://www.fws.gov/migratorybirds/.

All birds imported for this cooperative breeding program must remain within a Service-approved cooperative breeding program for these species unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the

Ms. Bethany McMartin                                                                                              3

oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application of May 10, 1994. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your program, you must submit a written request to this office and provide several years of breeding records for each proposed individual. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals to whom specimens will be loaned for any purpose, including falconry, must become members of the cooperative breeding program. You may designate them as non-breeding members. To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., falconry permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for non-breeding members.

The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the U.S. Fish and Wildlife Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles the members of this cooperative breeding program who are listed above as Program Members to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR 15.11. Enclosed you will find an application to import birds under an approved cooperative breeding program. Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

Ms. Bethany McMartin                                                            4


If you have any questions regarding this renewal, please feel free to contact Biologist Clifton A. Horton of this office at: 5275 Leesburg Pike, Falls Church, VA 22041-3803; telephone 703-358-1908; email: clifton_horton@fws.gov.

Sincerely,

*L. S. Noguchi*

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority


Enclosure

WILD BIRD CONSERVATION ACT
RECORD OF FINDINGS ON APPLICATION
FOR APPROVAL OF COOPERATIVE BREEDING PROGRAM
U. S. FISH & WILDLIFE SERVICE

<u>Application number:</u> CB004 (PRT# 14694C)      <u>Applicant:</u> Bethany McMartin Rondeau

<u>Oversight Organization:</u>   Washington Falconers Association (WFA)

| <u>Previously Approved Species:</u> | <u>Specimens approved:</u> |
|---|---|
| European sparrowhawk (*Accipiter nisus*) | 4.4 |
| Red-naped shaheen (*Falco peregrinus babylonicus*) | 6.6 |
| Ornate Hawk-eagle (*Spizaetus ornatus*) | 10.10 |
| European goshawk (*Accipiter gentilis*) | 15.15 |
| Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*) | 20.20 (combined) |

<u>Background:</u>

The original request for establishing Cooperative Breeding Program (CBP) #004 was first approved on November 29, 1994, for European sparrowhawk (*Accipiter nisus*) and European goshawk (*Accipiter gentilis*). Subsequent amendments to the cooperative breeding program included the addition of three species: Red-naped shaheen (*Falco peregrinus babylonicus*), Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*), and Ornate Hawk-eagle (*Spizaetus ornatus*). According to Wild Bird Conservation Act of 1992 implementing regulations (50 CFR Section 15.26, paragraph (e)), cooperative breeding programs are approved for two years, at which time applicants may apply to the Service for renewal of a program's approval. CB004 was renewed on December 11, 1995, December 8, 1998, February 13, 2002, August 3, 2004, December 21, 2006, May 1, 2009, August 1, 2011, and May 14, 2014. However, the CBP did not submit an application to renew the program's approval prior to the May 14, 2016, expiration date, at which point the previously issued approval expired. As a result, the applicant, Ms. Bethany McMartin Rondeau, was requested to submit an application to establish a new CBP, which she did on December 9, 2016. Ms. McMartin Rondeau is the Lead Cooperator for this cooperative breeding program (CBP).

According to the applicant, the purpose of the CBP is to establish and maintain a viable captive breeding population of native and non-native raptors. To accomplish this goal, the CBP expects cooperation among multiple breeders for each of the species being maintained. The Washington Falconers Association (WFA) has established three classes of CBP membership through their administrative policies (included with application):

- <u>Active Breeding Members</u>: consists of licensed and experienced raptor propagators who have been approved by six affirmative votes of the WFA Board admission. Active breeding members vote of the admission of new breeding members and on other CBP affairs.

- Inactive Breeding Members: consists of active breeding members who are no longer actively participating in the CBP. These members are not authorized to import raptors through the CBP, cannot request new species be added to the approved list, and cannot vote on CBP affairs including admission of new members.
- Non-breeding Members: consists of licensed falconers and others with legal authorization to possess Migratory Bird Treaty Act (MBTA) protected birds of prey who may receive CBP raptors on long term loan so they can be exercised through falconry or other means in preparation for their use in the CBP.

The WFA CBP policy guidelines state that individuals wishing to be added to the CBP must submit to the chair of the CBP all paperwork that is required by the Service for adding new CBP members. Once the WFA receives the required documents, the CBP permit co-coordinator and the president of the WFA draft and jointly sign a letter to the Service indicating that the applicant has been approved by the WFA. All required materials are then submitted to Service for final approval.

Current Status of the Program:

The CBP application currently includes a list of WFA CBP Approved Breeders and non-voting Falconry members. The following individuals were previously approved as members of the cooperative breeding program (CB004):

*Program Members*: Lester Boyd, Brian Sullivan, Jim Nelson, Barry Ollette, Doug Alton, Dan Pike, Ron Tokar, Chuck Arnold, Brad Wood, Danny Ertsgaard, Matthew Mitchell, Wayne Lippert, Dave Knutson, Jeff Rossey, Geoff Hirschi, Bill Meeker, Brad Felger, Dave Baker, Gregg Zerbe, Dennis Grisco, Thomas Coulson, Jennifer Coulson, Bill Murphy, John Brenan, Jim Adamson, Troy Morris, Jim Ingram, Tim Hickok, Connie Stanger, Jeff Novak, Christopher Lynn, Jimmy Bathke, Jason Hausman, Raul Ramirez, Keith Hix, Darryl Perkins, Jeff Kisak, Patrick Rummins, Joe Terry, Justin Rondeau, Bethany Rondeau, and Justin Stovall.

*Falconry Members*: Harry McElroy, Tom Gleason, Aaron Smith, Jeremy Roselle, Cliff Robinson, Randy Landis, Phil Smith, Simone Cook, and Marilyn Musser.

The applicant reported the following information regarding CBP imported birds, breeding success, mortalities, and disposition of birds:

| Species | Total Quantity Approved for Import | Total Quantity Imported under the CBP (to date) | Offspring produced (F1) | Mortalities | Disposition of Birds |
|---|---|---|---|---|---|
| European sparrowhawk (*Accipiter nisus*) | 4.4 | 5 | 2002-2004: 12 offspring 2005-2006: eggs only | 3 imported birds died (1 in quarantine, 2 killed by mate) 2 F1 died (killed by mate) | 2 imported birds retained Remaining birds transferred to CB005 in 2006; Currently no birds in CB004 |

| Species | Total Quantity Approved for Import | Total Quantity Imported under the CBP (to date) | Offspring produced (F1) | Mortalities | Disposition of Birds |
|---|---|---|---|---|---|
| Red-naped shaheen (*Falco peregrinus babylonicus*) | 6.6 | 7 | 2001-2017: 51 offspring | 4 imported died (old age)<br><br>2 F1 died (1 from heatstroke, 1 from owl predation)<br><br>1 F1 lost | 3 imported retained<br><br>24 F1 and F2 retained, 21 transferred outside CBP |
| Ornate Hawk-eagle (*Spizaetus ornatus*) | 10.10 | 1.0 (1) | 2007-2017: 21 eggs; no offspring | | 1 imported retained |
| European goshawk (*Accipiter gentilis*) | 15.15 | 17 | 2001-2017: 37 offspring | 3 imported birds killed by mate, 1 lost, 1 killed by raccoon, 1 died of old age.<br><br>8 F1 died: 2 aspergillosis, 1 from carbon monoxide, 1 from window strike, 1 sour crop, 1 horned owl predation, 1 raccoon predation. | 8 imported retained, 2 non-breeding birds moved (approval was requested from DMA)<br><br>15 F1 retained, 12 moved outside program<br><br>1 imported and 1 F1 moved to CBP014 |
| Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*) | 20.20 | 20.21 (41) | 2002-2017: 444 offspring | 16 imported died, 1 lost<br><br>[see table included in applicant's additional response for F1 data] | 21 imported retained, 3 removed from CBP due to inability to breed (all received approval from DMA)<br><br>[see table included in applicant's additional response for F1 data] |

## Species Information:

**European sparrowhawk (*Accipiter nisus*):**  The Eurasian sparrowhawk has a very broad distribution throughout Eurasia and Africa.  This species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016a).  It was listed in CITES

Appendix II in 1977 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017). The European population is estimated at 403,000-582,000 pairs, which is roughly 805,000-1,160,000 mature individuals (BirdLife International 2016a). Europe forms approximately 36% of the global range and a preliminary estimate of the global population size is 2,240,000-3,220,000 mature individuals, although further validation of this estimate is needed. The population trend at present appears stable (BirdLife International 2016a). Historically, widespread persecution, especially from gamekeepers, in the 20th century caused large numbers of the birds to be killed (del Hoyo *et al.* 1994; Ferguson-Lees and Christie 2001). Sharp declines in Europe in the 1950s-1960s were driven by the use of harmful organochlorine pesticides, which causes direct mortality of adults as well as reduced breeding success. The species is still trapped by the thousands annually in Turkey, where it is used by falconers, but habitat alteration is thought to be the major contemporary threat (del Hoyo *et al.* 1994). It is also highly vulnerable to the impacts of potential wind energy developments (Strix 2012). Ingestion of prey containing lead shot is an additional threat (BirdLife International 2016a).

According to the CITES trade database, there were 35 live *Accipiter nisus* in trade between 2006 and 2016 as reported by importing countries (66 reported by exporting countries). Of those, 23 were sourced from the wild (27 as reported by exporters) (UNEP-WCMC 2017b).

**Red-naped shaheen (*Falco peregrinus babylonicus*):** The Red-naped shaheen, or Barbary falcon, is one of ~19 currently recognized subspecies of Peregrine falcon (White *et al.* 2017; White *et al.* 2013). *Falco peregrinus babylonicus* is distributed in central Asia from eastern Iran to Mongolia (White *et al.* 2017). The global population of the nominate species is estimated at c.140,000 individuals which equates to 93,300 mature individuals. The European population is estimated at 14,900-28,800 pairs, which equates to 29,700-57,600 mature individuals (BirdLife International 2016c). Europe forms approximately 13% of the global range, so a preliminary estimate of the global population size is 228,000-443,000 mature individuals, although further validation of this estimate is needed (BirdLife International 2016c). Over the last 100 years, the species has suffered severe population declines due to persecution (19th and 20th centuries), and drastically reduced reproduction and increased mortality of adults associated with pesticide contamination. The species is also used extensively in falconry although the impact of this activity on population numbers is unknown (Ferguson-less and Christie 2001; BirdLife International 2016c). The global population is currently thought to be stable (BirdLife Interanational 2016c).

*Falco peregrinus babylonicus* was listed in CITES Appendix I in 1975. On a species level, *Falco peregrinus* was listed in Appendix I in 1977 (UNEP-WCMC 2017a). *Falco peregrinus* is listed as Least Concern on the IUCN Redlist, while the subspecies *F. p. babylonicus* does not have a unique IUCN listing.

According to the CITES trade database, between 2006 and 2016 there were 26 live *F. p. babylonicus* registered in trade by importing countries (42 recorded by exporting countries). All individuals were reported as captive-bred (UNEP-WCMC 2017).

**Ornate Hawk-eagle (*Spizaetus ornatus*):** The Ornate hawk-eagle is a neotropical endemic distributed from Mexico to Paraguay and northern Argentina (BirdLife International 2016e). The species is also found on Trinidad and Tobago (Canuto 2008). There are two currently recognized subspecies: *S. o. ornatus*, which is restricted to South America (Northern Columbia to northern Argentina); and *S. o. vicarious*, from Central America to northern Columbia and Ecuador (Ferguson-Lees and Christie 2001).

The Ornate hawk-eagle is typically a bird of dense forest although observations have been made in dry forest as well (Cerqueira *et al.* 2015). In Brazil, the species has declined in areas of heavy deforestation and it is known to have also declined in Argentina (BirdLife 2016e). Recent surveys in Mexico suggest that the Ornate hawk-eagle may be increasingly rare due to tropical deforestation and poaching (de Labra *et al.* 2013), and the species appears to be very sensitive to habitat fragmentation, edges and human presence (Canuto 2008).

Although population numbers throughout the species entire range have not been quantified, population estimates exist throughout parts of its range. In one forest site in French Guiana, density was estimated at 13 individuals/10,000 hectare (ha) (del Hoyo *et al.* 1994). In Petén, Guetemala, density was estimated at ten nests per 100 square kilometers (km$^2$) and a total of c. 50 pairs in Tikal National Park (Bierregaard *et al.* 2016b).

*Spizaetus ornatus* was listed in CITES Appendix II in 1979 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017a). *S. ornatus* was recently uplisted to 'Near Threatened' on the IUCN Red List (BirdLife International 2016e). Based on a model of future forest loss in the Amazon basin (40% loss of the species' habitat), coupled with past habitat loss and ongoing persecution, it is suspected that the population of this species may decline by 25-30% over the next three generations (Bird *et al.* 2011; BirdLife International 2016e).

According to the CITES trade database, between 2006 and 2016 there were 9 live *S. ornatus* in international trade as reported by importing countries (23 recorded by exporting countries). All were reported as captive-bred (UNEP-WCMC 2016b).

**European goshawk (*Accipiter gentilis*):** The European goshawk is distributed widely throughout North America, Europe, northern Asia and parts of South and Southeast Asia (Orta & Marks 2017). This species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016b). It was listed in CITES Appendix II in 1977 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017a). The current population trend is unknown (BirdLife International 2016b). The European population is estimated at 166,000-220,000 pairs, which equates to 332,000-440,000 mature individuals. Europe forms approximately 26% of the global range and an estimate of global population size is 1,280,000-1,690.000 mature individuals, although further validation of this estimate is needed (BirdLife International 2016b). Significant declines in Europe in the 19th-20th centuries are thought to have resulted from persecution and deforestation, with later declines in the 1950s-1960s a result of poisoning from pesticides and heavy metals. Persecution continues to be a threat, as is nest robbing for falconry (Orta & Marks 2014). The species is also highly vulnerable to the impacts of potential wind farm developments (Strix 2012).

According to the CITES trade database, between 2006 and 2016 there were 1,136 live *Accipiter gentilis* reported in trade by importing countries (1266 reported by exporting countries).  Of those, 320 were wild caught (382 as recorded by exporting countries) (UNEP-WCMC 2017b).

**Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*):**  There are three recognized subspecies of Aplomado falcon with the following distributions (Bierregaard *et al.* 2017):

- *F. f. septentrionalis*: Northern Mexico and south locally to Guatemala.
- *F. f. femoralis*: Southeast Honduras and northeast Nicaragua; Panama; Colombia east to the Guianas, and south through eastern Bolivia and Brazil to Argentina, extending south to Tierra del Fuego.
- *F. f. pichinchae*: Temperate zones of southwest Colombia, Ecuador, Peru and western Bolivia south to central Chile and northwest Argentina (Tucumán).

As a whole the species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016c).  The species was listed in CITES Appendix II in 1975 as part of a broader family listing for Falconidae (UNEP-WCMC 2017a).  Although the population globally is suspected to be in decline, populations in some regions may be increasing due to deforestation and the opening up of new grassland habitat. However, more data is needed (Bierregard *et al.* 2017).  For poorly understood reasons, the species was virtually eliminated in the southern United States and in northern Mexico with declines potentially starting at the turn of the 20th century (Bierregard *et al.* 2017).

According to the CITES trade database, between 2006 and 2016,  there were 172 live *F. femoralis* in trade as reported by importing countries (221 reported by exporting countries); all were reported as captive-bred (except for 2 reported by exporting countries) (UNEP-WCMC 2017b).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Findings relevant to issuance criteria of 50 CFR 15.26:

CB004 has been an approved cooperative breeding program since 1994.  The applicant was requested to submit an application to establish a new CBP because their previously issued approval had expired without the program submitting an application to renew their approval prior to the expiration date.

We previously found that this cooperative breeding program met all of the criteria necessary for approval.  Based on the summary report included with the application, as well as additional information submitted by Bethany McMartin Rondeau, Lead Cooperator, on activities conducted under the Cooperative Breeding Program and since no major changes to the CBP have been requested by the applicant, we believe that the program continues to fulfill the purposes of the Wild Bird Conservation Act and meet the criteria for approval.

Overall, the program has been able to successfully produce progeny from four of the raptor species the CBP has previously imported, as well as achieve egg production with an imported male Ornate hawk-eagle (*Spizaetus ornatus*).  In addition, according to the applicant, the program

has been working with other Service-approved cooperative breeding programs for European goshawk, European sparrowhawk, and Red-naped shaheens.

Therefore, we recommend approval of this application with the following conditions:

1. Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

2. Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed. Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program. With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a bird produced in a cooperative breeding program, the bird must be made available to other Service-approved programs for the species.

3. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. If the individuals do not plan to breed the specimens, the lead cooperator may designate these individuals as non-breeding members. To include these individuals in an approved cooperative breeding program, the lead cooperator must provide the Division of Management Authority with their names, contact information, and qualifications. In contrast to program members who will be undertaking breeding, we will not require a letter of endorsement from the oversight organization for non-breeding members.

4. Individuals who will be engaged in breeding birds may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add an individual to the program, the lead cooperator must submit a written request to the Division of Management Authority and provide several years of breeding records for the proposed individual. In addition, the oversight organization specified in the cooperative breeding program application must submit written notification indicating that the individual has met the established criteria for acceptance into the cooperative breeding program, as specified in the application for approval.

5. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. Each program member must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, the cooperative breeding program must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, the cooperative breeding program must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be submitted when the lead cooperator requests the renewal of the cooperative breeding program or upon request of the Division of Management Authority.

6. For cooperative breeding programs that include species listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of those species may only be imported for commercial purposes from a CITES-registered breeding operation. A directory of CITES-registered breeding operations, including U.S. operations, can be found at http://www.cites.org/common/reg/e_cb.html. For those species covered under the U.S. Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess, and sell specimens of those species. Additional information on the MBTA can be found at http://www.fws.gov/migratorybirds/.

7. Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired. If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

- - -

## Literature Cited

Bierregaard, R.O., Jr & Kirwan, G.M. (2017). Aplomado Falcon (*Falco femoralis*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53230 on 28 August 2017).

Bird, J. P.; Buchanan, J. M.; Lees, A. C.; Clay, R. P.; Develey, P. F.; Yépez, I.; Butchart, S. H. M. (2011). Integrating spatially explicit habitat projections into extinction risk assessments: a reassessment of Amazonian avifauna incorporating projected deforestation. *Diversity and Distributions*: doi: 10.1111/j.1472-4642.2011.00843.x.

BirdLife International. (2016a) *Accipiter nisus*. The IUCN Red List of Threatened Species 2016: e.T22695624A93519953. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22695624A93519953.en; accessed on August 25, 2017.

BirdLife International. (2016b). *Accipiter gentilis*. The IUCN Red List of Threatened Species 2016: e.T22695683A93522852. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22695683A93522852.en; accessed on August 25, 2017.

BirdLife International. (2016c). *Falco peregrinus*. The IUCN Red List of Threatened Species 2016: e.T45354964A95143387. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T45354964A95143387.en; accessed on on August 28, 2017.

BirdLife International. (2016d). *Falco femoralis*. The IUCN Red List of Threatened Species 2016: e.T22696450A93562619. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22696450A93562619.en; accessed on August 28, 2017.

BirdLife International. (2016e). *Spizaetus ornatus*. The IUCN Red List of Threatened Species 2016: e.T22696197A93548774. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22696197A93548774.en; accessed on August 28, 2017.

Canuto, M. (2008) Observations of two Hawk-Eagle species in a humid lowland tropical forest reserve in central Panama, *Journal of Raptor Research*, 42(4):287-292.

Cerqueira, Pablo Vieira, et al. (2015) First record of the ornate Hawk-Eagle (*Spizaetus ornatus*) from the Brazilian Caatinga. *The Wilson Journal of Ornithology*, 127(1):153.

del Hoyo, J.; Elliott, A.; Sargatal, J. (1994). *Handbook of the Birds of the World, vol. 2: New World Vultures to Guineafowl*. Lynx Edicions, Barcelona, Spain.

de Labra, M.A., Escalante, P., Monterrubio-Rico, T. (2013). Diurnal raptors in los Tuxtlas Biosphere Reserve, Mexico: Current presence and relative abundance, *Journal of Raptor Research*, 47(4):392-399.

Ferguson-Lees, J. and Christie, D.A. (2001). *Raptors of the world*. Christopher Helm, London.

Orta, J. & Marks, J.S. (2017). Northern Goshawk (*Accipiter gentilis*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53089 on August 25, 2017).

STRIX (2012). Developing and testing the methodology for assessing and mapping the sensitivity of migratory birds to wind energy development. BirdLife International, Cambridge.

UNEP-WCMC (2017a). United Nations Monitoring Programme-World Conservation Monitoring Centre. Accessed 28 August 2017. UNEP-WCMC Species+ Database: CITES-Listed

Species.

UNEP-WCMC (2017b). United Nations Monitoring Programme-World Conservation Monitoring Centre. Accessed 28 August 2017. UNEP-WCMC Species Database: CITES trade database.

White, C.M., Christie, D.A., de Juana, E. & Marks, J.S. (2017). Peregrine Falcon (*Falco peregrinus*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53247 on 28 August 2017).

White, C., Sonsthagen, S., Sage, G., Anderson, C., & Talbot, S. (2013). Genetic relationships among some subspecies of the Peregrine Falcon (Falco peregrinus L.), inferred from mitochondrial DNA control-region. *The Auk,*130(1), 78-87. doi:10.1525/auk.2012.11173

- - -

Monica A. Norton 11/14/2017
Monica A. Horton
Biologist (CITES Specialist)
Division of Scientific Authority

Eleanora Babij 11/14/17
Eleanora Babij, Ph.D.
Chief, Branch of Consultation and Monitoring
Division of Scientific Authority



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240



FEB 17 2017

IN REPLY REFER TO:
FWS/DMA/CB030

David Kanellis

Las Vegas, Nevada (b) (6)

Dear Mr. Kanellis:

This letter is formal notification that your application for renewal of the Raptor Cooperative Breeding Program (CB030) under the Wild Bird Conservation Act of 1992 (WBCA), dated September 25, 2016, has been approved under 50 CFR Section 15.26, as outlined below. This approval will be effective for two (2) years from the date of this letter. Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15. This letter also serves as official notification that Joel Knutson, Rebecca O'Connor, Nicole Perretta, and Charles Browning have been added as falconry members and Shane U. Phitides and Edward Elguezabal have been removed as falconry members of CB030.

**Cooperative Breeding Program Name:** Raptor Cooperative Breeding Program

**Oversight Organization:** California Hawking Club

**Cooperative breeding program application #:** CB030

**Species:** black goshawk (*Accipiter melanoleucus*), Eurasian (European) sparrowhawk (*Accipiter nisus*), Lanner falcon (*Falco biarmicus*), saker falcon (*Falco cherrug*), red-necked falcon (*Falco chicquera*), African hawk-eagle (*Hieraaetus spilogaster*), African fish-eagle (*Haliaeetus vocifer*), African crowned eagle (*Stephanoaetus coronatus*), Northern goshawk (*Accipiter gentilis*), Steppe eagle (*Aquila nipalensis*), Verreaux's eagle (*Aquila verreauxii*), Martial eagle (*Polemeatus bellicosus*), ornate hawk-eagle (*Spizaetus ornatus*), Bonelli's eagle (*Hieraaetus fasciatus*), African goshawk (*Accipiter tachiro*), Eurasian eagle-owl (*Bubo bubo*), Ural owl (*Strix uralensis*), Peregrine falcon *(Falco peregrinus)*

**Program Members:** Stuart Rossell, Randy Landis, Sonny (Donald) Squiciarino, Mark Moglich, David Kanellis, Martin Stiasny, Bill Murphy, Robert F. Kennedy, Jr., William G. Meeker, Gary D. Boberg, Ryan Moglich, Lewis R. Souder, Los Angeles Zoo

**Falconry Members:** Ronald E. Brown, Lew Souder, Steve Layman, Jim Tigan, Vasken Kevorkian, Vince Piccioni, Civon Gewelber, John Pallavicini, Ryan Moglich, Margaret D.

Mr. David Kanellis                                                                                            2

Cullen, Duane Zobrist, Duane Zobrist Jr., Thomas J. Cullen IV, Michael J. Clark, Vang Vang, Titus Plomaritis Jr., Chase Delles, Gary D. Boberg, Anthony C. Suffredini, Corey J. Dalton, David Myers, Joel Knutson, Rebecca O'Connor, Nicole Perretta, Charles Browning

**Expiration Date:** February 17, 2019

**Conditions**:

All birds imported for this cooperative breeding program must remain within a Service-approved cooperative breeding program for these species and may not be loaned, sold or transferred for any reason unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your program, you must submit a written request to this office and provide several years of breeding records for each proposed individual. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals, to whom specimens will be loaned for any purpose, must become members of the cooperative breeding program. You may designate individuals who will not be breeding birds as non-breeding members. To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., FWS migratory bird permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for non-breeding members.

All individuals of the cooperative breeding program must maintain records of all birds that come into their possession through the cooperative breeding program. These records must be made available to the U.S. Fish and Wildlife Service upon our request. All imported birds must meet

Mr. David Kanellis                                                                                                          3

all United States import requirements. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the U.S. Fish and Wildlife Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles members of this cooperative breeding program who are listed above as Program Members, to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR Section 15.11. Please be aware that 50 CFR Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this part that violates a condition of said permit.* Enclosed you will find an application to import birds under an approved cooperative breeding program. Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

If you have any questions regarding this renewal, please feel free to contact Biologist Clifton A. Horton of this office at: 5275 Leesburg Pike, Falls Church, VA 22041-3803; telephone 703-358-1908; email: clifton_horton@fws.gov.

Sincerely,

For

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosure



# United States Department of the Interior



### FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA 22041-3803

IN REPLY REFER TO:
FWS/DMA//CB030

**OCT 1 9 2018**

David Kanellis
(b) (6)
Las Vegas, Nevada (b) (6)

Dear Mr. Kanellis:

This letter is formal notification that your application for renewal of the Raptor Cooperative Breeding Program (CB030) under the Wild Bird Conservation Act of 1992 (WBCA), dated February 24, 2018, has been approved under 50 CFR Section 15.26, as outlined below. This approval is subject to the general conditions **and** the Division of Scientific Authority conditions below. This approval will be effective for two (2) years from the date of this letter, and replaces the current approval letter dated February 17, 2017, which is no longer valid. Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15. This letter also serves as official notification that Rebecca Searle, Justin Searle, Troy D. Taylor, Lauren McGough, Steve Hoddy, Adam Chavez, David Dixon, and Erland Renslo have been added as falconry members of CB030, and that your request to amend the quantities of previously approved species under the cooperative breeding program has been approved as follows:

| | |
|---|---|
| Black goshawk (*Accipiter melanoleucus*) | 15.15 |
| Eurasian (European) sparrowhawk (*Accipiter nisus*) | 15.15 |
| Lanner falcon (*Falco biarmicus*) | 11.11 |
| Saker falcon (*Falco cherrug*) | 15.15 |
| Northern goshawk (*Accipiter gentilis*) | 15.15 |
| African crowned eagle (*Stephanoaetus coronatus*) | 10.10 |
| Eurasian eagle-owl (*Bubo bubo*) | 10.10 |

Cooperative Breeding Program Name: Raptor Cooperative Breeding Program

Oversight Organization: California Hawking Club

Cooperative breeding program application #: CB030

Mr. David Kanellis                                                                                   2

Species: black goshawk (*Accipiter melanoleucus*), Eurasian (European) sparrowhawk (*Accipiter nisus*), Lanner falcon (*Falco biarmicus*), saker falcon (*Falco cherrug*), red-necked falcon (*Falco chicquera*), African hawk-eagle (*Hieraaetus spilogaster*), African fish-eagle (*Haliaeetus vocifer*), African crowned eagle (*Stephanoaetus coronatus*), Northern goshawk (*Accipiter gentilis*), Steppe eagle (*Aquila nipalensis*), Verreaux's eagle (*Aquila verreauxii*), Martial eagle (*Polemeatus bellicosus*), ornate hawk-eagle (*Spizaetus ornatus*), Bonelli's eagle (*Hieraaetus fasciatus*), African goshawk (*Accipiter tachiro*), Eurasian eagle-owl (*Bubo bubo*), Ural owl (*Strix uralensis*), Peregrine falcon (*Falco peregrinus*)

Program Members: Stuart Rossell, Randy Landis, Sonny (Donald) Squiciarino, Mark Moglich, David Kanellis, Martin Stiasny, Bill Murphy, Robert F. Kennedy, Jr., William G. Meeker, Gary D. Boberg, Ryan Moglich, Lewis R. Souder, Los Angeles Zoo

Falconry Members: Ronald E. Brown, Steve Layman, Jim Tigan, Vasken Kevorkian, Vince Piccioni, Civon Gewelber, John Pallavicini, Margaret D. Cullen, Duane Zobrist, Duane Zobrist Jr., Thomas J. Cullen IV, Michael J. Clark, Vang Vang, Titus Plomaritis Jr., Chase Delles, Anthony C. Suffredini, Corey J. Dalton, David Myers, Joel Knutson, Rebecca O'Connor, Nicole Perretta, Charles Browning, Rebecca Searle, Justin Searle, Troy D. Taylor, Lauren McGough, Steve Hoddy, Adam Chavez, David Dixon, Erland Renslo

**General Conditions:** All birds imported for this cooperative breeding program must remain within a cooperative breeding program approved by the U.S. Fish and Wildlife Service (Service) for these species and may not be loaned, sold or transferred for any reason including breeding purposes unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your

Mr. David Kanellis                                                                                                  3

program, you must submit a written request to this office and provide several years of breeding records for each individual proposed. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. You may designate them as "non-breeding members." To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., FWS migratory bird permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for "non-breeding members."

All individuals of the cooperative breeding program must maintain records of all birds that come into their possession through the cooperative breeding program. These records must be made available to the Service upon our request. All imported birds must meet all U.S. import requirements. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

**Division of Scientific Authority Conditions:** Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed. Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program. With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a

Mr. David Kanellis                                                                                     4

bird produced in a cooperative breeding program, the bird must be made available to other
Service-approved programs for the species.

Individuals to whom specimens will be loaned for any purpose must become members of the
cooperative breeding program. If the individuals do not plan to breed the specimens, the lead
cooperator may designate these individuals as non-breeding members. To include these
individuals in an approved cooperative breeding program, the lead cooperator must provide the
Division of Management Authority with their names, contact information, and qualifications. In
contrast to program members who will be undertaking breeding, we will not require a letter of
endorsement from the oversight organization for non-breeding members.

Individuals who will be engaged in breeding birds may be added to the cooperative breeding
program provided that they have demonstrated breeding success with the same or similar species.
To add an individual to the program, the lead cooperator must submit a written request to the
Division of Management Authority and provide several years of breeding records for the
proposed individual. In addition, the oversight organization specified in the cooperative
breeding program application must submit written notification indicating that the individual has
met the established criteria for acceptance into the cooperative breeding program, as specified in
the application for approval.

The cooperative breeding program must maintain records containing the number, species, and
sex of all birds imported for the program, as well as dates of import, countries of origin, and
disposition of the imported birds. Each program member must also maintain a record of
breeding activity, including the number of eggs and progeny produced, and the disposition of any
progeny. Finally, the cooperative breeding program must maintain a record of mortality
experienced within the program that includes the location of the bird when it died and the cause,
if known. For birds that died in quarantine, the cooperative breeding program must obtain
documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office.
These records must be submitted when the lead cooperator requests the renewal of the
cooperative breeding program or upon request of the Division of Management Authority.

For cooperative breeding programs that include species listed in Appendix I of the Convention
on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of
those species may only be imported for commercial purposes from a CITES-registered breeding
operation. A directory of CITES-registered breeding operations, including U.S. operations, can
be found at Register of Captive-Breeding Operations
(http://www.cites.org/common/reg/e_cb.html). For those species covered under the U.S.
Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess,
and sell specimens of those species. Additional information on the MBTA can be found at
MBTA (http://www.fws.gov/migratorybirds/).

Mr. David Kanellis                                                                                         5

Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired.  If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

This notice entitles members of this cooperative breeding program who are listed above as Program Members, to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR Section 15.11.  Please be aware that 50 CFR Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this part that violates a condition of said permit.*  Enclosed you will find an application to import birds under an approved cooperative breeding program.  Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

Please feel free to direct any inquiries regarding this matter to Biologist Clifton A. Horton of this office at:  5275 Leesburg Pike, MS-IA, Falls Church, VA 22041; telephone 703-358-1908; email: clifton_horton@fws.gov.

Sincerely,

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosure

 

# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA  22041-3803

**APR 1 8 2018**

IN REPLY REFER TO:
FWS/DMA//CB040

Mr. John Aynes
(b) (6)
Oklahoma City, Oklahoma (b) (6)

Dear Mr. Aynes:

This letter is formal notification that your application for renewal of the Cooperative Breeding Program (CBP) for Captive Breeding Program for African Grey Parrots (CB040) under the Wild Bird Conservation Act of 1992 (WBCA), dated January 4, 2018, has been approved under 50 CFR Section 15.26, as outlined below.  This approval is subject to the general conditions below **and** the conditions in the enclosed Division of Scientific Authority finding.  This approval will be effective for two (2) years from the date of this letter.  Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15.

**Cooperative Breeding Program Name:**  Captive Breeding Program for African Grey Parrots

**Oversight Organization:**  Zoological Association of America (ZAA)

**Cooperative Breeding Program #:**  CB040

**Species:**  African grey parrot (*Psittacus erithacus*) and Cape parrot (*Poicephalus robustus*)

**Program Members:**  John Aynes, Susan Clubb, Walter Frey

**General Conditions:** All birds imported for this cooperative breeding program must remain within a cooperative breeding program approved by the U.S. Fish and Wildlife Service (Service) for these species and may not be loaned, sold or transferred for any reason including breeding purposes unless otherwise authorized by this office.  An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed.  Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species.  To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how

Mr. John Aynes                                                                                      2

the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your program, you must submit a written request to this office and provide several years of breeding records for each individual proposed. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. You may designate them as "non-breeding members." To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., FWS migratory bird permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for "non-breeding members."

All individuals of the cooperative breeding program must maintain records of all birds that come into their possession through the cooperative breeding program. These records must be made available to the Service upon our request. All imported birds must meet all U.S. import requirements. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles members of this cooperative breeding program who are listed above as Program Members, to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR Section 15.11. Please be aware that 50 CFR Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this part that violates a condition of said permit.* Enclosed you will find an application to import birds

Mr. John Aynes                                                                    3

under an approved cooperative breeding program.  Please be advised that the estimated
processing time for these import permit applications is sixty (60) days.

Please feel free to direct any inquiries regarding this matter to Biologist Clifton A. Horton o᷄ this
office at: 5275 Leesburg Pike, MS-IA, Falls Church, VA 22041; telephone 703-358-1908; e᷄ail:
clifton_horton@fws.gov.

Sincerely,

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosures

WILD BIRD CONSERVATION ACT
RECORD OF FINDINGS ON APPLICATION
FOR APPROVAL OF COOPERATIVE BREEDING PROGRAM
U. S. FISH & WILDLIFE SERVICE

**\*\*Renewal\*\***

Application number: CB040 (PRT# 76975B)     Applicant: John Aynes

Oversight organization: Zoological Association of America (ZAA)

| Species: | Specimens approved: |
|---|---|
| African grey parrot (*Psittacus erithacus*) | 75.75 |
| Cape parrot (*Poicephalus robustus*) | 30.30 |

Background:

On January 10, 2018, the USFWS Division of Management Authority (DMA) received an application from Mr. John Aynes requesting renewal of CB040, the Captive Breeding Program for African Grey Parrots. Mr.Aynes is the Lead Cooperator for this cooperative breeding program (CBP).

The original request for establishing the Captive Breeding Program for African Grey Parrots (CB040) was approved on March 16, 2016, for 75.75 African grey parrot (*Psittacus erithacus*). A subsequent amendment was issued on May 25, 2016, with the addition of 30.30 Cape parrot (*Poicephalus robustus*).

Current Status of the Program:

The current members approved under this cooperative breeding program (CB040) include: John Aynes, Susan Clubb, and Walter Frey.

Below is a summary of the total number of birds imported under the Cooperative Breeding Program (CB040), at the time of this renewal request, as reported by the Lead Cooperator:

| Species Approved | Total Quantity Approved for Import | Total Quantity Imported under the CBP |
|---|---|---|
| African grey parrot (*Psittacus erithacus*) | 75.75 (150) | 75.75 (150) |
| Cape parrot (*Poicephalus robustus*) | 30.30 (60) | 0.0 (0) |

*Mortality*: In the renewal application and prior information submitted to the Service on September 26, 2016, Mr. Aynes indicated that there have been some mortalities of birds imported under the cooperative breeding program. Details for the reported mortalities are as follows:

- African grey parrot (*Psittacus erithacus*) – 6 deaths.  Two birds were deceased when they arrived into the United States from South Africa (the country of export), during the original import.  Three birds died while in quarantine.  One bird died, under the care of John Aynes, from flying into the wire in a large flight cage.

***Breeding:*** According to the Lead Cooperator, no eggs/hatchlings have been produced from imported birds due to the young age of the imported birds.  The program expects the imported birds to start breeding in the next couple of years.  In the meantime, the imported birds remain in flight cages to socialize until they are ready to breed.

***Cooperation with existing breeding programs:***  Although the applicant is not aware of an African grey parrot cooperative breeding program in the United States or internationally, he is aware of numerous individual breeders of the species.  The applicant states that he collaborates with many people around the world when information or advice is requested of him, not only for African grey parrots but also various cockatoo and other species.  Examples of recent communications with various individuals around the world regarding a range of topics including diet, husbandry, and facilities, were also provided by the applicant to demonstrate his willingness to assist whenever he can.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We previously found that this cooperative breeding program met all of the criteria necessary for approval.

Based on the summary report included with the renewal, as well as additional information submitted by John Aynes, Lead Cooperator, on activities conducted under the Cooperative Breeding Program, we believe that the program continues to fulfill the purposes of the Wild Bird Conservation Act and meet the criteria for approval.  Therefore, we recommend approval of this renewal application with the following conditions:

1. Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

2. Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed.  Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species.  To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program.  Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.  With regard to birds produced within the program, a sufficient number of offspring produced must be retained

within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a bird produced in a cooperative breeding program, the bird must be made available to other Service-approved programs for the species.

3. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. If the individuals do not plan to breed the specimens, the lead cooperator may designate these individuals as non-breeding members. To include these individuals in an approved cooperative breeding program, the lead cooperator must provide the Division of Management Authority with their names, contact information, and qualifications. In contrast to program members who will be undertaking breeding, we will not require a letter of endorsement from the oversight organization for non-breeding members.

4. Individuals who will be engaged in breeding birds may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add an individual to the program, the lead cooperator must submit a written request to the Division of Management Authority and provide several years of breeding records for the proposed individual. In addition, the oversight organization specified in the cooperative breeding program application must submit written notification indicating that the individual has met the established criteria for acceptance into the cooperative breeding program, as specified in the application for approval.

5. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. Each program member must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, the cooperative breeding program must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, the cooperative breeding program must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be submitted when the lead cooperator requests the renewal of the cooperative breeding program or upon request of the Division of Management Authority.

6. For cooperative breeding programs that include species listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of those species may only be imported for commercial purposes from a CITES-registered breeding operation. A directory of CITES-registered breeding operations, including U.S. operations, can be found at Register of Captive-Breeding Operations (http://www.cites.org/common/reg/e_cb.html). For those species covered under the U.S. Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess, and sell specimens of those species. Additional information on the MBTA can be found at MBTA (http://www.fws.gov/migratorybirds/).

7. Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired. If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

8. Members must demonstrate cooperation with the existing captive breeding programs that are developing sustainable populations of these species (e.g., sharing breeding stock, progeny, records, techniques) in order to more rapidly develop sustainable captive populations. Such communication should be documented in the renewal application materials that the applicant will submit to the Division of Management Authority.

\* \* \* \* \*

Monica A. Horton 4/12/2018
Monica A. Horton
Biologist (CITES Specialist)
Division of Scientific Authority

Eleanora Babij 4/12/18
Eleanora Babij, Ph.D.
Chief, Branch of Consultation and Monitoring
Division of Scientific Authority



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IRTM
Falls Church, VA 22041



December 11, 2018

In Reply Refer To:
FWS/AIA/DSA/FOIA: 2019-00160

David A. Garcia
Organization of Professional Aviculturists
3191 Coral Way, Suite 607
Miami, Florida 33145
E-mail address: dgarcia@pradaurizar.com

Dear Mr. Garcia:

The U.S. Fish and Wildlife Service Headquarters FOIA Office received your Freedom of
Information Act (FOIA) request, dated October 15, 2018, and assigned it control number: FWS-
2019-00160. Please cite this number in any future communications with our office regarding
your request. You requested the following:

> "The OPA requests from FWS all documents relating to its interpretation of its
> obligations under WBCA."

The Wild Bird Conservation Act (WBCA) of 1992 (H.R. 5013 9/30/1992) is available on the
Internet at: https://www.congress.gov/bill/102nd-congress/house-bill/5013.

The U.S. Statues for the WBCA, is on the Internet at:
https://www.fws.gov/le/USStatutes/WBCA.pdf

The Code of Federal Regulations (CFR) for the Service to implement the WBCA is: Title 50
Chapter 1, Part 15- Wild Bird Conservation Act, is available on the Internet at:
https://www.ecfr.gov/cgi-
bin/retrieveECFR?gp=&SID=df97a004f5ffdae40d4a4f7bcf9afcac&mc=true&n=pt50.1.15&r=P
ART&ty=HTML#se50.1.15_11.

The Fish and Wildlife Service (Service) fact sheet about the WBCA is available on the Internet
at: https://www.fws.gov/international/pdf/factsheet-wild-bird-conservation-act-summary-of-
effects-2013.pdf.

The Service has published three *Federal Register* notices - final rules to implement the Wild
Bird Conservation Act of 1992, as follows:

- Final Rule, published on November 16, 1993 (58 FR 60524) [18 pages];

- Final Rule, published on December 2, 1994 (59 FR 62254) [13 pages]; and
- Final Rule, published on January 24, 1996 (61 FR 2084) [10 pages].

We have enclosed 41 pages of responsive records, being released to you in their entirety. All requested information under the FOIA and Privacy Act regulations has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g).* Therefore, there is no billable fee for the processing of this request.

We use Multitrack Processing to process FOIA requests. The Simple track is for requests that can be processed in one to five workdays. The Normal track is for requests that can be processed in six to twenty workdays. The Complex track is for requests that can be processed in twenty-one to sixty workdays. The Exceptional/Voluminous track is for requests requiring more than sixty workdays for processing. The Expedited track is for requests that have been granted expedited processing. Within each track, requests are usually processed on a first-in, first-out basis. We placed your request into the Complex processing track.

You may appeal this response to the Department's FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email. All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the USFWS' response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS' response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

*DOI FOIA/Privacy Act Appeals Office Contact Information*

Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240

Attn: FOIA/Privacy Act Appeals Office

Telephone: 202- 208-5339
Fax: 202-208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA & Privacy Act Appeals Officer.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.** If you have questions relating to this response, please contact Ms. Pat Ford, Division of Scientific Authority, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (phone: 703-358-2494; e-mail: patricia_ford@fws.gov).

Sincerely,

CARRIE HYDE-MICHAELS
Digitally signed by CARRIE HYDE-MICHAELS
Date: 2018.12.11 10:58:42 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer

Enclosure

3



**Tuesday**
**November 16, 1993**

Part IV

# Department of the Interior

**Fish and Wildlife Service**

**50 CFR Part 15**
**Importation of Exotic Wild Birds to the**
**United States; Final Rule**

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 15**

**RIN: 1018–AB93**

**Importation of Exotic Wild Birds to the United States; Final Rule Implementing the Wild Bird Conservation Act of 1992**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** On October 23, 1992, the Wild Bird Conservation Act of 1992 (WBCA) was signed into law, the purposes of which include promoting the conservation of exotic birds by: ensuring that all imports into the United States of species of exotic birds are biologically sustainable and not detrimental to the species; ensuring that imported birds are not subject to inhumane treatment during capture and transport; and assisting wild bird conservation and management programs in countries of origin. This final rule implements the prohibitions stipulated in the WBCA and provides permit requirements and procedures for some allowed exemptions. This rule also replaces the feather importation quota regulations.

**EFFECTIVE DATE:** This rule is effective November 16, 1993.

**FOR FURTHER INFORMATION CONTACT:** Dr. Susan S. Lieberman, U.S. Fish and Wildlife Service, Office of Management Authority, 4401 N. Fairfax Dr., room 420C, Arlington, VA 22203, telephone (703) 358–2093.

**SUPPLEMENTARY INFORMATION:** This rule implements some aspects of the Wild Bird Conservation Act (WBCA), which was signed into law on October 23, 1992. The WBCA limits or prohibits imports of exotic bird species to ensure that their populations are not harmed by trade. It also encourages wild bird conservation programs in countries of origin by both ensuring that all trade in such species involving the United States is biologically sustainable and not detrimental to the species, and by creating an Exotic Bird Conservation Fund to provide conservation assistance in countries of origin. The effects of the WBCA, which this rule implements, are as follows:

The WBCA covers the importation of all bird species not indigenous to the 50 United States and the District of Columbia, while exempting the following bird families from its provisions: Phasianidae, Numididae, Cracidae, Meleagrididae, Megapodiidae, Anatidae, Struthionidae, Rheidae, Dromaiinae, and Gruidae, based on "Reference List of the Birds of the World" by Morony, Bock, and Farrand (1975).

An immediate moratorium, effective October 23, 1992, was established on the importation of ten species of wild birds of particular concern that are listed in Appendix II of the Convention on International Trade in Endangered Species (CITES), two of which were moved to Appendix I at the March 1992 CITES meeting. The prohibition on importation of those species was announced in the **Federal Register** of December 4, 1992 (57 FR 57510).

During the one-year delay period from October 23, 1992, to October 22, 1993, there has been a maximum number of individuals of any CITES-listed bird species that can be imported. That quota, equal to the number imported during the last year for which the Service had complete data (1991), was announced in the **Federal Register** of December 4, 1992 (57 FR 57510).

A notice published on March 30, 1993 (58 FR 16644) solicited public comments and announced a public meeting, held April 15–16, 1993, to receive input from the public in the development of regulations to implement some of the provisions of the WBCA. Useful input was received from a broad cross-section of interested members of the public who participated in the meeting and submitted comments in writing; that input was utilized in developing this rule. A notice published on April 16, 1993, (58 FR 19840) announced species for which the quota had been met and no further individual birds could be imported.

On August 12, 1993 the Service published a proposed rule (58 FR 42926) which proposed regulations implementing the prohibitions stipulated in the WBCA and provided permit requirements and procedures for some allowed exemptions. That rule also proposed to replace the feather importation quota regulations and gave notice that comments must be received by September 13, 1993, in order to be assured consideration.

Effective October 23, 1993, imports of all CITES-listed birds are prohibited, except for species included in an approved list, or for which an import permit has been issued. The approved list will include species (by country) and/or specific captive-breeding facilities. The Service will publish a proposed rulemaking establishing the criteria for adopting the approved list in the very near future. The Service also has the emergency authority to suspend imports of any CITES-listed bird species at any time based on a series of criteria.

The WBCA authorizes the Service to issue permits for the importation of individual birds from otherwise prohibited species for the following purposes (after required findings are made): (1) Scientific research; (2) personally owned pets of individuals returning to the United States after being out of the country for at least a year; (3) zoological breeding or display programs; and (4) cooperative breeding programs designed to promote the conservation of the species and maintain the species in the wild, as long as such programs are developed and administered by organizations meeting certain standards. This final rule finalizes the proposals made in the **Federal Register** of August 12, 1993, with some modifications based on comments received and further analysis by the Service.

**Regulatory Schedule**

This rule replaces CFR part 15 so that it relates only to implementation of the Wild Bird Conservation Act. There is regulatory text for the following subparts: subpart A (Introduction and General Provisions), subpart B (Prohibitions and Requirements), and subpart C (Permits and Approval of Cooperative Breeding Programs). It is the Service's intent to propose text for subparts D (Approved list of species) and E (Qualifying foreign breeding facilities) in the near future, and to propose text for subpart F (Prohibited non-CITES species) not long thereafter.

**Comments and Information Received**

Comments were received from 73 organizations and private individuals, including 2 Universities, 5 conservation and/or animal welfare organizations (including 1 submission representing 14 organizations), 6 zoos or zoological organizations, 1 importer, 1 representative of the pet industry, 2 private companies, 19 bird breeders or avicultural organizations (one of which submitted 24 form letters), and 37 private individuals.

*Comments of a General Nature*

Several commenters supported the permit provisions of the proposed rule in their entirety, whereas others had specific concerns that are addressed in the discussion of comments received, below. In reference to permit application and issuance requirements, several commenters considered the proposed rule to be excessive and/or burdensome. It was not the Service's intention to be either excessive or burdensome, but rather to fully clarify

the information required to be submitted in order to facilitate the Service's making the required findings under the law, and to expedite the permit issuance process. In many cases in its past experience the Service has found that permit applicants submit minimal information, and in order to make the necessary findings, the Service must write back to applicants for further information. The proposed rule intended to provide the public with a full view as to what information is necessary. The Service, in analyzing all comments received, agrees that some of the permit application and issuance requirements may appear too restrictive or burdensome, and has modified them accordingly. The Service notes, that in order to make a finding of non-detriment to a species' survival in the wild, or whether or not a cooperative breeding program benefits a species' conservation, a stricter test will be applied for species listed in Appendix I of the Convention than for Appendix II or III species. The Service agrees with some commenters who noted that the information it proposed to be required, while appropriate for endangered or Appendix I species, may not be as necessary for Appendix II species. The Service has modified the rule accordingly, by eliminating some proposed requirements and modifying others to include language such as "as appropriate" or "when applicable," to provide more flexibility to both the public and the Service.

*Feather Import Quotas: Elimination of Rule*

This rule eliminates regulations currently in 50 CFR part 15, which implement feather import quotas contained in the Tariff Classification Act of 1962 (19 U.S.C. 1202). The previous regulations in 50 CFR part 15 contained three subparts regulating the importation of skins bearing feathers of the mandarin duck, a jungle fowl, and six species of pheasants, under the authority of the Tariff Classification Act of 1962; these regulations were last amended in January, 1974 (39 FR 1168). The Service believes that those feather import quota regulations are unnecessary and wasteful of government and private resources, with no benefit to wildlife species. The Service notes there are a number of other laws and regulations that protect species of birds for which there is cause for concern and for which importation of skins bearing feathers could be of concern. These laws include the Lacey Act Amendments of 1981, the Migratory Bird Treaty Act, the Bald and Golden Eagle Protection Act, the Endangered

Species Act, and CITES. The Service notes that the regulations in 50 CFR part 15, and the Tariff Classification Act, were passed prior to the signing and implementation by the United States of the CITES treaty. The feather import regulations that are hereby repealed prohibited the importation of feathers of two species that are listed in the CITES Appendices; *Gallus sonneroti* and *Crossoptilon mantchuricum* were listed in CITES Appendix II and I, respectively, in 1975. The Service believes that if there were any conservation concern regarding trade in feathers of the other species listed in 50 CFR part 15, the government authorities responsible for their listing in the CITES Appendices could have proposed their listing in the CITES Appendices. There were no comments in opposition to this proposal, and one in support.

*Renumbering of 50 CFR Part 15*

The Service hereby includes the regulations implementing the WBCA in 50 CFR part 15. The Service hereby eliminates those three subparts regulating the importation of skins bearing feathers of the mandarin duck, a jungle fowl, and six species of pheasants, and includes the regulations implementing the WBCA in 50 CFR part 15 subparts A–F.

*Comments Pertaining to Subpart A— Wild Bird Conservation Act: Introduction and General Provisions*

Comments Pertaining to Section 15.1: Purpose of Regulations

This section outlines the general purpose of the regulations in 50 CFR part 15, which apply to all species of exotic birds as defined in this subpart. No comments were received on this section.

Comments Pertaining to Section 15.2: Scope of Regulations

This section clarifies that all of the requirements of part 15 are in addition to the existing requirements in parts 13 and 14, part 17 (species listed as endangered or threatened under the Endangered Species Act (ESA)), part 21 (Migratory Bird Treaty Act) and part 23 (species listed in the Appendices to the Convention on International Trade in Endangered Species). Thus, for example, in addition to the requirements of part 15 relating to the Wild Bird Conservation Act (WBCA), importation of a species of bird listed in CITES Appendix I would still require a CITES Appendix I import permit and be required to comply with the requirements of 50 CFR part 23. One application will suffice for both sets of requirements, and one permit will be

issued covering CITES, ESA, and Wild Bird Conservation Act requirements, as is now done for imports requiring both CITES and ESA permits. Two commenters supported this intent of the Service, while one also requested that the Service require through these regulations that permits be issued within 30 days, and approval of cooperative breeding programs within 60 days. It is the Service's intent to process all applications as expeditiously as possible. The Service cannot, however, impose a regulatory time frame within which permits or approvals for cooperative breeding programs will be issued, as the processing time depends on the completeness of an application, whether the Service needs further information from an applicant, the Service's ability to make the required findings, and financial and personnel resources available to the relevant Service offices. In the case of permit applications involving birds removed from the wild, and particularly when the species is listed in Appendix I, a finding of non-detriment to the wild application is particularly critical, dependent on information from a wide range of sources, and often more time consuming. The Service encourages applicants to provide all of the information necessary to make the required findings.

Comments Pertaining to Section 15.3: Definitions

This section defines a number of terms used in part 15. The definitions in parts 10 and 23 of 50 CFR, unless defined herein, also apply. The definitions of exotic bird, person, species, and United States are taken directly out of the text of the WBCA. One commenter explicitly supported the definitions as proposed.

Regarding the definition of exotic bird, one commenter (on behalf of 14 organizations) requested that the Service not exempt from the provisions of the WBCA exotic birds in the families Phasianidae, Numididae, Cracidae, Meleagrididae, Megapodiidae, Anatidae, Struthionidae, Rheidae, Dromaiinae, and Gruidae. Another commenter requested that only some species in those families be exempted from the provisions of the WBCA. While arguments given for not exempting some species in those families may be valid, the statute itself provides that exemption, and the Service cannot by regulation make the WBCA applicable to species that Congress explicitly in the law decided to exempt from the statute's provisions. Another commenter requested that two additional families of

birds (Accipitridae and Falconidae) be exempted from the provisions of the WBCA through this definition of exotic bird, in order to facilitate their importation. The Service cannot exempt entire families of birds that Congress did not choose to exempt. However, the Service is aware that many species in those two orders are either already part of successful existing cooperative breeding programs, which could qualify for approval under subpart C, or are bred in captivity in facilities that could obtain approval under subpart E. Another commenter asked that dead specimens also be regulated. The Service notes that the WBCA explicitly excludes dead sport-hunted birds, dead museum specimens, and dead scientific specimens, which is reflected in the definition.

One commenter supported the inclusion of hybrids of any species or subspecies as covered by these regulations; the Service agrees, and notes that this is consistent with CITES requirements. Hybrids will be treated according to the more restrictive Appendix or category in which either parental species is listed.

*Comments Pertaining to Subpart B: Prohibitions and Requirements*

Comments Pertaining to Section 15.11: Prohibitions

This section describes the prohibitions under the Act, which relate to the importation of birds into the United States. It is unlawful to import any exotic bird listed under CITES if it is not listed either in the approved list of species pursuant to subpart D or in the approved list of qualifying foreign captive-breeding facilities pursuant to subpart E. It is unlawful to import any bird from an approved breeding facility if the bird was not bred at that facility. It is unlawful to import any non-CITES bird if it is listed under subpart F as a prohibited species, or if it was exported from a prohibited country, also under subpart F. It is unlawful to engage in any activity in violation of a specified condition of a permit issued pursuant to subpart C that authorizes the import of an exotic bird under this part 15. If a species is re-exported from a country, whether or not it can be imported into the United States is dependent on the country of origin (the country of first export) of the bird. For example, if a CITES-listed bird species is re-exported from country A, but originated in country B, that species must be listed as an approved species from country B. These regulations can be illustrated through an example; these examples are not meant to imply approval or

disapproval of any species or country but are just for the sake of giving an example. *Example 1:* If exports of *Amazona aestiva* are exported from Argentina but not from any other country, then *A. aestiva* could not be imported into the United States with an export permit from Venezuela or Peru; a re-export from Belgium could only be imported with a valid CITES permit indicating the original country of export as Argentina, and giving the valid Argentina CITES Permit number. *Example 2:* If Species X is listed as a captive-bred species under subpart D, it can be imported from any country with a valid CITES permit; no additional permits are required. *Example 3:* If Smith's Breeding Farm in England is listed under subpart E as approved for *Amazona aestiva* and *Amazona albifrons*, then those two species can be imported from Smith's Breeding Farm with a valid CITES permit; no additional import permit is required from the Service; they must have been bred at Smith's. If Smith's is the only approved facility for the species, imports from any other facility or country are only allowed with a valid import permit issued by the Service, pursuant to subpart C.

Thirty-two (32) organizations or private individuals commented on this section. A large number of those comments indicate confusion about the proposed rule, the Service's intent, or the relationship between these regulations and other parts in 50 CFR, so for the sake of clarity the Service will respond for each paragraph of this section for which it received specific comments from the public.

Comments Pertaining to Section 15.11(c): CITES Appendix III

Three commenters supported the Service's interpretation that Appendix III species are considered CITES-listed species for the purposes of these regulations only if they originate in the country that listed them in Appendix III. Four commenters (including one on behalf of 14 organizations) opposed this interpretation. The Service notes that listing of a species in Appendix III is a unilateral action by a particular CITES Party, thereby requiring CITES permits and implementation of CITES permits issuance requirements for that country; when the species is found in other countries that did not list it in Appendix III, only a certificate of origin is required, stating that it did not originate in the country that listed the species in Appendix III. Therefore, when the species is found in countries other than where listed in Appendix III, it is not subject to the same level of

CITES controls, and indeed is only listed in the Appendices in the country so annotated in the official CITES Appendices. Several commenters stated that this provision allows too many finches and other non-psittacine birds to be legally imported, given that they are prone to high transport mortalities. The Service notes that if there is evidence that trade in those species [listed in Appendix III that originate in a country that has not listed them in Appendix III] is detrimental to the species' survival, or inhumane, a petition may be submitted to the Service pursuant to the WBCA to impose a moratorium on the species' import. In addition, the option remains to list the entire species in CITES Appendix I or II at a meeting of the CITES Conference of the Parties, if appropriate, commensurate with the conservation and trade status of the species. Therefore, the Service has retained this provision as proposed.

Comments Pertaining to Section 15.11(e): Qualifying Facility

One commenter agreed with this paragraph. Three commenters recommended that individual foreign hobby breeders be able to consolidate their shipments, to be considered a single qualifying facility. This will be dealt with in a future proposed rulemaking. The Service notes, however, that the prohibition on importing birds from a qualifying foreign breeding facility that were not bred at the listed facility derives directly from the WBCA.

Comments Pertaining to Section 15.11(f): Possession of an Illegally Imported Bird

In the proposed rule published on August 12, 1993, the Service proposed that it be unlawful to possess an exotic bird imported into the United States contrary to any of the requirements of this part 15. Numerous commenters were opposed to this provision, including several form letters, although in many cases the intent of the Service was perhaps not sufficiently clear in the proposed rule. It was not the Service's intention to require a proof of legality of all birds in the possession of citizens of the United States, as was misinterpreted by several commenters. Rather, the Service notes that it is already prohibited under the Lacey Act Amendments of 1981 to import a bird possessed or sold in violation of any foreign or State law. The provision proposed herein that possession be a violation of this part 15 is therefore eliminated as largely redundant with the Lacey Act Amendments. Four commenters asked that a special

exemption be provided in this paragraph for pre-Act birds. The Service notes that such a provision was debated and rejected by Congress, and explicitly is not found in the WBCA.

**Comments Pertaining to Section 15.12: Requirements**

This section establishes that no exotic bird can be imported into the United States except in accordance with the provisions of subparts D–F, or under the terms of a valid import permit issued pursuant to subpart C. Even if a species is prohibited from import, or originates in a prohibited country, individuals are eligible to apply for a permit under subpart C if the purpose for which they desire to import a bird qualifies for one of the four types of permits. There were no comments on this section.

**Comments Pertaining to Previously Exported Birds**

Numerous commenters misinterpreted the Service's intentions regarding birds that have previously been exported from the United States and are being "re-imported," and therefore the Service is changing the rule in that regard. The Service agrees with the 21 commenters who requested that any person who is issued a permit to export birds from the United States should be allowed to return to the United States, with the *same* birds, at any time; such a person would not be subject to the limitation on two pet birds per individual or to being out of the United States for more than a year. The Service notes that the WBCA was silent on this issue, and therefore the proposed rule published on August 12, 1993 intentionally adhered strictly to the letter of the law, in limiting imports to two pet birds per year. (The Service was aware that this might cause some concern, and wanted to assess comments from the public.) The Service appreciates the attention the public focused on this issue, and the full consensus of all commenters that any bird legally exported from the United States on a permit issued by the Service's Office of Management Authority be able to return to the United States, whether for personal or other purposes. The Service is in full agreement with the public that the intent of the WBCA is to conserve and protect exotic birds in the wild, and therefore any bird that the Service agrees can be exported from the United States can return with its original owner to the United States. The Service notes that, based on its past experience, this provision will apply largely to individuals traveling on vacation or on overseas assignment with their pet bird.

Therefore, the Service has modified this section accordingly, such that a bird can be imported to the United States that was legally exported from the United States with a permit issued by the Service's Office of Management Authority, provided that: (1) the import is by the same person (as defined by this part 15) who exported the bird; (2) the person provides a copy of the cleared (validated) CITES export permit or certificate issued by the Service; (3) the Service is satisfied that the same bird is being imported as is indicated on the aforementioned permit or certificate; and (4) the import complies with all other applicable Service regulations. The Service stresses that this "return" provision *does not apply* to any bird obtained or purchased outside of the United States and entering the United States for the first time. The Service will monitor the implementation of this provision, and if there is evidence that it is being used to facilitate illegal importation or smuggling of birds into the United States, the Service may modify it in the future. The Service's Office of Management Authority will also notify future recipients of CITES export permits or certificates for pet birds leaving the United States of these provisions, particularly in that a copy of the cleared permit or certificate must be retained.

**General Comments Pertaining to Subpart C: Permits and Approval of Cooperative Breeding Programs**

This subpart establishes procedures, application requirements, and issuance criteria for four types of permits authorized under the WBCA. The Service received several comments on the following issues that pertain to terms used in several different paragraphs in §§ 15.22–15.26:

**Comments Pertaining to Sex (Section 15.22(a)(1)(i), Section 15.23(a)(1)(i), Section 15.24(a)(1)(i), Section 15.25(a)(1)(i))**

Several commenters noted that the sex of an exotic bird to be imported is not always known, but the proposed rule requested the applicant provide the Service with the sex of the bird to be imported. The Service is aware that for many birds, particularly monomorphic species, sex cannot be determined without surgical methods or chromosome analysis. The Service has modified the rule (in §§ 15.22–15.25) to require sex, when known.

**Comments Pertaining to Age (Section 15.22(a)(1)(i), Section 15.23(a)(1)(i), Section 15.24(a)(1)(i), Section 15.25(a)(1)(i), Section 15.26(a)(1))**

Several commenters misunderstood the application requirement in the proposed rule, which requested the age of the bird to be imported, thinking that a permit would not be issued if the bird's exact age in months and years was not known. The Service is quite aware that for wild-caught birds, an individual bird's exact age cannot necessarily be determined, although age class (i.e. chick, fledgling, juvenile, sub-adult, adult) is known. For captive-bred birds, however, age is often known with certainty. Therefore, the Service has modified the rule to require either age or age class.

**Comments Pertaining to Locations (Section 15.22(a)(2)(i), Section 15.23(a)(2)(i), Section 15.24(a)(2))**

In the proposed rule, for permits for scientific research, zoological breeding or display, or cooperative breeding involving imports of wild-caught birds, the Service had proposed to require both the country and specific location where the bird was [or was to be] removed from the wild. Several commenters misunderstood that the Service wanted exact location, including fully accurate details, as to where the bird was or was to be removed from the wild. Such is not the case; rather, in order to make the required finding that the import will not be detrimental to the species survival, the Service needs to know the location in the country of origin where the bird was [or will be] removed from the wild. In many countries, a species may be locally abundant in one area or region, while rare and/or declining in another. therefore, for the clarity of the public, the Service has changed location to region, to indicate the region within the country of origin. However, particularly in the case of Appendix I species, permit applicants should provide as much information to the Service as is necessary to make the required non-detriment finding. This is for the benefit of the public, since if the Service does not have sufficient information on which to base a non-detriment finding, it cannot issue a permit.

**Comments Pertaining to Persons Capturing Birds**

In the proposed rule, for all of the permits except personal pets, the Service had proposed to require, for wild-caught birds, the names and qualifications of persons who will capture or who captured the bird.

**60528   Federal Register** / Vol. 58, No. 219 / Tuesday, November 16, 1993 / Rules and Regulations

Several commenters felt this was overly burdensome. The Service did not intend this to be burdensome, and rather considered that for wild-caught birds such information is useful. The Service agrees that it is not necessary in most cases, and has removed the requirement. However, as was discussed above, in the case of Appendix I species, permit applicants should provide as much information to the Service as is necessary to make the required non-detriment finding. Several commenters noted that zoological institutions often import birds that were obtained illegally and have been confiscated by other governments, and therefore details as to their origin in the wild are often unavailable. The service is aware of such situations although they are rare, and will take such circumstances into consideration if there is extenuating information showing that the import will benefit the conservation of the species.

Comments Pertaining to Status of the Species in the Area of Capture (Section 15.22(a)(2)(ii), Section 15.23(a)(2)(ii), Section 15.24(a)(2)(ii))

In the proposed rule, the Service proposed to require a description of the status of the species in the area of capture. Such information is necessary to make a non-detriment finding. In order to be consist with the changed language regarding region rather than location where a bird was removed from the wild, area of capture has been changed to region of removal. The Service hereby clarifies that status in this context refers to the species' conservation status in the wild (i.e., increasing, stable, declining, protected, endangered, threatened, rare, vulnerable, insufficiently known). The Service has scientific information available to help it make the required findings, and may consult the Convention Scientific and/or Management Authority in the country of origin; however, the Service encourages permit applicants to provide as detailed information in this regard as may be readily available to them.

Comments Pertaining to Collecting Permits (Section 15.22(a)(2)(iii), Section 15.23(a)(2)(iii), Section 15.24(a)(2)(iii))

In the proposed rule, the Service proposed to require, for wild-caught birds, a copy of any foreign collecting permit or authorizing letter. Several commenters felt this was a burdensome requirement. The Service does not consider this requirement to be excessive and has retained the requirement, with the addition of the words "if applicable," such that any

case where there is no such permit required or it does not apply, such a permit is not required. However, in many cases of scientific research, or export to zoological institutions, the Service is aware of the requirement of the country of origin for a collecting permit.

Comments Pertaining to Manner of Taking

In the proposed rule, the Service proposed to require a description of the manner of taking of wild-caught birds. Several commenters considered this either excessive, or not within the capability of the applicant to ascertain. The Service agrees that it may be more information than is necessary to make a non-detriment finding. In the future proposed rulemaking establishing criteria for approval of sustainable use management plans for wild-caught birds, the Service will address this issue. The Service agrees that it is not critical for permits issuance, and has removed it from the final rule. However, particularly in the case of Appendix I species, if that information is available to the permit applicant, it could assist the Service in making the necessary findings.

Comments Pertaining to Date of Removal

In the proposed rule, the Service requested the date when a specimen was removed from the wild, for wild-caught birds that had been held in captivity for more than a year. Several commenters misunderstood this requirement, and thought that the Service wanted the exact calendar date that a bird was removed from the wild. Rather, the Service had included this requirement for the benefit of permit applicants, in order to facilitate the necessary findings and to expedite permit processing. The Service has however removed this requirement, since it was apparently unclear. Rather, in order to determine if a particular removal from the wild was detrimental to a species' survival, the Service will need to know, approximately, when it was so removed. For a given species, the more information the Service has about when an individual bird was removed from the wild, the easier it may be to make the required non-detriment finding. The Service encourages applicants to err on the side of providing too much rather than too little information.

Comments Pertaining to Length of Time in Captivity

In the proposed rule, the Service Distinguished between birds not yet

removed from the wild and those wild-caught birds that had been held in captivity for more than a year. The distinction facilitated requiring more information, including about capture, for imports of birds not yet removed from the wild. Since there is now no difference between the two situations, the Service has combined paragraphs (2) and (3) in the proposed rule, for §§15.22–15.24.

Comments Pertaining to Progeny (Section 15.22(a)(4)(iv), Section 15.23(a)(4)(v), Section 15.24(a)(5)(iv), and Section 15.26(a)(2)(vi))

Several commenters were concerned that the rule requires plans for the disposition of exotic birds imported and any progeny, upon completion of the applicable project or program. These commenters either did not understand the meaning of the term progeny, or were confused as to how many generations of progeny are referred to. The Service notes that "progeny" is the more zoologically correct version of the more anthropomorphic "offspring", but means the same. The Service notes that it has required information on plans for disposition of progeny, and not a full reporting in every case of whether those plans were fulfilled. If progeny of imported birds are sold or otherwise leave the control of the permittee, then the applicant can have no plans for the disposition of their progeny. The purpose of this application requirement is to assist the service in making the determination required by the statute that the birds are being imported *exclusively* for the purpose for which the permit is issued. The Service notes that it will constitute a violation of a permit issued under this part 15 to utilize imported birds for purposes other than those authorized by the permit.

Comments Pertaining to Multiple Transactions (Section 15.22(a)(3)(ii), Section 15.23(a)(3)(ii), Section 15.24(a)(3)(ii))

For permits for birds that were bred in captivity, the Service proposed requiring documentation showing the bird was acquired from the breeder and a history of multiple transactions, when the applicant is not the breeder. Some commenters misunderstood this requirement. The Service has added the words "if applicable," such that only if it is applicable should such a history be provided. The Service notes that, if a permit is for a bird that is bred in captivity, it will be far easier for the Service to make a non-detriment finding, particularly in the case of Appendix I species. In addition, recent

law enforcement investigations have shown cases of wild-caught birds being falsely claimed to have been bred in captivity. In one particular case, eggs from protected parrot species in Australia (prohibited from export) were smuggled from Australia to New Zealand, where they were declared to be captive-bred and then exported to the United States. Therefore, the Service must be particularly vigilant in being certain that it is satisfied that birds claimed to be so, were indeed bred in captivity.

## Comments Pertaining to Preparation for Shipment

In the proposed rule, the Service proposed to require a description (for all permits to be issued under this part 15) of the shipping methods and enclosure to be used to transport the exotic bird, including feeding and care during transport, along with an issuance criterion that the birds would be prepared and shipped as to minimize the risk of injury, damage to health, or cruel treatment. Numerous commenters objected to this requirement, noting that it is not explicitly stated as a permit requirement in the WBCA. The Service is cognizant of that fact, but included this requirement in the proposed rule for these reasons, which were for the benefit and convenience of the importing public: All shipments of exotic birds into the United States must comply with the humane and healthful transport requirements of 50 CFR part 14, which incorporated by reference the International Air Transport Association (IATA) Live Animals Regulations (LAR); all CITES shipments must also comply with the IATA LAR. The Service included a requirement to provide shipping and transport information, and the requirement to make a finding that the proposed shipping and transport would comply with all CITES and U.S. requirements. Such requirements were to assist the importing public in avoiding a situation where an import permit was issued, but the birds suffered high mortalities, the shipment was found in violation of U.S. law, or was even possibly confiscated, due to lack of awareness by the importer and/ or exporter. Since so many commenters did not understand this proposed requirement (which required nothing more than is already required), the Service has removed it from the final rule. However, the Service stresses that all exotic bird imports into the United States must fully comply with all humane transport requirements of U.S. law. Copies of the humane and healthful transport regulations in 50 CFR part 14

are available from the Service on request.

## Comments Pertaining to Enhancement or Promotion of the Conservation of Species in the Wild

Several commenters objected strongly to the proposal by the Service that importation of birds for zoological breeding or display and scientific research purposes should enhance, or promote, the conservation of the species in the wild. These commenters claimed that because Section 112 of the WBCA authorizes the Secretary to issue permits for otherwise prohibited species if the Secretary determines that the import is not detrimental to the survival of the species and if the bird is being imported exclusively for the stated purpose, the Secretary (and thereby the Service) should ignore that stated purpose of the WBCA (Section 103) to "promote the conservation of exotic birds." The Service disagrees with this comment in principle. The Service notes that Congress, in the Committee Report on the WBCA, said that the primary goal of the WBCA is "to conserve birds in the wild in order to protect their genetic diversity and the integrity of the ecosystems in which they are found." The Service feels strongly that the underlying principle of the WBCA is to promote the conservation of exotic birds in the wild. Any permit issued is an exemption to otherwise prohibited acts, which the Service, acting on behalf of the Secretary, may or may not authorize, depending on individual circumstances.

However, the Service is also cognizant that the rule as proposed appeared to many commenters to utilize the same standard for Appendix II and III species as for endangered, threatened, or Appendix I species. As is standard practice within the Offices of Scientific and Management Authority, a stricter test is applied to Appendix I than to Appendix II and III species. The rule has been modified, such that for permits for zoological breeding or display, or for scientific research, applications will not be judged as to whether or not the import will promote or enhance the conservation of the species in the wild. In the case of wild-caught specimens of Appendix I species, however, such a test will be utilized.

In the same context, several commenters objected to the inclusion in the proposed rule (previous § 15.22(a)(5)(ii) and § 15.23(a)(5)(v)), for scientific research and zoological breeding and display, of a requirement that applicants state the relationship of the breeding or display program, or the research, to promoting the conservation of the species in the wild. In light of the

aforementioned discussion, in this final rule the Service will not require information on how the program will promote the conservation of the species per se, but retains a requirement for information on the relationship (§ 15.22(a)(4)(2) and § 15.23(a)(4)) of the research or breeding or display program to the conservation of the species in the wild. That is for two reasons: First, to allow the Service to make the necessary non-detriment finding and second, to make the finding inherent in issuance criterion 3 in both cases. Issuance criterion 3 (§ 15.22(b)(3), § 15.23(b)(3), and § 15.26(b)(3)) refers to whether a permit (or approval, in the case of cooperative breeding programs), if issued, would conflict with any known program intended to enhance the survival of the population from which the exotic bird was or would be removed. This does not require that the import actually enhance the survival of the population, but rather would prohibit any import that conflicted with a conservation program in a country of origin.

Two ornithologists commented that captive breeding of endangered species should be conducted in the country of origin of the species (in situ) for conservation purposes and ex situ captive-breeding programs should only be sanctioned when it is not possible to set up captive-breeding programs in the country of origin. The Service feels quite strongly that conservation, management, and recovery programs in countries of origin should be given full consideration. This is consistent with the Statement of Purpose of the WBCA (Section 103), whereby a purpose of the WBCA is "to promote the conservation of exotic birds by assisting wild bird conservation and management programs in the countries of origin of wild birds." The Service notes that, for permits for cooperative breeding, for the convenience of the public, once a program is approved, this finding is not required for individual permits.

Several commenters objected to the issuance criterion in § 15.24(b)(3) and § 15.26(b)(4) requiring the Service to determine if the cooperative breeding program for which the permit is required would be likely to enhance or promote the conservation of the exotic bird species in the wild or result in a self-sustaining population of the exotic birds species in captivity. The Service disagrees, and has retained this provision in the rule. Unlike the situation for other exemptions specified in Section 112 of the WBCA, the law requires that cooperative breeding programs are "designed to promote the conservation of the species and

maintain the species in the wild [emphasis added] by enhancing the propagation and survival of the species." The Service is therefore required to make such a finding that the cooperative breeding program and imports pursuant to it promote or enhance the species' conservation. The Service believes that it is being flexible in allowing, as an alternative, that the program could also lead towards a self-sustaining population of the exotic bird species in captivity. However, it may be more difficult to make a non-detriment finding for imports of CITES Appendix I species solely for this latter purpose, if specific offsetting conservation value is lacking.

*Comments Pertaining to Letters of Recommendation or Endorsement*

Several commenters opposed the proposed requirement for three letters of recommendation or endorsement for permits for scientific research, zoological breeding or display, and cooperative breeding programs. Some commenters felt this was a burdensome requirement. The Service disagrees that this would be burdensome, and notes that this requirement was actually included in the proposed rule for the benefit of the public, to provide the opportunity for an application to be accompanied by additional supportive information that might expedite permit processing. The Service does agree that this information is not necessary in all cases, and has eliminated it. The Service has also removed the requirement for a letter of endorsement from the Convention Scientific Authority in the country from which an exotic bird is to be (or was) removed from the wild, based on its agreement with commenters that this need not be required in all cases (Appendix I, II, and III). However, for wild-caught birds, the Service may require such an endorsement or other information from the Convention Scientific Authority in the country of origin, on a case-by-case basis. The Service stresses that such supporting documentation for any relevant permit may expedite processing of the permit application, particularly in the case of appendix I, endangered, or threatened species.

*Comments Pertaining to the Same or Similar Species (Section 15.23(a)(7), Section 15.24(a)(9), Section 15.26(a)(3))*

Several commenters expressed concern as to what is meant by the phrase "same or similar species." Specifically, permit applicants are required to submit a history of either their zoological breeding or display program, or cooperative breeding

program, with the same or similar species. Some commenters inquired if the Service wanted voluminous records of all bird species, or of all bird species in the same order, particularly if applicants are zoos with large collections and years of experience with many exotic bird species. Such is not the Service's intent. Rather, in order to make the required finding that the exotic bird will be imported for the intended purpose, the Service needs to be convinced that the applicant has experience with either the species requested, or closely related or otherwise similar species. Thus, if the applicant has extensive experience with the species or genus applied for, that may suffice. If an applicant has no experience with birds of the same species or genus, the application should include pertinent information for bird species as closely related to the species applied for as is possible. Clearly, particularly in the case of birds being taken from the wild, the applicant is expected to have experience with similar bird species. The Service notes that similarity can be behavioral or physiological, and not necessarily only taxonomic.

Comments Pertaining to Plans for Disposition of Birds (Section 15.22(a)(4)(iv), Section 15.23(a)(4)(v), Section 15.24(a)(5)(iv), Section 15.26(a)(2)(vi))

Several commenters noted that the proposed rule requested planned disposition of birds, and individuals, zoological institutions, or breeding programs cannot know in advance what disposition of birds will be. The Service agrees, and clarifies that its intent is for the applicant to indicate any plans it may have for the disposition of birds and/or their immediate progeny. This will assist the Service in determining that the exotic birds for which the permit is requested will be used for the requested purpose. This will also assist the Service in assessing a given breeding or display program. This information will also assist the Service in issuing future permits for the same or similar species to the same applicant. The Service has clarified this requirement in all cases by changing "planned disposition" to "plans for disposition."

Comments Pertaining to Care and Maintenance of the Exotic Bird (Section 15.22(a)(6), Section 15.23(a)(5), Section 15.24(a)(8))

Several commenters opposed the proposed requirement for a description of the care and maintenance of the exotic bird, including how the facility meets professionally recognized

standards. The Service disagrees, and considers this information critical to its determination that the expertise, facilities, or other resources that are available to the applicant are adequate for proper care and maintenance of the exotic bird, in order to successfully accomplish the objectives stated in the application. Such a finding is critical to determining that the exotic bird is being imported exclusively for the purpose for which the permit is issued, as is required by the WBCA. Furthermore, the Service reminds the public of the existing requirements in 50 CFR part 13 for all permits issued by the Service.

Several commenters opposed the inclusion of the address of any facility, expressing a concern that they did not want members of the general public knowing where they or their birds are. The Service disagrees, and feels strongly that it must have both the name and address of any facility that will house birds for which an import permit is being issued; this is consistent with existing requirements of 50 CFR part 13. Several commenters objected to the requirement of photographs or diagrams of the facility, as being excessive. The Service agrees that this information may not be necessary in all cases, and has eliminated the requirement. Several commenters objected to the requirement for information on qualifications and experience of personnel responsible for the care of the bird, as being excessive and/or duplicative. The Service agrees that this information may not be necessary in all cases, and has eliminated the requirement. However, the Service will accept the aforementioned documentation for any relevant permit.

Comments Pertaining to Veterinary Care

Several commenters considered this proposed requirement excessive or unnecessary. The Service agrees that it is not necessary and was insufficiently clear, and is indeed covered by the term "husbandry practices" (discussed below). The Service has eliminated the requirement.

Comments Pertaining to Husbandry Practices (Section 15.22(a)(6)(iii), Section 15.23(a)(5)(iii), Section 15.24(a)(8)(iii))

Some commenters questioned what is meant by husbandry practices, and why it is required. The Service is requiring details on husbandry practices, for scientific research, zoological breeding or display, and cooperative breeding permits (but not cooperative breeding programs, as several facilities could be involved). Information on husbandry practices is required in the context of a

description of the care and maintenance of the exotic bird, and how professionally recognized standards are met. That information is necessary to allow the Service to determine that the expertise, facilities, or other resources available to the applicant appear adequate to accomplish the objectives in the application. Such an issuance criterion is vital to determining whether the stated objectives in the application could be expected to be accomplished, and whether the exotic bird will be imported exclusively for a purpose allowed by the WBCA (as required by the statute). Husbandry practices can include information on: diet and feeding regimes; provision of water; temperature control; veterinary practices, such as vaccination and health screening; and substrate and/or bedding provided. Information on husbandry practices should include the specific needs of the particular species of exotic bird.

**Comments Pertaining to Opinions of Other Scientists or Organizations With Expertise (Section 15.22(b) and Section 15.23(b))**

Several commenters objected to the proposed issuance criterion regarding the opinions of scientists or other persons or organizations having expertise concerning the exotic bird or other matters germane to the application. The Service agrees that this is not strictly an issuance criterion. The Service has eliminated this requirement as unnecessarily duplicative with its existing authority under 50 CFR part 13 to obtain information as is necessary to issue any permit.

**Comments Pertaining to Publication of Permit Applications in the Federal Register**

Several commenters objected to the Service's proposed requirement to publish all applications for scientific research and zoological breeding and display permits in the Federal Register, for public comment from interested parties. The Service had included this requirement in order to facilitate receiving information from the widest possible sources. The Service agrees, however, that such publication is not necessary in all cases, particularly for Appendix II species. Since this constituted the Service placing an additional administrative burden upon itself, this requirement has been eliminated for scientific research and zoological breeding and display permits. Several commenters objected to publication in the Federal Register of permit applications for cooperative breeding programs. The Service notes that this was not included in the

proposed rule of August 12, 1993; the publication in the Federal Register applied to approval of cooperative breeding programs (§ 15.26) and not to the import permits for individual birds (§ 15.24). However, in the case of controversial permits, or permits for which the Service deems it necessary to obtain information from the public, the Service by policy reserves the option of publishing in the Federal Register a notice of any permit application.

Several commenters objected to publication in the Federal Register of applications for approval of cooperative breeding programs. The Service disagrees, and has retained the requirement to publish all applications for approval of cooperative breeding programs (§ 15.26(c)) in the Federal Register. The Service notes that this is a new program, and exotic wild birds and their conservation will benefit from the Service's receiving information from all knowledgeable members of the public in granting approval to cooperative breeding programs. Therefore, this requirement is not changed in the final rule.

**Comments Pertaining to Section 15.21: General Application Procedures**

All applications should be submitted to the Service's Office of Management Authority. In all cases, any additional requirements in 50 CFR parts 13, 14, 17, 21, and 23 must also be met. For the four types of permits, each section (§§ 15.22–15.25) is organized in the following manner: (1) Application requirements, which contains the information the applicant must provide to the Service; (2) Issuance criteria, which includes the findings the Service must make before a permit can be issued; and (3) Permit conditions: All permits are subject to the general conditions set forth in 50 CFR part 13, as well as any special conditions. Approval of cooperative breeding programs, § 15.26, is organized in the following manner: (1) Application requirements, which contains the information the applicant must provide to the Service; (2) Approval criteria, which include the findings the Service must make before approval can be granted; (3) Approval conditions: All approvals are subject to the general conditions set forth in 50 CFR part 13. An approved cooperative breeding program is required to maintain records of birds imported and their immediate progeny, and their disposition, which shall be made available to the Service on request; and (4) Publication in the Federal Register. Requests for approval will be published in the Federal Register for public comment.

One commenter was supportive of this section, while another inquired if cooperative breeding programs in the United States are subject to approval. The Service stresses that the only cooperative breeding program that needs to apply for approval under this part 15 is a program that intends to import exotic birds into the United States. The Service is not proposing to regulate breeding of exotic birds within the United States, nor is such regulation called for under the WBCA.

**Comments Pertaining to Section 15.22: Permits for Scientific Research**

Five commenters, including one ornithologist and one commenter on behalf of 14 organizations, agreed with the proposed rule. Four commenters considered the application requirements to be too restrictive or burdensome for scientific researchers. Comments pertaining to a number of issues were discussed above, in the general introduction to subpart C, as they pertain to all or most of the types of permits. In addition, comments were received regarding the following application requirements in paragraph (a) of this section:

**Comments Pertaining to Section 15.22(a)(4): Description of Scientific Research**

Several commenters considered it excessive to request information on a formal research protocol. The Service disagrees. Since the Service is required by the statute to determine that the import is exclusively for the stated purpose, in this case scientific research, the Service is by necessity required to ascertain the nature of the scientific research. One commenter felt that the application requirements for scientific research could discourage valid research, by requiring excessive information. The Service disagrees, since the information required is, in the Service's experience, standard information contained in research grant applications, and would not require additional work to provide that information to the Service. The Service agrees with some of the comments that the requirements for scientific research permits may appear excessive, and, in addition to those modifications addressed under "General Comments Pertaining to Subpart C," above, has made some modifications.

Section 15.22(a)(4)(i): In the proposed rule, the Service had required details on the funding of the research. Several commenters considered this excessive, unnecessary information. The Service agrees that this information is not necessary in all cases, and has removed

he requirement, but notes that it will accept such information for any relevant permit for scientific research, particularly in the case of Appendix I, endangered, or threatened species.

**Comments Pertaining to Section 15.22(a)(5): Qualifications Statement**

Several commenters considered it excessive to request information on the qualifications of the principal investigator conducting the proposed research.

The Service agrees that the information requested in the proposed rule may have been more than is necessary to make the required findings. However, the Service considers the issuance criteria in § 15.22(b) (4) and (5) to be valid, important, and consistent with the purposes of the Act. That is, the Service feels that the research for which a permit is required should have scientific merit, and the expertise, facilities, or other resources available to the applicant should be adequate for proper care and maintenance of the exotic bird, in order to successfully accomplish the stated research objectives. Such a finding is critical to the Service's being convinced that the exotic bird imported will indeed be used for the stated purpose of scientific research. The Service does not consider it appropriate to issue permits for activities that do not constitute *bona fide* scientific research, are unnecessary, or are duplicative. The Service notes that, based on its experience, unqualified individuals calling themselves researchers may attempt to engage in activities that no accredited research or zoological institution would consider to be a *bona fide* scientific research. Furthermore, one commenter requested clarification if scientific research had to be done at a public or academic institution, or if private research firms could qualify. The Service believes that nothing in this final rule precludes private institutions from receiving import permits for scientific research, under this section. The Service has modified the rule accordingly. The Service does not wish to burden legitimate, useful scientific research in a way. Therefore, instead of the detailed requirements in the proposed rule, the rule now requires only the qualifications of the scientific personnel conducting the proposed research, including applicable experience and a description of relevant past research conducted.

In summary, persons desiring to import otherwise prohibited species of exotic birds for scientific research must therefore provide information to the Service as prescribed in this section,

and import permits will be valid for up to one year.

**Comments Pertaining to Section 15.23: Permits for Zoological Breeding or Display**

Twelve commenters considered the proposed requirements in § 15.23(a) to be too restrictive, while five agreed in principle. Two commenters requested that permits be issued only for zoological breeding and display, but not for display programs alone. The Service notes that the term "zoological breeding or display programs" is directly from the statute, and has been retained. Comments pertaining to a number of issues were discussed above, in the general introduction to subpart C, as they pertain to all or most of the types of permits. In addition, comments were received regarding the following aspects of this section:

Several commenters objected to the proposed requirement in § 15.23(a) that applicants for permits for zoological breeding or display programs provide information on their breeding and inventory records, including hatching, survival and mortality records, as well as causes of any mortalities and efforts made to correct any problems. These commenters felt that such a requirement was unnecessary and burdensome on zoological institutions. The Service disagrees. Permit applications for species that suffer high mortality in captivity need to be evaluated as to how such mortality affects the need for further removal of wild-caught birds from their natural populations. Furthermore, in order to evaluate further applications for the same species from the same facility, the Service will benefit from knowing the mortalities and survival rates of a given species at a facility.

Several zoological institutions suggested that the information provided in a given application might also be pertinent for one or more other applications submitted by the same institution. The Service agrees; such would be the case in particular for information on the same or similar species, a history of the facility's programs, husbandry practices, and other facility information. Some institutions suggested that the Service maintain facility files that an applicant can refer to in a permit application, to avoid sending duplicate information. The Service accepts this suggestion, although it will be implemented as a matter of policy and not as a regulation in this Part 15. The Service will endeavor to maintain a master file for each institution with multiple applications. However, a separate

application will still be required to be submitted for each separate importation of exotic birds, in order to obtain the permits under this section. It is the responsibility of the applicant to guarantee that the information available to the Service from previous permit applications is current and accurate.

**Comments Pertaining to Expertise of a Zoological Institution**

One commenter inquired what was meant by a zoological institution, in order to determine what type of facility could apply for permits under this section. The Service considers a zoological institution, or zoo, to be one that is open to the public, has animals on public display, and in the context of this section, one that has a breeding or educational protocol that includes providing educational materials to the general public on the ecology and/or conservation of the species. Some commenters recommended only allowing applications for permits under this section to zoological institutions accredited by the American Association of Zoological Parks and Aquariums (AAZPA). Some commenters considered issuance criterion § 15.23(b)(5) to be unnecessary if only AAZPA-accredited institutions were eligible. Other commenters considered application requirement § 15.23(a)(5) unnecessary (the requirement for a description of the care and maintenance of the exotic bird, and how the facility meets professionally recognized standards of the public display community). The Service disagrees. The Service agrees that AAZPA accreditation is an important indicator of a facility's level of professionalism and expertise, and such accreditation is an indicator that the facility meets the professionally recognized standards of the public display community. However, the Service is also aware that there is a possibility that a facility might meet those standards, and satisfy the issuance criteria in § 15.23(b), without being accredited by AAZPA. Furthermore, the U.S. Government cannot limit applicants for permits authorized by statute to facilities recognized or accredited by a private entity, whose standards are not subject to government review or the Administrative Procedure Act.

Some commenters requested that zoological institutions be subject to the same requirements as cooperative breeding programs. The Service notes that the WBCA explicitly differentiated between the two, and this rule is consistent with the distinctions in the statute. One commenter felt that the zoological breeding community needs

more structure and integration of programs, particularly as regards genetic management plans. Indeed, the Service notes that no zoological institution is precluded from participating in a cooperative breeding program approved under § 15.26, and applying for an import permit under § 15.24. The Service is supportive of cooperative breeding efforts that involve coordination between private and public programs or institutions.

In summary, persons desiring to import otherwise prohibited species of exotic birds for zoological breeding or display must provide information to the Service as prescribed in this section, and import permits will be valid for up to one year.

Comments Pertaining to Section 15.24: Permits for Cooperative Breeding

Four commenters agreed in principle with the proposed rule, while 48 considered the proposed rule to be too restrictive, burdensome, or unnecessary. Several commenters recommended overview of applicants by approved avicultural organizations, which is the case in this rule. Comments pertaining to a number of issues were discussed above, in the general introduction to supart C, as they pertain to all or most of the types of permits. In addition, comments were received regarding the following aspects of this section:

Several commenters expressed concerns that requirements for approval of cooperative breeding programs were excessive and/or prohibitive of captive breeding: they are discussed under § 15.26, below. Several commenters were confused as to the "two-tiered" system for cooperative breeding programs. The Service notes that a cooperative breeding program may apply for approval under § 15.26. If a cooperative breeding program is approved, for importation of otherwise prohibited species, individuals affiliated with that program may apply to import birds under § 15.24. This process is expedited by requiring approval first of the program, and information that the Service would have needed to require from all applicants will only be required for the approval of the program. Information required from individual applicants refers to specific imports of specific exotic birds by a person.

Several commenters were confused about whether or not the Service had proposed to regulate interstate commerce in captive-bred exotic birds, or in general to regulate captive breeding of exotic birds in the United States. The Service stresses that that is not the case, and any person not wishing to import exotic birds need not

apply for a permit under this part 15, and any cooperative breeding program that does not intend to import exotic birds does not need to apply for approval. Some commenters raised concerns about marking requirements; none were proposed in the proposed rule of August 12, 1993, and none are found in this final rule. Other general comments pertaining to captive breeding in general will be discussed under § 15.26, below.

Comments Pertaining to Origin of Birds

One commenter objected to requiring information from applicants on the origin of the birds to be imported (wild-caught or captive-bred), as being unnecessary information for captive breeding purposes. The Service disagrees, and feels that this information is vital to making the required non-detriment finding. This information is also for the benefit of the applicant, since a less strict test of non-detriment will be employed in the case of captive-bred birds to be imported.

Comments Pertaining to Recordkeeping, Section 15.24(a)(5)(iii)

Several commenters opposed or expressed concern about the requirement for details on recordkeeping. The Service clarifies that it does not want all records kept by a participant in a cooperative breeding program. Rather, applicants are required to provide recordkeeping details pertaining to the relationship of the exotic bird to be imported to the cooperative breeding program approved under § 15.26. This is to assist the Service in being certain that records are kept that allow the cooperative breeding program to exercise the necessary oversight, to comply with the requirements of § 15.26, and to satisfy the intent of Congress that permittees for birds for cooperative breeding keep track of birds and their progeny. This issue is discussed further under § 15.26, below. The Service notes that it has removed the requirement for veterinary details, as being redundant with other requirements.

In summary, persons desiring to import otherwise prohibited species of exotic birds for cooperative breeding programs must first be affiliated with a cooperative breeding program approved under the provisions of § 15.26. If a person is affiliated with an approved program, to apply for a permit they must provide information to the Service as prescribed in this section. Import permits will be valid for up to one year.

Comments Pertaining to Section 15.25: Permits for Personal Pets

Several commenters expressed concerns about the Service's intentions regarding birds that have previously been exported from the United States and are being returned to the United States. The Service has modified the rule, and discussed this issue under § 15.12, above.

Comments Pertaining to Section 15.25(a): Two Birds Per Individual

In the proposed rule, the Service had required that no household be able to import more than two birds as pets in any year, although section 112 of the WBCA clearly states that the restriction is on two birds per individual. Some commenters felt that limiting imports to two birds per household was an unnecessary restriction when compared with the requirements of statute. The Service agrees, and in this final rule the restriction is on two birds per individual per year. The Service had proposed household rather than individual, for a number of reasons, including to avoid situations where persons would purchase birds for each member of their family, and import them for commercial purposes. The Service has however returned to the original language of the statute. If a household wishes to import more than two birds, individual members of that household must each apply for import permits. The Service is still required to make the required findings, including whether the import is detrimental to the species in the wild. The Service has retained the permit condition that the exotic birds cannot be imported with the intention to sell. One commenter requested that the rule limit imports to one per individual rather than two birds; the Service has retained the two bird limit, as that is contained in statute.

Comments Pertaining to Section 15.25(a): One Year Resident Outside of the United States

Several commenters were concerned about the requirement that in order to obtain a permit to import a personally owned pet bird acquired outside of the United States, individuals are required to show documentation that they have continually resided outside of the United States for a minimum of one year. Several commenters noted that the WBCA states that individuals must have been "continuously out of the country for a minimum of one year"; these commenters felt that the residence requirement was more restrictive than the statute. Actually, the opposite is the

case. The Service is aware of many situations where U.S. citizens are stationed overseas for several years (and thereby reside outside of the United States), but they have not actually been physically out of the country for the entire time, as they make frequent visits to family in the United States. The Service did not consider it the intent of Congress to prevent Foreign Service and military officers stationed outside of the United States for one or more years to import their birds, if perchance they had visited the United States during that period. The proposed rule language has not been changed. Another commenter recommended increasing the required period of residency outside of the United States to two years; the Service disagrees, since one year is specified in the WBCA, the one year requirement has been retained.

One commenter objected to requiring information from applicants on the origin of their pet bird (wild-caught or captive-bred), as being information unavailable to the general public. The Service disagrees, and feels that this information is vital to making the required non-detriment finding, and considers the detail of information requested to not be excessive.

Comments Pertaining to Section 15.26: Approval of Cooperative Breeding Programs

Sixteen commenters considered the provisions of the proposed rule to be too restrictive, redundant, or unnecessary, while five agreed in principle. Comments pertaining to a number of issues were discussed above, in the general introduction to subpart C, as they pertain to all or most of the types of permits and to approval of cooperative breeding programs. In addition, comments were received regarding the following aspects of this section:

Some commenters expressed concerns that the proposed rule would discourage captive breeding. The Service disagrees. One commenter claimed that the "intent of the WBCA is to promote breeding of exotic avian species." The Service notes that the stated purpose of the WBCA, in section 103 of the statute, is "to promote the conservation of exotic birds", in a number of ways, with a focus on benefits to exotic birds in the wild. Nevertheless, the Service is aware of, and agrees with, exemptions provided for in the WBCA for importation of-otherwise prohibited exotic bird species for cooperative breeding programs. Based on comments received and its own analysis, the Service has changed or eliminated elements of the proposed rule that relates to cooperative breeding

programs (see "General comments pertaining to subpart C", above), and that may have been unnecessary.

Some commenters recommended that the Service leave any regulation of cooperative breeding programs to avicultural organizations. The Service believes that the final rule is quite self-regulating, in that cooperative breeding programs must submit information on a number of topics, but the Service has allowed for great flexibility in these topics and in how cooperative breeding programs are designed. For example, the Service has required information on a breeding protocol, genetic management plan and breeding methods, and plans for developing and maintaining a self-sustaining population in captivity of the exotic bird species; the Service has not directed cooperative breeding programs as to what breeding protocol should be used, or how to allocate birds, but rather is leaving that up to each program to coordinate. The Service notes that in the public meeting of April 15–16, 1993, there was consensus of those attending (including many aviculturists) that the most expeditious way to handle cooperative breeding programs in a rulemaking implementing the WBCA would be a two-tiered system, with approval of the entire program first, followed by applications from individual breeders.

Comments Pertaining to Section 15.26(a)(1): Birds to be Imported

One commenter suggested that individual cooperative breeding programs be eligible for approval whether or not they intend to import birds. The Service agrees that a cooperative breeding program may not have a specific importation planned, and has modified the rule accordingly to require a description of the exotic bird(s) to be imported or to be covered under the program. However, the Service notes that any program breeding exotic birds in captivity with no intent to import birds has no need to apply for approval under the WBCA.

Comments Pertaining to Recordkeeping and Tracking of Birds

Some commenters objected to the proposed requirement in § 15.26(a)(2) for submission by cooperative breeding programs of details on the system of recordkeeping and tracking of birds and their progeny. The Service however considers that requirement to be vital, and has retained it in the final rule. Congress, in the House Committee Report on the Wild Bird Conservation Act, said that it "expects that the Secretary will issue permits for the importation of birds for breeding if the

applicant can demonstrate that he or she is capable and fully intends to keep track of the whereabouts of the offspring of birds that are imported under this exemption. The purpose of this requirement is to ensure that it efforts to reintroduce the species into the wild are undertaken, the location of birds that might be included in such a program and their genetic makeup will be known." To comply with the intent of Congress in this matter, the Service has retained the requirement for information on plans for disposition of progeny, a breeding protocol that includes a discussion of the proposed genetic management plan, and details on the system of recordkeeping to be used.

Comments Pertaining to Types of Facilities

One commenter felt very strongly that cooperative breeding programs for endangered species and/or CITES Appendix I be done only in closed, single-species facilities, because of disease transmission concerns; the commenter cited the Service's policy for the captive breeding of Puerto Rican Parrots. The Service agrees that there are serious risks of disease exposure in captive-breeding programs for threatened or endangered species. The Service, as a matter of policy, for Appendix I species or species listed under the Endangered Species Act, will seek to obtain information as to whether facilities are single or multi-species, where reintroduction is the stated objective of the breeding program.

Comments Pertaining to Annual Reports

One commenter felt that the proposed requirement in § 15.26(a)(5) to provide annual reports for 3 years imposes an impediment to creating new cooperative breeding programs, since there are very few such programs established for CITES Appendix II-listed species. The Service neither intended nor wishes to discourage the formation of new cooperative breeding programs. Therefore, the Service has modified the proposed requirement to ask for such information from pre-existing cooperative breeding programs, by including "if applicable " in the rule.

Comments Pertaining to Affiliation

Several commenters were unclear what is meant by professional affiliation in § 15.26, which requires a qualification statement for each individual who will be overseeing a cooperative breeding program, and requires that individuals overseeing the program demonstrate an affiliation with an avicultural, conservation or zoological organization. The proposed

rule required that this affiliation be professional. Some commenters noted that some avicultural organizations are administered by volunteers, who might be thought of as non-professionals. The Service agrees, and has removed the requirement that affiliations be professional. The Service notes however that the individuals overseeing a cooperative breeding program must be able to demonstrate some formal affiliation with the avicultural, zoological, or conservation organization, whether professional, as an officer, or otherwise.

Comments Pertaining to Country of Origin

Two commenters recommended that captive breeding of endangered species be conducted in the country of origin of the species (*in situ*) for conservation purposes and *ex situ* captive breeding programs should only be sanctioned when it is not possible to set up captive breeding programs in the country of origin. The Service feels strongly that conservation, management, and recovery programs in countries of origin should be given full consideration.

Comments Pertaining to Studbooks

One commenter objected to the requirement for information on a studbook, if one has been developed for the species, as being superfluous. The Service disagrees, and considers that if a studbook has been developed for a species, that information is useful in making the required findings.

Comments Pertaining to Publication in the Federal Register (§ 15.26(c))

Several commenters objected to publication in the Federal Register of applications for approval of cooperative breeding programs. The Service disagrees, and has retained its commitment and requirement to publish all applications for approval of cooperative breeding programs in the Federal Register. The Service notes that this is a new program, and exotic wild birds and their conservation will benefit from the Service's receiving information form all knowledgeable members of the public in granting approval to cooperative breeding programs. The Service notes that individual permit applications associated with approved cooperative breeding programs will not be required to be published in the Federal Register.

Comments Pertaining to Renewal of Approval, Section 15.26(e)

Cooperative breeding programs will be approved for two years, and can apply for renewal of approval. One commenter inquired if a cooperative breeding program that does not intend to import any more birds needs to apply for renewal. The Service stresses that no renewal would then be needed, and renewal is *not* obligatory. The Service further stresses that approval of cooperative breeding programs is *only* necessary when participants in the program intend to apply to import otherwise prohibited species of exotic birds.

In summary, cooperative breeding programs that wish to oversee the importation of otherwise prohibited species of exotic birds must be approved under this section before persons can apply for import permits under § 15.24. In applying for approval, a cooperative breeding program must provide information to the Service as prescribed in this section.

Comments Pertaining to Subpart D–Approved List of Species Listed in the Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora

No comments were received on the proposed organization of this subpart. This subpart D is established in this rule; actual text will be proposed in a future proposed rulemaking. The subpart is organized as follows:

15.31  Criteria for including species in the approved list.
  (a) Captive-bred species
  (b) Non-captive-bred species
15.32  Species included in the approved list.
  (a) Captive-bred species
  (b) Non-captive-bred species

Comments Pertaining to Subpart E: Qualifying Facilities Breeding Exotic Birds in Captivity

No comments were received on the proposed organization on this subpart. This subpart E is established in this rule; actual text will be proposed in a future proposed rulemaking. The subpart is organized as follows:

Section 15.41  Criteria for including facilities as qualifying for imports.
Section 15.42  List of foreign qualifying breeding facilities.

Comments Pertaining to Subpart F: List of Prohibited Species Not Listed in the Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora

No comments were received on the proposed organization of this subpart. This subpart F is established in this rule; actual text will be proposed in a future proposed rulemaking. The subpart is organized as follows:

Section 15.51  Criteria for including species and countries in the prohibited list.
Section 15.52  Species included in the prohibited list.
Section 15.53  Countries of export included in the prohibited list.

General Comments

Comments Pertaining to Marking of Exotic Birds

One commenter noted that section 114 of the WBCA calls on the Secretary to review a program for labeling of exotic birds and certification of breeding facilities, and to report to Congress the results of that review by October 23, 1994. The Service has not yet begun that review, but welcomes the voluntary contribution of information or suggestions from members of the public on the way to proceed with this review. Several commenters inquired if the Service intends to propose regulations pursuant to Section 115 of the WBCA, which authorizes the Secretary to promulgate regulations requiring marking or recordkeeping for certain species of exotic birds. The Service will review that issue, and decide in the future on what regulations to propose.

Comments Pertaining to the Regulatory Flexibility Act

One commenter inquired how the Service could certify that these regulations will not have a significant economic effect on a substantial number of small entities as described by the Regulatory Flexibility Act. The Service notes that while the statute may have an economic effect, these regulations establishing permit procedures will allow the importation of otherwise prohibited species; since the regulations remove an automatic restriction, any potential economic effect is either minor or beneficial.

Effects of the Rule

The Service has determined that this rule is categorically excluded under Departmental procedures in complying with the National Environmental Policy Act (NEPA). The regulations are procedural in nature, and the environmental effects are judged to be minimal, speculative, and do not lend themselves to meaningful analysis. See 516 DM [Departmental Manual] 2, Appx. 1, Paragraph 1.10. The permits authorized under the WBCA and regulations may be subject to NEPA documentation requirements, on a case-by-case basis. For good cause as explained herein, the effective date of this final rule has not been delayed for thirty (30) days after publication in the Federal Register because, in accordance

with 5 U.S.C. 553(d) (1) and (3), the rule recognizes permitting exceptions to the requirements of the Wild Bird Conservation Act, which automatically imposes broad import bans as of October 23, 1993.

**Executive Orders 12866, 12612, and 12630 and the Regulatory Flexibility Act**

It had been previously determined that these revisions to 50 CFR Part 15 do not constitute a "major" rule under the criteria established by Executive Order 12291. Since that time, President Clinton has signed Executive Order 12866 which revokes Executive Order 12291 and requires, among other things, that agencies determine whether a regulatory action is significant. This rule is not significant as defined in Executive Order 12866. This action is not expected to have significant taking implications for U.S. citizens, as per Executive Order 12630. It has also been certified that these revisions will not have a significant economic effect on a substantial number of small entities as described by the Regulatory Flexibility Act. Since the rule applies to importation of live wild birds into the United States, it does not contain any Federalism impacts as described in Executive Order 12612.

**Paperwork Reduction**

The information collection requirement(s) contained in this section have been approved by the Office of Management and Budget, as required by 44 U.S.C. 3501 *et seq.* The collection of this information has been assigned approval number 1018–0084 by the Office of Management and Budget and the expiration date of August 31, 1996.

**Author**

The primary author of this final rule is Dr. Susan S. Lieberman, Office of Management Authority, U.S. Fish and Wildlife Service, Washington, D.C. 20240 (703/358–2093).

**List of Subjects in 50 CFR Part 15**

Imports, Reporting and recordkeeping requirements, Transportation, Wildlife.

**Regulation Promulgation**

Accordingly, part 15 of Chapter I of title 50 of the Code of Federal Regulations is hereby revised to read as follows:

**PART 15—WILD BIRD CONSERVATION ACT**

**Subpart A—Introduction and General Provisions**

Sec.
15.1   Purpose of regulations.

Sec.
15.2   Scope of regulations.
15.3   Definitions.

**Subpart B—Prohibitions and Requirements**

15.11   Prohibitions.
15.12   Requirements.

**Subpart C—Permits and Approval of Cooperative Breeding Programs**

15.21   General application procedures.
15.22   Permits for scientific research.
15.23   Permits for zoological breeding or display programs.
15.24   Permits for cooperative breeding.
15.25   Permits for personal pets.
15.26   Approval of cooperative breeding programs.

**Subpart D—Approved List of Species Listed in the Appendices to the Convention**

15.31   Criteria for including species in the approved list. [Reserved]
15.32   Species included in the approved list. [Reserved]

**Subpart E—Qualifying Facilities Breeding Exotic Birds in Captivity**

15.41   Criteria for including facilities as qualifying for imports. [Reserved]
15.42   List of foreign qualifying breeding facilities. [Reserved]

**Subpart F—List of Prohibited Species Not Listed in the Appendices to the Convention**

15.51   Criteria for including species and countries in the prohibited list. [Reserved]
15.52   Species included in the prohibited list. [Reserved]
15.53   Countries of export included in the prohibited list. [Reserved]
Authority: 61 U.S.C. 4901–4916.

**Subpart A—Introduction and General Provisions**

**§ 15.1   Purpose of regulations.**

The regulations in this part implement the Wild Bird Conservation Act of 1992, Pub. L. 102–440, 16 U.S.C. 4901–4916.

**§ 15.2   Scope of regulations.**

(a) The regulations in this part apply to all species of exotic birds, as defined in section 15.3.

(b) The provisions in this part are in addition to, and are not in lieu of, other regulations of this subchapter B that may require a permit or prescribe additional restrictions or conditions for the import, export, reexport, and transportation of wildlife.

**§ 15.3   Definitions.**

In addition to the definitions contained in Parts 10 and 23 of this subchapter B, and unless the context requires otherwise, in this Part:

*Exotic bird* means any live or dead member of the Class Aves that is not indigenous to the 50 States or the District of Columbia, including any egg

or offspring thereof, but does not include domestic poultry, dead sport-hunted birds, dead museum specimens, dead scientific specimens, products manufactured from such birds, or birds in any of the following families: Phasianidae. Numididae, Cracidae, Meleagrididae, Megapodiidae, Anatidae, Struthionidae Rheidae, Dromaiinae, and Gruidae.

*Indigenous* means a species that is naturally occurring, not introduced as a result of human activity, and that currently regularly inhabits or breeds in the 50 States or the District of Columbia.

*Person* means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

*Species* means any species, any subspecies, or any district population segment of a species or subspecies, and includes hybrids of any species or subspecies. Hybrids will be treated according to the more restrictive Appendix or category in which either parental species is listed.

*United States* means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

**Subpart B—Prohibitions and Requirements**

**§ 15.11   Prohibitions.**

(a) Except as provided under a permit issued pursuant to subpart C of this Part, it is unlawful for any person subject to the jurisdiction of the United States to commit, attempt to commit, to solicit another to commit, or to cause to be committed, any of the acts described in paragraphs (b) through (f) of this section in regard to any exotic bird.

(b) It is unlawful to import into the United States any exotic bird species listed in the Appendices to the Convention that is not included in the approved list of species, pursuant to subpart D of this part, except that

(1) This paragraph (b) does not apply to any exotic bird that was bred in a foreign breeding facility listed as qualifying pursuant to subpart E of this part, and

(2) This paragraph (b) does not apply to an exotic bird species listed in

Appendix III to the Convention that originated in a country that has not listed the species in Appendix III.

(c) It is unlawful to import into the United States any exotic bird species not listed in the Appendices to the Convention that is listed in the prohibited species list, pursuant to subpart F of this Part. In addition to all other exotic birds species, this paragraph also applies to exotic bird species listed in Appendix III to the Convention that originated in a country that has not listed the species in Appendix III.

(d) It is unlawful to import into the United States any exotic bird species from any country included in the prohibited country list, pursuant to subpart F of this part.

(e) It is unlawful to import into the United States any exotic bird species from a qualifying facility breeding exotic birds in captivity, listed pursuant to subpart E of this part, if the exotic bird was not captive-bred at the listed facility.

(f) It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this Part that violates a condition of said permit.

**§ 15.12   Requirements.**

(a) No person shall import into the United States any exotic bird except as may be permitted under the terms of a valid permit issued pursuant to the provisions of subpart C of this part and 50 CFR part 13, or in accordance with the provisions of subparts D–F of this part 15, or in accordance with the provisions of paragraph (b) of this section.

(b) Any exotic bird can be imported to the United States if it was legally exported from the United States with a permit issued by the Service's Office of Management Authority, provided that the import is by the same person who exported the bird, the import is accompanied by a copy of the cleared CITES export permit or certificate issued by the Service that was used to export the exotic bird, and the Service is satisfied that the same bird is being imported as is indicted on the aforementioned permit or certificate.

**Subpart C—Permits and Approval of Cooperative Breeding Programs**

**§ 15.21   General application procedures.**

(a) The Director may issue a permit authorizing the importation of exotic birds otherwise prohibited by § 15.11, in accordance with the issuance criteria of this subpart, for the following purposes

only: Scientific research; zoological breeding or display programs; cooperative breeding programs designed to promote the conservation and maintenance of the species in the wild; or personally owned pets accompanying persons returning to the United States after being out of the country for more than 1 year.

(b) Additional requirements as indicated in parts 13, 14, 17, 21, and 23 of this subchapter must also be met.

(c) Applications for permits under this subpart and applications for approval of cooperative breeding programs under this subpart shall be submitted to the Director, U.S. Fish and Wildlife Service, Office of Management Authority, 4401 N. Fairfax Drive, Arlington, Virginia 22203 by the person wishing to engage in the activity. Each application must be submitted on an official application (Form 3–200) provided by the Service and must contain all of the information specified in the applicable section, § 15.22–15.26. The sufficiency of the application shall be determined by the Director in accordance with the requirements of this part and part 13 of this subchapter.

**§ 15.22   Permits for scientific research.**

(a) Application requirements for permits for scientific research. Each application shall provide the following information and such other information that the Director may require:

(1) A description of the exotic bird(s) to be imported, including:

(i) The common and scientific names of the species, number, age or age class, and, when known, sex; and

(ii) A statement as to whether, at the time of the application, the exotic bird is still in the wild, has already been removed from the wild, or was bred in captivity:

(2) If the exotic bird is in the wild or was taken from the wild, include:

(i) The country and region where the removal will occur or occurred;

(ii) A description of the status of the species in the region of removal; and

(iii) A copy of any foreign collecting permit or authorizing letter, if applicable;

(3) If the exotic bird was bred in captivity, include:

(i) Documents or other evidence that the bird was bred in captivity, including the name and address of the breeder, and when known, hatch date and identity of the parental birds; and

(ii) If the applicant is not the breeder, documentation showing the bird was acquired from a breeder and a history of multiple transactions, if applicable:

(4) A statement of the reasons applicant is justified in obtaining a

permit, and a complete description of the scientific research to be conducted on the exotic bird requested, including:

(i) Formal research protocol with timetable;

(ii) The relationship of such research to the conservation of the species in the wild;

(iii) A discussion of possible alternatives and efforts to obtain birds from other sources; and

(iv) Plans for disposition of the exotic birds and any progeny upon completion of the research project;

(5) Qualifications of the scientific personnel conducting the proposed research, including applicable experience and a description of relevant past research conducted;

(6) A description of the care and maintenance of the exotic bird, and how the facility meets professionally recognized standards, including;

(i) The name and address of the facility where the exotic bird will be maintained;

(ii) Dimensions of existing enclosures for the birds to be imported and number of birds to be housed in each; and

(iii) Husbandry practices.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in Part 13 of this subchapter, the following factors;

(1) Whether the purpose of the scientific research is adequate to justify removing the exotic bird from the wild or otherwise changing its status;

(2) Whether the proposed import would be detrimental to the survival of the exotic bird species in the wild, including whether the exotic bird was bred in captivity or was (or will be) taken from the wild, taking into consideration the conservation status of the species in the wild;

(3) Whether the permit, if issued, would conflict with any known program intended to enhance the survival of the population from which the exotic bird was or would be removed;

(4) Whether the research for which the permit is required has scientific merit;

(5) Whether the expertise, facilities, or other resources available to the applicant appear adequate for proper care and maintenance of the exotic bird and to successfully accomplish the research objectives stated in the application.

(c) Permit conditions. In addition to the general conditions set forth in Part 13 of this subchapter, every permit issued under this section shall be

subject to special conditions as the Director may deem appropriate.

(d) Duration of permits. The duration of the import permits issued under this section shall be designated on the face of the permit, but in no case will these permits be valid for longer than one year.

### 15.23 Permits for zoological breeding or display programs.

(a) Application requirements for permits for zoological breeding or display programs. Each application shall provide the following information and such other information that the Director may require:

(1) A description of the exotic bird(s) to be imported, including:

(i) The common and scientific names of the species, number, age or age class, and, when known, sex; and

(ii) A statement as to whether, at the time of the application, the exotic bird is still in the wild, has already been removed from the wild, or was bred in captivity;

(2) If the exotic bird is in the wild or was taken from the wild include:

(i) The country and region where the removal will occur or occurred;

(ii) A description of the status of the species in the region of removal; and

(iii) A copy of any foreign collecting permit or authorizing letter, if applicable;

(3) If the exotic bird was bred in captivity, include:

(i) Documents or other evidence that the bird was bred in captivity, including the name and address of the breeder, and when known, identity of the parental birds, and hatch date; and

(ii) If the applicant is not the breeder, documentation showing the bird was acquired from a breeder and a history of multiple transactions, if applicable;

(4) A statement of the reasons the applicant is justified in obtaining a permit, and a complete description of the breeding or display program to be conducted with the exotic bird requested, including:

(i) A breeding or education protocol that provides information on educational materials on the ecology and/or conservation status of the species provided to the general public;

(ii) Plans, if any, for developing or maintaining a self-sustaining population of the exotic bird species in captivity;

(iii) A statement on efforts to obtain birds from alternative sources or sources within the United States;

(iv) The relationship of such a breeding or display program to the conservation of the species in the wild; and

(v) Plans for disposition of the exotic birds and any progeny.

(5) A description of the care and maintenance of the exotic bird, and how the facility meets professionally recognized standards of the public display community, including:

(i) The name and address of the facility where the exotic bird will be maintained;

(ii) Dimensions of existing enclosures for the birds to be imported and number of birds to be housed in each;

(iii) Husbandry practices;

(6) A history of the zoological facility's breeding programs with the same or similar species, including:

(i) participation in any cooperative breeding programs;

(ii) breeding and inventory records for the last two years, including hatching, survival, and mortality records; and

(iii) causes of any mortalities and efforts made to correct any problems.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in part 13 of this subchapter, the following factors:

(1) Whether the zoological breeding or display program is adequate to justify removing the exotic bird from the wild or otherwise changing its status;

(2) Whether the proposed import would be detrimental to the survival of the exotic bird species in the wild, including whether the exotic bird was bred in captivity or was (or will be) taken from the wild, taking into consideration the conservation status of the species in the wild;

(3) Whether the permit, if issued, would conflict with any known program intended to enhance the survival of the population from which the exotic bird was or would be removed;

(4) Whether the breeding or display program for which the permit is required has conservation merit; and

(5) Whether the expertise, facilities or other resources available to the applicant appear adequate for proper care and maintenance of the exotic bird and to successfully accomplish the zoological breeding or display objectives stated in the application.

(c) Permit conditions. In addition to the general conditions set forth in Part 13 of this subchapter, every permit issued under this section shall be subject to special conditions as the Director may deem appropriate.

(d) Duration of permits. The duration of the import permits issued under this section shall be designated on the face of the permit, but in no case will these permits be valid for longer than one year.

### § 15.24 Permits for cooperative breeding.

(a) Application requirements for permits for cooperative breeding. Each application shall provide the following information and such other information that the Director may require:

(1) A description of the exotic bird(s) to be imported, including:

(i) The common and scientific names of the species, number, age or age class, and, when known, sex; and

(ii) A statement as to whether, at the time of the application, the exotic bird is still in the wild, has already been removed from the wild, or was bred in captivity;

(2) If the exotic bird is still in the wild or was taken from the wild include:

(i) The country and region where the removal will occur or occurred;

(ii) A description of the status of the species in the region of removal; and

(iii) A copy of any foreign collecting permit or authorizing letter, if applicable;

(3) If the exotic bird was bred in captivity, include;

(i) Documents or other evidence that the bird was bred in captivity, including the name and address of the breeder, when known, the identity of the parental birds and hatch date; and

(ii) If the applicant is not the breeder, documentation showing the bird was acquired from the breeder and a history of multiple transactions, if applicable;

(4) A statement of the reasons the applicant is justified in obtaining a permit, and a statement detailing the applicant's participation in a cooperative breeding program approved under section 15.26 of this chapter, including;

(i) Copies of any signed agreements or protocols with the monitoring avicultural, conservation, or zoological organization overseeing the program; and

(ii) Applicable records of the cooperative breeding program of any other birds imported, their progeny, and their disposition;

(5) A complete description of the relationship of the exotic bird to the approved cooperative breeding program, including;

(i) A statement of the role of the exotic bird in a breeding protocol;

(ii) A plan for maintaining a self-sustaining captive population of the exotic bird species;

(iii) Details on recordkeeping; and

(iv) Plans for disposition of the exotic birds and any progeny produced during the course of this program.

(6) A statement outlining the applicant's attempts to obtain the exotic bird in a manner that would not cause its removal from the wild, and attempts

to obtain the specimens of the exotic bird species from stock available in the United States;

(7) A description of the care and maintenance of the exotic bird, and how the facility meets professionally recognized standards, including;

(i) The name and address of the facility where the exotic bird will be maintained;

(ii) Dimensions of existing enclosures for birds to be imported and number of birds to be housed in each; and

(iii) Husbandry practices;

(8) A history of the applicant's past participation in cooperative breeding programs with the same or similar species, including;

(i) breeding and inventory records for at least the last two years;

(ii) hatching, survival, and mortality records;

(iii) causes of any mortalities and efforts made to correct any problems.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in part 13 of this subchapter, the following factors:

(1) Whether the cooperative breeding program is adequate to justify removing the exotic bird from the wild or otherwise changing its status;

(2) Whether the proposed import would be detrimental to the survival of the exotic bird species in the wild, including whether the exotic bird was bred in captivity or was (or will be) taken from the wild, taking into consideration the conservation status of the species in the wild;

(3) Whether the cooperative breeding program for which the permit is required would be likely to enhance or promote the conservation of the exotic bird species in the wild or result in a self-sustaining population of the exotic bird species in captivity; and

(4) Whether the expertise, facilities, or other resources available to the applicant appear adequate for proper care and maintenance of the exotic birds and to successfully accomplish the cooperative breeding objectives stated in the application.

(c) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this section shall be subject to special conditions as the Director may deem appropriate.

(d) Duration of permits. The duration of the import permits issued under this section shall be designated on the face of the permit, but in no case will these

permits be valid for longer than one year.

§ 15.25   Permits for personal pets.

(a) Application requirements for personal pets not intended for sale. No individual may import more than two exotic birds as pets in any year. Each application shall provide the following information and such other information that the Director may require:

(1) A description of the exotic bird to be imported, including;

(i) The common and scientific names, number, age, and, when known, sex;

(ii) A band number, house name, or any other unique identifying feature; and

(iii) A statement as to whether the exotic bird was bred in captivity or taken from the wild;

(2) A statement of the reasons the applicant is justified in obtaining a permit;

(3) Documentation showing that the applicant has continually resided outside of the United States for a minimum of one year;

(4) A statement of the number of exotic birds imported during the previous 12 months as personal pets by the applicant;

(5) Information on the origin of the exotic bird, including;

(i) Country of origin; and

(ii) A description and documentation of how the exotic bird was acquired, including a copy of any Convention permit under which the bird was re-exported or exported. If there is no such permit, a sales receipt or signed statement from seller with name and address of seller, date of sale, species, and other identifying information on the bird or signed breeder's certificate or statement with name and address of breeder, date of sale or transfer, species and hatch date.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in Part 13 of this subchapter, the following factors:

(1) Whether the proposed import would be detrimental to the survival of the exotic bird species in the wild;

(2) Whether the exotic bird to be imported is a personal pet owned by the applicant, who has continuously resided outside the United States for a minimum of one year, and who has no intention to sell the bird; and

(3) Whether the number of exotic birds imported in the previous 12 months by the applicant does not exceed two.

(c) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this section shall be subject to special conditions that no individual may import more than two exotic birds as personal pets in any year, the exotic birds cannot be sold after importation into the United States, and any other conditions as the Director may deem appropriate.

(d) Duration of permits. The duration of the import permits issued under this section shall be designated on the face of the permit.

§ 15.26   Approval of cooperative breeding programs.

Upon receipt of a complete application, the Director may approve cooperative breeding programs. Such approval will allow individuals to import exotic birds otherwise prohibited by section 15.11, with permits under section 15.24. Such approval for cooperative breeding programs shall be granted in accordance with the issuance criteria of this section.

(a) Application requirements for approval of cooperative breeding programs. Each application shall provide the following information and such other information that the Director may require:

(1) A description of the exotic bird(s) to be imported or to be covered under the program, including the common and scientific names of the species, number, sex ratio (if applicable), and age class;

(2) A statement of the reasons the applicant is justified in obtaining this approval, and a description of the cooperative breeding program requested for the exotic bird species, including:

(i) A breeding protocol, including a genetic management plan and breeding methods;

(ii) A statement on the plans for developing and maintaining a self-sustaining population in captivity of the exotic bird species;

(iii) Details on the system of recordkeeping and tracking of birds and their progeny, including how individual specimens will be marked or otherwise identified;

(iv) A statement on the relationship of such a breeding program to the conservation of the exotic bird species in the world;

(v) Details on the funding of this program; and

(vi) Plans for disposition of the exotic birds and any progeny;

(3) A qualification statement for each individual who will be overseeing the cooperative breeding program. This statement should include information on the individual's prior experience

with the same or similar bird species. Individuals overseeing the program will be required to demonstrate an affiliation with an avicultural, conservation, or zoological organization;

(4) A statement of the oversight of the program by the avicultural, zoological, or conservation organization, including their monitoring of participation in the program, criteria for acceptance of individuals into the program, and the relationship of the cooperative breeding program to enhancing the propagation and survival of the species; and

(5) A history of the cooperative breeding program, including an annual report for the last 3 years (if applicable), mortality records, breeding records, and a studbook if one has been developed for the species.

(b) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a) of this section, the Director will decide whether or not a cooperative breeding program should be approved. In making this decision, the Director shall consider, in addition to the general criteria in Part 13 of this subchapter, the following factors:

(1) Whether the cooperative breeding program for which the approval is requested is adequate to justify removing the exotic bird from the wild or otherwise changing its status;

(2) Whether the granting of this approval would be detrimental to the survival of the exotic bird species in the wild, including whether the exotic birds were bred in captivity or will be taken from the wild, taking into consideration the conservation status of the species in the wild;

(3) Whether the granting of this approval would conflict with any known program intended to enhance the survival of the population from which the exotic bird species was or would be removed;

(4) Whether the cooperative breeding program for which the permit is requested would be likely to enhance or promote the conservation of the exotic bird species in the wild or result in a self-sustaining population of the exotic bird species in captivity; and

(5) Whether the expertise or other resources available to the program appear adequate to successfully accomplish the objectives stated in the application.

(c) Publication in the Federal Register. The Director shall publish notice in the Federal Register of each application submitted under Section 15.26(a). Each notice shall invite the submission from interested parties of written data, views, or arguments with respect to the application. The Director shall publish periodically a notice as appropriate in the Federal Register of the list of approved cooperative breeding programs.

(d) Approval conditions. In addition to the general conditions set forth in part 13 of this subchapter, every approval issued under this paragraph shall be subject to the special condition that the cooperative breeding program shall maintain records of all birds imported under permits issued under this subpart and their progeny, including their sale or transfer, death, or escape, and breeding success. These records shall be made available to the Service on request and when renewing an approval.

(e) Duration of approval. Cooperative breeding programs shall be approved for two years, at which time applicants may apply to the Service for renewal of a program's approval. Applications for renewal of approval shall comply with the general conditions set forth in part 13 of this subchapter.

## Subpart D—Approved List of Species Listed in the Appendices to the Convention

§ 15.31   Criteria for including species in the approved list. [Reserved].

§ 15.32   Species included in the approved list. [Reserved].

## Subpart E—Qualifying Facilities Breeding Exotic Birds in Captivity

§ 15.41   Criteria for including facilities as qualifying for imports. [Reserved].

§ 15.42   List of foreign qualifying breeding facilities. [Reserved].

## Subpart F—List of Prohibited Species Not Listed in the Appendices to the Convention

§ 15.51   Criteria for including species and countries in the prohibited list. [Reserved].

§ 15.52   Species included in the prohibited list. [Reserved].

§ 15.53   Countries of export included in the prohibited list. [Reserved].

Dated: October 19, 1993.

**Bruce Blanchard,**

*Deputy Director, U.S. Fish and Wildlife Service.*

[FR Doc. 93–28085 Filed 11–15–93; 8:45 am]

BILLING CODE 4310-55-M

[Federal Register Volume 59, Number 231 (Friday, December 2, 1994)]
[Unknown Section]
[Page 0]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 94-29673]


[[Page Unknown]]


[Federal Register: December 2, 1994]


-----------------------------------------------------------------------


DEPARTMENT OF THE INTERIOR
50 CFR Part 15
RIN 1018-AC15


Importation of Exotic Wild Birds to the United States; Final Rule
Implementing the Wild Bird Conservation Act of 1992

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

-----------------------------------------------------------------------

SUMMARY: On October 23, 1992, the Wild Bird Conservation Act of 1992
(WBCA) was signed into law, the purposes of which include promoting the
conservation of exotic birds by: Ensuring that all imports of exotic
bird species into the United States are biologically sustainable and
not detrimental to the species; ensuring that imported birds are not
subject to inhumane treatment during capture and transport; and
assisting wild bird conservation and management programs in countries
of origin. This final rule implements procedures for the establishment
of an approved list of species listed in the Appendices to the
Convention on International Trade in Endangered Species of Wild Fauna
and Flora that may be imported without a WBCA permit because it has
been determined that trade in these species involves only captive-bred
specimens.

EFFECTIVE DATE: This rule is effective January 3, 1995.

FOR FURTHER INFORMATION CONTACT: Dr. Susan S. Lieberman, U.S. Fish and
Wildlife Service, Office of Management Authority, 4401 N. Fairfax
Drive, room 420C, Arlington VA 22203, telephone (703) 358-2093.

SUPPLEMENTARY INFORMATION: This final rule implements aspects of the
WBCA, which was signed into law on October 23, 1992. This is the second
of two rulemakings under the WBCA; the first final rulemaking under the
WBCA was published in the Federal Register on November 16, 1993 (58 FR
60524). The WBCA limits or prohibits imports of exotic bird species to
ensure that their wild populations are not harmed by trade. It also
encourages wild bird conservation programs in countries of origin by
both ensuring that all imports of such species into the United States
are biologically sustainable and not detrimental to the species, and by
creating an Exotic Bird Conservation Fund to provide conservation
assistance in countries of origin. The final rule of November 16, 1993,
summarized the effects of the WBCA and established procedures for
obtaining import permits authorized by the WBCA.
    An immediate moratorium, effective October 23, 1992, was
established on the importation of 10 species of wild birds of
particular concern that were listed in Appendix II of the Convention on
International Trade in Endangered Species of Wild Fauna and Flora
(CITES, or Convention), two of which were moved to Appendix I at the
March 1992 CITES meeting. The prohibition on importation of those
species was announced in the Federal Register on December 4, 1992 (57
FR 57510).
    During the one-year period immediately following enactment of the
WBCA, from October 23, 1992, to October 22, 1993, import quotas were
established for CITES-listed bird species. Those quotas were announced
in the Federal Register on December 4, 1992 (57 FR 57510). A notice

publication March 30, 1993 (58 FR 16547), solicited public comments
and announced a public meeting, held April 15-16, 1993, to receive
input from the public for the development of regulations to implement
some of the provisions of the WBCA. Useful input was received from a
broad cross-section of interested members of the public who
participated in the meeting and submitted comments in writing; that
input has been used to develop this final rule. A notice published on
April 16, 1993 (58 FR 19840), announced species for which the quotas
had been met and no further individual birds could be imported.

     With the publication of the final rule of November 16, 1993,
imports of all CITES-listed birds (as defined in the final rule) are
prohibited, except for (a) species included in an approved list; (b)
specimens for which an import permit has been issued; (c) species from
countries that have approved management plans for those species; or (d)
specimens from approved foreign captive-breeding facilities. The U.S.
Fish and Wildlife Service (Service) published a proposed rule in the
Federal Register on March 17, 1994 (59#FR 12784), that would implement
procedures for approval of foreign captive-breeding facilities and
establishment of an approved list of species listed in the CITES
Appendices that can be imported without a WBCA permit; that approved
list is published herein.

     As a result of a lawsuit filed on February 15, 1994, by the Humane
Society of the United States and Defenders of Wildlife, and a resultant
District Court Order that found a portion of the regulation in the
November 16, 1993, Federal Register (58 FR 60524) invalid, the Service,
consistent with that Court Order, announced in the Federal Register on
May 24, 1994 (59 FR 26810), that all exotic birds listed in Appendix
III of CITES are covered by the automatic import moratorium of the
WBCA, regardless of their country of origin. A proposed rule was
published on June 3, 1994 (59 FR 28826), to promulgate that regulatory
change.

     This rule finalizes those proposals made in the Federal Register of
March 17, 1994, for the approved list of captive-bred species, with
some modifications based on comments received and further analysis by
the Service. The proposed regulations for the approval of foreign
breeding facilities and the approved list for wild-caught CITES-listed
species will be addressed in a future final rulemaking.


Comments and Information Received

     The Service received roughly 4800 comments from the public,
including over 4600 form letters from private aviculturists (bird
breeders) and comments from 6 conservation and/or animal welfare
organizations, 1 zoological organization, 2 scientific organizations, 1
representative of the pet industry, 2 private companies, 3 importers,
11 avicultural organizations, and 6 falconry/raptor breeder
organizations; the remaining comments were from other private
individuals.


Comments of a General Nature

     Several commenters, including a scientific organization, several
conservation organizations, a zoological organization, an avicultural
organization, and some private individuals, supported the criteria for
listing species on the approved list of captive-bred species and the
proposed list of captive-bred species in their entirety.
     Numerous comments contended that the proposed list of approved
captive-bred species was too restrictive and allowed for the captive
breeding of only those species on the approved list. The Service is
aware that the proposed list of approved captive-bred species has
caused misunderstanding and confusion in the avicultural community and
wishes to clarify what the WBCA and the approved list for captive-bred
species actually regulates. Neither the Wild Bird Conservation Act nor
the Service's regulations implementing Section 106 of the Act impose
new burdens or requirements on buying, selling, breeding, transport,
interstate commerce, or export of birds bred in the United States.
Those activities are not regulated by the WBCA. What the WBCA does is
to restrict imports of bird species listed in the CITES Appendices,
whether taken from the wild or bred in captivity.
     Species listed on the approved list of captive-bred species are
those species that can be imported into the United States without a
WBCA permit. This approved list of captive-bred species does not
regulate the breeding, selling, transport, interstate commerce, or
export of birds bred in the United States. Several commenters were

under the false impression that, if a species is not on the approved
list of captive-bred species, this species could not be possessed or
bred in the United States. The Service encourages such captive breeding
within the United States to meet the commercial demand for pet birds.
The Service also notes that the approved list of captive-bred species
only means that the species is approved for import without a WBCA
permit; it does not mean that the Service does not approve the breeding
of other species. The Service is in the process of working to ease the
bird breeding public's concerns by initiating a program of public
education on the WBCA and its regulations.

Comments Pertaining to Section 15.31: Criteria for Including Species in
the Approved List for Captive-Bred Species

    This section establishes the criteria for the inclusion of captive-
bred species in the approved list. Pursuant to Section 106 of the WBCA,
the Secretary of the Interior (Secretary) is required to publish a list
of species of exotic birds that are listed in an appendix to the
Convention and that are not subject to a prohibition or suspension of
importation otherwise applicable under the WBCA. In order to list a
species as exclusively captive-bred, the Service is required by the
statute to determine that the species is regularly bred in captivity
and that no wild-caught birds of the species are in trade, legally or
illegally.
    These captive-bred species can be imported into the United States
without meeting any additional requirements of the Wild Bird
Conservation Act or this Part 15; however, all of the existing
requirements in Parts 13 and 14, Part 17 (species listed as endangered
or threatened under the Endangered Species Act (ESA)), Part 21
(Migratory Bird Treaty Act), and Part 23 (species listed in the
Appendices to the Convention, or CITES must still be complied with.
    This section establishes the following criteria for the approval of
the importation of captive-bred species:
    (a) All specimens of the species known to be in trade (legal or
illegal) must be captive-bred;
    (b) No specimens of the species can be known to be removed from the
wild for commercial purposes;
    (c) Any importation of specimens of the species must not be
detrimental to the survival of the species in the wild; and
    (d) Adequate enforcement controls must be in place in countries of
export to ensure compliance with the aforementioned paragraphs. Imports
of species approved according to the criteria of this section are not
limited to specimens originating from qualifying facilities as
described under Subpart E of this Part.
    If a species is bred in captivity in large numbers, but individual
birds of that species are frequently, sometimes, or even rarely taken
from the wild, or if there are enforcement concerns that illegal trade
occurs in the species, the statute does not allow that species to be
included as a captive-bred species. However, individual captive-bred
birds may still be imported into the United States under one of the
following conditions: (1) the foreign breeding facility could be
approved pursuant to Subpart E of this Part 15; or (2) a permit for an
individual import could be obtained pursuant to Subpart C, if the
requirements of that Subpart are met.
    As established in the WBCA, the Service will periodically review
the list of species that meet the approval criteria for the importation
of captive-bred species. Any changes [additions and/or deletions] to
this approved list will be proposed in the Federal Register for public
comment, followed by a final rule in which the proposed changes will be
made or an explanation provided for not making them.
    Numerous commenters, including 762 form letters from aviculturists,
requested that all captive-bred birds be exempted from the WBCA and its
implementing regulations. The Service disagrees, since that is not
allowed by the statute. One of the purposes of the WBCA is to assist
wild bird conservation and management in the countries of origin.
However, except for the 10 bird families specifically exempted from the
WBCA, the WBCA applies to all species of exotic birds being exported
from any country, whether individual birds are of captive or wild
origin. In passing the WBCA, Congress recognized that there are serious
concerns that wild-caught birds are often intentionally misrepresented
as captive-bred. For this reason, the law specifies criteria for the
import of captive-bred species; it does not simply exempt them.
Furthermore, the Service is aware of illegal trade whereby wild-caught
birds are misrepresented as captive-bred and laundered as captive-bred

birds. Therefore, it would be inconsistent with both the plain language
and intent of the statute to exempt entirely all birds that are claimed
to be bred in captivity from the provisions of the law. However, the
Service notes that, in addition to the list of approved captive-bred
species, several other ways exist to import captive-bred birds into the
United States under the WBCA.

   Numerous commenters objected to the Service's use of the standards
adopted by the State of New York with respect to establishing the
criteria for including species in the approved list for captive-bred
species, and commented that such standards were too restrictive. The
Service disagrees. The Service was advised to adopt such standards by
the House of Representatives Committee Report for the WBCA. The House
Merchant Marine and Fisheries Committee advised the Service ``to use
the standards adopted by the State of New York with respect to
importation of captive-bred species, and include such species on the
approved list under this section, as long as the Secretary believes
that trade based on these standards will not result in harm to species
in the wild'' [House Report No. 102-749 (I) pages 1602-1603]. These
standards would include species of exotic birds in the approved list if
the species is regularly bred in captivity and none are taken from the
wild for trade. Many commenters stated that many more species are bred
in captivity than occur on the New York State Approved List of Captive-
bred Species and that this list was adopted years ago when avicultural
techniques were not as developed as they are today. The Service agrees
that many more species are bred in captivity now than when New York
State developed its regulations and approved list. The Service has
adopted the standards used by New York State in developing its criteria
for the approval of captive-bred species, and has included many species
that are not found on the New York State approved list of captive-bred
species.

   Animal welfare organizations and one conservation organization
supported the criteria for including species on the approved list of
captive-bred species, but requested that additional criteria be added
to conform to CITES requirements for the humane transport of live
animals. They requested that species experiencing 10% or higher
mortality in transit or 15% or higher mortality in quarantine not be
included on the approved list of captive-bred species. Although the
Service is concerned about the humane treatment and transport of all
birds, it disagrees that such criteria are required for including
species on the approved list of captive-bred species. The Service
implements requirements for the humane and healthful transport of live
birds imported into the United States through its implementation of the
Lacey Act humane and healthful transport requirements, found in 50 CFR
Part 14. In including species on the approved list of captive-bred
species, the Service is required to determine that the species is
regularly bred in captivity and no wild-caught birds of the species are
in trade, legally or illegally. The Service notes as well that
mortalities in shipments of birds that are bred in captivity tend to be
lower than those of wild-caught birds.

   Several aviculturists commented that the approved list of captive-
bred species should include species where captive breeding of the
species is needed to conserve the species. The Service recognizes the
contribution that captive breeding may make to the conservation of some
species, but the statute does not instruct the Secretary to list a
species on the approved list of captive-bred species using such
criteria. If an ex-situ captive-breeding program is needed for a
species' conservation, wild-caught or captive-bred birds may be
imported from approved overseas breeding facilities, from countries
with approved management plans, and for scientific research, zoological
breeding, and approved cooperative breeding programs under WBCA permits
available from the Service. The Service notes that cooperative breeding
programs encourage such conservation efforts.

   Several aviculturists commented that the approved list of captive-
bred species would cause a loss of genetic diversity in captive
populations of birds in the U.S. and restrict access to new bloodlines
for a species' conservation. The Service disagrees and notes that birds
which are not on the approved list of captive-bred species may still be
imported into the U.S. under the WBCA in several other ways: from
approved overseas breeding facilities, from countries with approved
management plans, and for scientific research, zoological breeding, and
approved cooperative breeding programs. Congress included the
exemptions for zoological breeding and cooperative breeding programs
for just this purpose. The Service notes that it is not the intent of
approval of captive-bred species to enhance conservation of a species,

but rather to restrict trade imports of specimens that in any way impact
wild populations.

Numerous aviculturists (including 2318 represented by form
letters), a representative of the pet industry, avicultural groups, and
several importers commented that any species that is regularly captive-
bred, and that is prohibited from export for the pet trade by its
country of origin, should be listed on the approved list of captive-
bred species (regardless of enforcement concerns). For example, they
recommend that all species which are regularly bred in captivity and
are indigenous solely to Australia, a country from which there is no
legal avian trade in wild-caught birds, should be listed on the
approved list of captive-bred species. The Service disagrees. There
remain problems in adequate regulatory and enforcement mechanisms in
many countries of origin for species which are subject to illegal
trade. Adoption of this recommendation would lead to the logically
absurd conclusion to list all indigenous parrots of Mexico on the
approved list of captive-bred species because Mexico bans their export.
Since there exists a flourishing domestic trade in wild-caught parrots
in Mexico and their subsequent illegal export to the U.S., such
inclusion on the approved list would undermine species conservation, as
well as Mexico's enforcement efforts. We cannot adopt this
recommendation, which is counter to the purpose of the statute and the
intent of Congress.

Several aviculturists, some importers, and a raptor breeders'
organization commented that species should be listed on the approved
list of captive-bred species, on a country-by-country basis, if they
are reliably bred in captivity in a specific country only. For example,
Saker falcons from Great Britain would be listed on the approved list
of captive-bred species because they are reliably captive-bred in Great
Britain. The Service disagrees and is making no changes based on these
comments. The statute does not provide for species listings in such a
country-by-country manner. However, the qualifying overseas breeding
facilities can be listed by the country from which the species is to be
imported.

The representative of the pet industry and a national avicultural
organization objected to Section 15.31 (a) stating that it is
inappropriate for the Service to require that all specimens of the
species known to be in trade (legal or illegal) be captive-bred. They
consider trade to be legal trade only and that illegal trade should not
be considered to be trade. They recommend that the Service not take
illegal trade into consideration. The Service strongly disagrees and
recognizes that it was Congress' intent to prevent the illegal trade in
birds, which is detrimental to species' survival, and the laundering of
wild-caught birds as captive-bred specimens. The Service notes that,
for any species, trade includes both legal and illegal trade. Article I
of the CITES Convention defines trade as ``export, re-export, import
and introduction from the sea'' and does not differentiate legal from
illegal. For the purposes of implementing this law, the Service agrees
with the authors of the CITES Convention, as well as the reality of
international trade, that trade has both legal and illegal components.

The Service originally proposed that Section 15.31 (b) read ``no
specimens of the species can be known to be removed from the wild for
the pet bird market.'' In its review of the comments, the Service noted
that several commenters were confused by this wording and the Service
has changed Section 15.31 (b) to read ``no specimens of the species can
be known to be removed from the wild for commercial purposes.'' If in
the future wild-caught specimens are imported to the U.S. for the
exemptions allowed under the WBCA for scientific research, zoological
breeding or display, personal pets, or approved cooperative breeding
programs, such importations would not preclude listing the species in
the approved list of captive-bred species when the species is reliably
bred in captivity and all specimens imported for commercial purposes
are captive-bred. Commercial purposes includes but is not limited to
the pet market (it also includes travelling animal acts, circuses, and
other uses which result in financial benefit).

The representative of the pet industry and a national avicultural
organization objected to Section 15.31 (c) stating that ``inasmuch as
the listing process requires that no wild-caught specimens are in
trade, there is no necessity even to address the non-detriment issue''
and that such a requirement is beyond the scope of the WBCA. The
Service disagrees. One of the stated purposes of the WBCA is to ensure
that all trade in species of exotic birds involving the U.S. is
biologically sustainable and is not detrimental to the species. The
WBCA requires the Service to make such a finding before listing species

advised to adopt such standards by the House of Representatives
Committee Report for the WBCA. In this Committee Report, the Secretary
was advised ``to use the standards adopted by the State of New York
with respect to importation of captive-bred species, and include such
species on the approved list under this section, as long as the
Secretary believes that trade based on these standards will not result
in harm to species in the wild'' [House Report No. 102-749 (I) pages
1602-1603].

Furthermore, the Service believes that if the inclusion of any
species on an approved list could be detrimental to the survival of the
species in the wild, the intent of Congress, the purposes of the WBCA
and the ``non-detriment'' requirements of CITES for Appendix II species
are such that the species should not be included in the approved list.
The Service cannot list a species in the approved list if such listing
could undermine the conservation of wild bird species in the wild.
Therefore, the Service is making no changes based on these comments.

Several aviculturists and one conservation organization expressed
confusion over Section 15.31 (d). They note that adequate enforcement
controls should be in place in countries of export of captive-bred
birds, as well as in countries of origin of the wild populations. The
Service agrees and notes that it is just as critical that enforcement
be in place and adequate in range countries as it be in place in
exporting countries. The Service notes that adequate enforcement in
exporting countries is critical to ensure that wild-caught birds will
not be misrepresented and laundered as captive-bred birds. Adequate
enforcement is critical to implementation of CITES, a specified purpose
of the WBCA. Therefore, the Service has modified 15.31 (d) accordingly.

General Comments Pertaining to Section 15.33: Species Included in the
Approved List for Captive-Bred Species

This section establishes a list of approved captive-bred species,
based on the criteria in Section 15.31. The Service used the best
information available, including records of imports into the United
States of both wild-caught and captive-bred birds for the years 1988-
1992, CITES annual reports, published reports on the bird trade, law
enforcement data on the commercial trade in captive-bred species, law
enforcement and intelligence information on the illegal trade in exotic
bird species, information from the CITES Secretariat, and information
from other governments. The final list of approved species includes 45
captive-bred exotic bird species and the color mutations for 3 captive-
bred species that can be imported from any other country without a WBCA
permit; other applicable requirements still apply, including any
permits or documents required by CITES, other federal laws, and the
exporting country.

The Service has included in the approved list of captive-bred
species several exotic bird species that are not listed in any Appendix
to the Convention but are regularly bred in captivity and are not taken
from the wild. Although these species are not listed in an Appendix and
thus are not presently prohibited under the WBCA, these species are
included in the list for the convenience of the public. If any of these
species were to become listed in CITES Appendix I, II, or III, their
importation would remain exempt from the provisions of the WBCA,
pursuant to this section. To ensure that there is no confusion, even if
the species or higher taxon to which it belongs were subsequently
listed in the Appendices to the Convention, the Service would still
consider it to be an approved captive-bred species pursuant to this
subpart D.

Several commenters supported the approved list of captive-bred
species published in the March 17, 1994 Federal Register notice,
whereas numerous commenters suggested specific additions of parrot and
finch species to the approved list. The Service reviewed information
available to it for all of these species, based on the criteria in
Section 15.31. These comments are addressed below.

Several falconry/raptor breeder organizations commented that all
birds in the order Falconiformes should be exempted from the WBCA and
its implementing regulations. The Service disagrees and cannot exempt
entire families of birds that Congress did not choose to exempt. Except
for the 10 bird families specifically exempted by the WBCA, the WBCA
applies to all species of exotic birds being exported from any country,
whether individual birds are of captive or wild origin. However, the
Service notes that raptors can be imported into the United States in
several ways, including under permit requirements for scientific

research cooperative breeding programs, or zoological display or breeding.

Several commenters expressed concerns that once this list of approved captive-bred species is published, no additional species could be added to the list. That is not the case. As new information becomes available, and as captive breeding becomes more successful, the Service may propose modifications to this list of approved captive-bred species, including the inclusion of additional species.

Some of the species recommended by several commenters for inclusion in the list of approved captive-bred species are very rare in aviculture, and there are few records of their international trade, either in the United States or elsewhere. The Service has not included such species in the approved list, and notes that a purpose of the list of approved captive-bred species is to facilitate commercial importation of captive-bred species, whose trade in no way can be detrimental to populations of these species in the wild. The fundamental purpose of the WBCA is conservation of exotic bird species in the wild. For species that are rare in aviculture, individual captive-bred birds may be imported for approved cooperative breeding programs, zoological breeding and display, or scientific research, pursuant to Subpart C of this part.

Comments on Specific Species

Several commenters suggested specific species for inclusion in the approved list of captive-bred species, which are addressed as follows:

Psittacines That Cannot Be Added to the Approved List

The Service found that the following psittacine species could not be added to the approved list of captive-bred species because they did not meet the criteria for approval in Sec. 15.31(a), and that wild-caught birds are in trade and have been imported into the United States: Red-faced lovebird (Agapornis pullaria), Fischer's lovebird (Agapornis fischeri), Madagascar or Grey-headed lovebird (Agapornis cana), Green-winged king parrot (Alisterus chloropterus), Amboina king parrot (Alisterus amboinensis), Blue-fronted amazon (Amazona aestiva), Yellow-crowned Amazon (Amazona ochrocephala), Orange-winged Amazon (Amazona amazonica), Mealy Amazon (Amazona farinosa), Red-winged Parrot (Aprosmictus erythropterus), Scarlet macaw (Ara macao), Blue and yellow macaw (Ara ararauna), Green-winged macaw (Ara chloroptera), Golden-crowned conure (Aratinga aurea), Orange-fronted conure (Aratinga canicularis), Golden-capped Conure (Aratinga auricapilla), Andean or Sierra Parakeet (Bolborhynchus aymara), Tovi or orange-chinned Parakeet (Brotogeris jugularis), Canary-winged parakeet (Brotogeris versicolorus), Citron-crested cockatoo (Cacatua sulphurea citrinocristata), White or umbrella cockatoo (Cacatua alba), Salmon-crested Cockatoo (Cacatua moluccensis), Lesser sulphur-crested Cockatoo (Cacatua sulphurea), Greater sulphur-crested cockatoo (Cacatua galerita), Triton cockatoo (Cacatua galerita triton), Bare-eyed cockatoo (Cacatua sanguinea), Ducorp's cockatoo (Cacatua ducorpsii), Goffin's cockatoo (Cacatua goffini), Red-vented cockatoo (Cacatua haematuropygia), Duyvenbode's lory (Chalcopsitta duivenbodei), Yellow-streaked lory (Chalcopsitta scintillata), Stella's lorikeet (Charmosyna papou), Red-flanked lorikeet (Charmosyna placentis), Vasa parrot (Coracopsis vasa), Eclectus parrot (Eclectus roratus), Austral conure (Enicognathus ferrugineus), Blue-streaked lory (Eos reticulata), Red lory (Eos bornea), Pacific parrotlet (Forpus coelestis), Green-rumped parrotlet (Forpus passerinus), Blue-winged parrotlet (Forpus xanthopterygius), Chattering lory (Lorius garrulus), Black-headed caique (Pionites melanocephala), White-crowned Pionus (Pionus senilis), Meyer's parrot (Poicephalus meyeri), Senegal parrot (Poicephalus senegalus), Moustache parakeet, (Psittacula alexandri), Derbyan parakeet (Psittacula derbiana), Alexandrine parakeet (Psittacula eupatria), Slaty-headed parakeet (Psittacula himalayana), African Indian Ringneck (Psittacula krameri krameri), Blossom-headed parakeet (Psittacula roseata), African grey parrot (Psittacus erithacus), Maroon-tailed conure (Pyrrhura melanura), Painted conure (Pyrrhura picta), Goldie's lorikeet (Trichoglossus goldiei), Perfect lorikeet (Trichoglossus euteles), Swainson's or blue mountain lorikeet (Trichoglossus haematodus moluccanus) and red-collared lorikeet (Trichoglossus haematodus rubritorquis).

Although no imports of wild-caught Sun conures (Aratinga solstitialis) were recorded for the United States, wild-caught birds

were available from Guyana, which had an annual export quota of 600
birds for this species during 1988-1991. Therefore, Sun conures are not
included in the approved list.

The Service found that the following species, which commenters
requested be included in the approved list, could not be added to the
approved list of captive-bred species because they did not meet the
criteria for approval in Sec. 15.31(a) and wild-caught birds are in
international trade: Lineolated or barred parakeet (Bolborhynchus
lineola), and Spectacled parrotlet (Forpus conspicillatus).

The Service found that the following bird species, which commenters
requested be included in the approved list, could not be added to the
approved list of captive-bred species because there was insufficient
information to determine that all specimens in trade were captive-bred:
Black goshawk (Accipiter melanoleucus), Black-cheeked lovebird
(Agapornis nigrigenis), Black-collared lovebird (Agapornis
swinderniana), Abyssinian lovebird (Agapornis taranta), Buffon's macaw
(Ara ambigua), Blue-throated [Caninde] macaw (Ara glaucogularis),
Illiger's macaw (Ara maracana), Mountain parakeet (Bolborhynchus
aurifrons), Blue-eyed cockatoo (Cacatua ophthalmica), Slender-billed
conure (Enicognathus leptorhynchus), Yellow-faced parrotlet (Forpus
xanthops), Sclater's parrotlet (Forpus sclateri), Red-cheeked parrot
(Geoffroyus geoffroyi), Musk lorikeet (Glossopsitta concinna), Purple-
crowned lorikeet (Glossopsitta porphyrocephala), Little lorikeet
(Glossopsitta pusilla), Philippine hanging parrot (Loriculus
philippensis), Purple-capped lory (Lorius domicellus), Black-capped
lory (Lorius lory), Tepui parrotlet (Nannopsittaca panychlora), Orange-
bellied parakeet (Neophema chrysogaster), Rock parakeet (Neophema
petrophila), White-bellied caique (Pionites leucogaster), Coral-billed
pionus (Pionus sordidus), Plum-crowned pionus (Pionus tumultuosus),
Ruppell's parrot (Poicephalus rueppellii), Paradise parrot (Psephotus
pulcherrimus), which is probably extinct in the wild, Pesquet's parrot
(Psittrichas fulgidus), Malabar parakeet (Psittacula columboides),
Blaze-winged conure (Pyrrhura devillei), Fiery-shouldered conure
(Pyrrhura egregria), Sulphur-winged conure (Pyrrhura hoffmanni), Pearly
conure (Pyrrhura perlata), Crimson-bellied conure (Pyrrhura
rhodogaster), Black-capped conure (Pyrrhura rupicola), all 7 species of
Touit parrotlets, Varied lorikeet (Trichoglossus versicolor), and Blue-
crowned lory (Vini australis).

For the above species, there are either no records or very few
records of any specimens in trade. The Service was therefore not able
to make the determination required by the statute that the above
species are regularly bred in captivity and that the importation of
specimens of the species is not detrimental to the species survival in
the wild. The Service recognizes that with increased captive breeding
efforts for these species, they may be able to meet criteria for
approval in Sec. 15.31 in the future.

Birds of Prey That Cannot Be Added to the Approved List

The Service found that the following bird of prey species could not
be added to the approved list of captive-bred species because they did
not meet the criteria for approval in Sec. 15.31(a), and that wild-
caught birds are in trade: Black kite (Milvus migrans), and European
eagle owl (Bubo bubo).

Toucans That Cannot Be Added to the Approved List

The Service found that the following toucan species, which
commenters requested be included in the approved list, could not be
added to the approved list of captive-bred species because it did not
meet the criteria for approval in Sec. 15.31(a) and wild-caught birds
are in trade and have been imported into the United States: Toco toucan
(Ramphastos toco).

Law Enforcement Concerns

The Service found that the following bird species, all of which
commenters requested be included in the approved list, could not be
added to the approved list of captive-bred species because they did not
meet the criteria for approval in Sec. 15.31 due to law enforcement
concerns that wild-caught birds are in trade illegally and have been
imported either into the United States or other countries: Nyasa
lovebird (Agapornis lilianae), Australian king parrot (Alisterus
scapularis), Double yellow-headed Amazon (Amazona ochrocephala

oratrix), Green-cheeked Amazon (Amazona viridigenalis), Yellow-naped cockatoo (Callocephalon fimbriatum), Major Mitchell's cockatoo (Cacatua leadbeateri), Western long-billed cockatoo (Cacatua pastinator), Long-billed corella (Cacatua tenuirostris), Spix's macaw (Cyanopsitta spixii), Rose-breasted cockatoo or Galah (Eolophus roseicapillus), Mexican parrotlet (Forpus cyanopygius), Black Palm cockatoo (Probosciger aterrimus), Lanner falcon (Falco biarmicus), Saker falcon (Falco cherrug), Gyrfalcon (Falco rusticolus), Red siskin (Carduelis cucullata), and Crimson finch (Neochmia phaeton).

The Service received 1708 form letters requesting that all cockatoo species from Australia be added to the approved list of captive-bred species. The Service disagrees, because all cockatoo species do not meet the criteria for approval in Sec. 15.31 due to the illegal trade in wild-caught birds from Australia. A recent three-year covert law enforcement investigation, dubbed Operation Renegade, found that over a 10-year period individuals were hired as couriers and travelled to Australia each fall during the cockatoo nesting season to remove eggs from nests in the wild. Several hundred smuggled eggs were then incubated, hand-reared, and sold as captive-bred birds to collectors in the United States. Among the smuggled species were Rose-breasted cockatoos, Red-tailed black cockatoos, Major Mitchell's cockatoos, and Slender-billed corellas. This investigation was a joint effort with law enforcement officials from Australia, New Zealand, and the United States, and to date, has resulted in criminal convictions against 17 individuals.

Illegal trade in lanner falcons and saker falcons was reported in the Review of Alleged Infractions and Other Problems of Implementation of the Convention (Doc. 9.22), which is a document prepared by the CITES Secretariat for discussion at the Ninth Meeting of the Conference of the Parties to CITES. These species appear to be involved in illegal trade on a fairly regular basis, including the laundering of wild-caught specimens through captive-breeding operations.

CITES-Listed Passerines That Cannot Be Added to the Approved List

The Service found that the following CITES-listed passerine species, which commenters requested be included in the approved list, could not be added to the approved list of captive-bred species because they did not meet the criteria for approval in Sec. 15.31(a) and wild-caught birds are in trade and have been imported into the United States or have been in international trade: Strawberry finch (Amandava amandava), Greater Indian [Javan] hill myna (Gracula religiosa), St. Helena waxbill (Estrilda astrild), Orange-cheeked waxbill (Estrilda melpoda), Black-rumped waxbill (Estrilda troglodytes), Yellow-crowned bishop (Euplectes afer), Orange weaver (Euplectes orix franciscanus), Village Indigobird or Senegal combassou (Vidua chalybeata), Red-billed firefinch (Lagonosticta senegala), Quail finch (Ortygospiza atricollis), Cordon bleu [red-cheeked finch] (Uraeginthus benegalus), and Pin-tailed whydah (Vidua macroura).

Non-CITES-Listed Passerines That Cannot Be Added to the Approved List

The Service found that the following non-CITES-listed species, which commenters requested be included in the approved list, could not be added to the approved list of captive-bred species because they did not meet the criteria for approval in Sec. 15.31 (However, since they are not listed in the CITES Appendices, they are not covered by the WBCA): Hooded pitta (Pitta sordida), Hartlaub's turaco (Tauraco hartlaubi), Blue-faced parrot-finch (Erythrura trichroa), Red-headed parrot-finch (Erythrura psittacea), Pin-tailed parrot-finch (Erythrura prasina), Black-cheeked waxbill (Estrilda erythronotos), Violet-eared waxbill (Uraeginthus granatina), Peters' twinspot (Hypargos niveoguttatus), Chestnut munia (Lonchura malacca), Yellow-rumped finch (Lonchura flaviprymna), Melba finch (Pytilia melba), Orange-winged Pytilia (Pytilia afra), Saffron finch (Sicalis flaveola), Purple grenadier (Uraeginthus ianthinogaster), White-rumped shama thrush (Copsychus malabaricus), Silver-eared mesa (Leiothrix argentauris), Pekin robin (Leiothrix lutea), and Asian Fairy bluebird (Irena puella).

Some commenters asked that the Java sparrow (Padda oryzivora) be approved as a captive-bred species. The Java sparrow is listed as an injurious wildlife species, under regulations in 50 CFR Part 16, and its importation, transportation, or acquisition is prohibited. Therefore, the Service cannot list it as a species approved for importation.

Several form letters were received commending that the Northern
Cardinal (Cardinalis cardinalis) be added to the approved list of
captive-bred species. This species is native to the United States and
is protected under the Migratory Bird Treaty Act (16 U.S.C. 703-711)
and implementing regulations in 50 CFR Subchapter B. Therefore, the
Service cannot list it as a species approved for importation.


Comments Pertaining to Section 15.33: Species Included in the Approved
List for Captive-bred Species. Inclusion of Species in the Approved
List, in Addition to Those in the Proposed Rule of March 17, 1994

     The Service found that the following species could be added to the
approved list of captive-bred species because they meet the criteria
for approval in Sec. 15.31: Cherry finch (Aidemosyne modesta), Diamond
sparrow (Emblema guttata), Red-browed finch (Aegintha temporalis),
Masked lovebird (Agapornis personata), Jendaya conure (Aratinga
jandaya), Yellow-fronted parakeet (Cyanoramphus auriceps), Red-fronted
parakeet (Cyanoramphus novaezelandiae), Blue-winged parrot (Neophema
chrysostoma), Elegant parrot (Neophema elegans), Northern rosella
(Platycercus venustus), Western or Stanley rosella (Platycercus
icterotis), Golden-shouldered parakeet (Psephotus chrysopterygius),
Indian ringneck parakeet (Psittacula krameri manillensis), Scaly-
breasted lorikeet (Trichoglossus chlorolepidotus), and Common buzzard
(Buteo buteo).
     Several commenters requested that color mutations of several
psittacine species be added to the approved list of captive-bred
species. The Service agrees when the color mutation is (a) rare or non-
existent in the wild, and therefore not likely to be obtained as wild-
caught stock; (b) regularly produced in captivity, and (c)
distinguishable from the typical wild form and such ability to
distinguish the color mutation is easy for the non-expert. Therefore,
the Service is adding the following color mutations for selected
species to the approved list of captive-bred species: Pacific parrotlet
(Forpus coelestis) - lutino, yellow, blue and cinnamon forms;
lineolated or barred parakeet (Bolborhynchus lineola) - blue, yellow,
and white forms; and Alexandrine parakeet (Psittacula eupatria) - blue
and lutino forms. The Service understands that newly discovered color
mutations are continuously appearing and being established in
captivity, and would appreciate information as the process occurs, so
that additional color mutations could be listed on the approved list of
captive-bred species.


Comments Pertaining to Section 15.33: Species Included in the Approved
List for Captive-Bred Species. Deletions of Species in the Approved
List

     Animal welfare organizations and one conservation organization
commented that Peach-faced lovebird (Agapornis roseicollis) and Plum-
headed parakeet (Psittacula cyanocephala) do not meet the criteria for
approval in Sec. 15.31(a) and wild-caught birds are in trade. The
Service has reviewed its own and international import trade records for
Peach-faced lovebirds and is satisfied that all specimens of the
species known to be in trade are captive-bred. The commenters expressed
concern that imports of Peach-faced lovebirds from South Africa could
be wild-caught birds, since the species occurs in the wild there. The
Service reviewed the wildlife import declarations for all Peach-faced
lovebirds imported from South Africa to the U.S. from 1988 through 1992
and is satisfied that the birds imported were captive-bred. Virtually
all shipments had been certified by the South African CITES Management
Authority as captive-bred. This species meets the criteria for approval
in Sec. 15.31 and will remain on the approved list of captive-bred
species.
     The Service has reviewed import trade records for Plum-headed
parakeets and found wild-caught specimens of this species in trade,
although none have been imported into the United States. Therefore,
this species does not meet the criteria for approval in Sec. 15.31, and
the Service is not including the Plum-headed parakeet in the approved
list of captive-bred species.
     The Government of Australia communicated its concern with listing
in the approved list of captive-bred species the following species: the
Port Lincoln parrot (Barnardius zonarius), Swift Parrot (Lathamus
discolor), Green rosella (Platycercus caledonicus), Yellow rosella
(Platycercus flaveolus), and Blue-bonnet parakeet (Psephotus
haematogaster). They stated that these species are not common in

captive in Australia and that there are problems associated with the
smuggling of wild-caught specimens of these species. The Service
proposed these species for listing in its March 17, 1994, Notice of
Proposed Rulemaking, based on the information available to it at that
time, which showed that specimens imported into the U.S. were captive-
bred. Given this new information from Australia, the Service agrees and
is not including these species in the final list of approved captive-
bred species.

    Animal welfare organizations and one conservation organization
recommended that the Gouldian finch (Chloebia gouldiae), Long-tailed
grassfinch (Poephila acuticaudata), and Double-barred finch (Poephila
bichenovii) be deleted from the approved list of captive-bred species
because of the high mortality these species suffer in transit and
quarantine. Although the Service recognizes the problems with mortality
of birds in trade, the statute does not allow the use of such
information in listing captive-bred species on the approved list. The
Service is committed, however, to enforcement of the Humane and
Healthful Transport Regulations in 50 CFR Part 14, which apply to these
and all other bird species imported into the United States.

    The representative of the pet industry and two aviculturists
commented it was ``in error and misleading'' for the Service to list
Bourke's parrot (Neophema bourkii) and the Scarlet-chested parrot
(Neophema splendida) on the approved list of captive-bred species
because they are listed as endangered under the U.S. Endangered Species
Act (ESA). The Service disagrees and notes that we are aware of the
species' listing under the ESA. The Service did not intend to mislead
the public and was aware that these species were listed under the ESA
and would require ESA permits to be imported. However, the Service
found that these 2 species met the criteria in Section 15.31, and since
a few captive-bred birds had been imported into the U.S. in past years,
it was appropriate to list them and not require a WBCA permit for their
import. The Service notes that, although the species is endangered in
the wild in Australia, adequate enforcement controls exist such that
wild-caught birds are not threatened by illegal trade. The Service does
not have any evidence of any specimens in international trade that are
not captive-bred. The Government of Australia agrees with this
interpretation for these species. The Service has footnoted the species
on the approved list of captive-bred species which require an ESA
permit for importation to avoid any confusion.


Effects of the Rule

    The Service has determined that this final rule is categorically
excluded under Departmental procedures in complying with the National
Environmental Policy Act (NEPA). See 516 DM [Departmental Manual] 2,
Appendix 1 Paragraph 1.10. The regulations are procedural in nature,
and the environmental effects, while crafted to carry out the benign
purposes of the WBCA, are judged to be minimal, speculative, and do not
lend themselves to meaningful analysis. Future regulations implementing
the WBCA may be subject to NEPA documentation requirements, on a case-
by-case basis.


Executive Orders 12866, 12612, and 12630 and the Regulatory Flexibility
Act

    This rule was not subject to Office of Management and Budget review
under Executive Order 12866. This action is not expected to have
significant taking implications for United States citizens, as per
Executive Order No. 12630. It has also been certified that these
revisions will not have a significant economic effect on a substantial
number of small entities as described by the Regulatory Flexibility
Act. Since the rule applies to importation of live wild birds into the
United States, it does not contain any Federalism impacts as described
in Executive Order 12612.


Paperwork Reduction

    This final rule does not contain any increase in information
collection or record keeping requirements as defined by the Paperwork
Reduction Act of 1980. The information collection requirement(s)
contained in this section have been approved by the Office of
Management and Budget, as required by 44 U.S.C. 3501 et seq.


List of Subjects in 50 CFR Part 15

Imports, Reporting and recordkeeping requirements, Transportation and wildlife.

Regulation Promulgation

PART 15--WILD BIRD CONSERVATION ACT

    Accordingly, 50 CFR Part 15 is amended as follows:
    1. The authority citation for Part 15 continues to read as follows:

    Authority: Pub. L. 102-440, 16 U.S.C. 4901-4916.

    2. A new Subpart D, consisting of Sections 15.31, 15.32, and 15.33, is added to Part 15 to read as follows:

Subpart D--Approved List of Species Listed in the Appendices to the Convention

Sec.
15.31  Criteria for including species in the approved list for captive-bred species.
15.32  Criteria for including species in the approved list for non-captive-bred species. [Reserved].
15.33  Species included in the approved list.


15.31  Criteria for including species in the approved list for captive-bred species.

    The Director will periodically review the list of captive-bred exotic bird species in paragraph 15.33(a), for which importation into the United States is approved. Any exotic bird species listed in paragraph 15.33(a) pursuant to this section must meet all of the following criteria:
    (a) All specimens of the species known to be in trade (legal or illegal) are captive-bred;
    (b) No specimens of the species are known to be removed from the wild for commercial purposes;
    (c) Any importation of specimens of the species would not be detrimental to the survival of the species in the wild; and
    (d) Adequate enforcement controls are in place to ensure compliance with paragraphs (a) through (c) of this section.


Sec. 15.32  Criteria for including species in the approved list for non-captive-bred species. [Reserved]


Sec. 15.33  Species included in the approved list.

    (a) Captive-bred species. The list in this paragraph includes species of captive-bred exotic birds for which importation into the United States is not prohibited by section 15.11. The species are grouped taxonomically by order.

| Species | Common name |
| --- | --- |
| Order Falconiiformes: | |
| Buteo buteo............................................ | Common European buzzard. |
| Order Columbiformes: | |
| Columba livia......................................... | Rock dove. |
| Order Psittaciformes: | |
| Agapornis personata.................................. | Masked lovebird. |
| Agapornis roseicollis............................... | Peach-faced lovebird. |
| Aratinga jandaya..................................... | Jendaya conure. |
| Barnardius barnardi................................. | Mallee ringneck parrot. |
| Bolborhynchus lineola (blue form).................. | Lineolated parakeet (blue form). |
| Bolborhynchus lineola (yellow form)............... | Lineolated parakeet (yellow form). |
| Bolborhynchus lineola (white form)................ | Lineolated parakeet (white form). |
| Cyanoramphus auriceps............................... | Yellow-fronted Parakeet. |
| Cyanoramphus novaezelandiae........................ | Red-fronted parakeet. |
| Forpus coelestis (lutino form).................... | Pacific parrotlet (lutino form). |

```
Forpus coelestis (yellow form)......................  Pacific parrotlet (yellow form).
Forpus coelestis (blue form).......................  Pacific parrotlet (blue form).
Forpus coelestis (cinnamon form)...................  Pacific parrotlet (cinnamon form).
Melopsittacus undulatus............................  Budgerigar.
Neophema bourkii...................................  Bourke's parrot.
Neophema chrysostoma...............................  Blue-winged Parrot.
Neophema elegans...................................  Elegant Parrot.
Neophema pulchella\1\..............................  Turquoise parrot.
Neophema splendida\1\..............................  Scarlet-chested parrot.
Nymphicus hollandicus..............................  Cockatiel.
Platycercus adelaide...............................  Adelaide rosella.
Platycercus adscitus...............................  Pale-headed rosella.
Platycercus elegans................................  Crimson rosella.
Platycercus eximius................................  Eastern rosella
Platycercus icterotis..............................  Western (stanley) rosella.
Platycercus venustus...............................  Northern rosella.
Polytelis alexandrae...............................  Princess parrot.
Polytelis anthopeplus..............................  Regent parrot.
Polytelis swainsonii...............................  Superb parrot.
Psephotus chrysopterygius\1\.......................  Golden-shouldered parakeet.
Psephotus haematonotus.............................  Red-rumped parakeet.
Psephotus varius...................................  Mulga parakeet.
Psittacula eupatria (blue form)....................  Alexandrine parakeet (blue form).
Psittacula eupatria (lutino form)..................  Alexandrine parakeet (lutino form).
Psittacula krameri manillensis.....................  Indian ringneck parakeet.
Purpureicephalus spurius...........................  Red-capped parrot.
Trichoglossus chlorolepidotus......................  Scaly-breasted lorikeet.
Order Passeriformes:
Aegintha temporalis................................  Red-browed Finch.
Aidemosyne modesta.................................  Cherry Finch.
Chloebia gouldiae..................................  Gouldian finch.
Emblema guttata....................................  Diamond Sparrow.
Emblema picta......................................  Painted finch.
Lonchura castaneothorax............................  Chestnut-breasted finch.
Lonchura domestica.................................  Society (=Bengalese) finch.
Lonchura pectoralis................................  Pictorella finch.
Neochmia ruficauda.................................  Star finch.
Poephila acuticauda................................  Long-tailed grassfinch.
Poephila bichenovii................................  Double-barred finch.
Poephila cincta....................................  Parson finch.
Poephila guttata...................................  Zebra finch.
Poephila personata.................................  Masked finch.
Serinus canaria....................................  Common Canary.
```

----------------------------------------------------------------------------------------------

\1\Note: Permits are still required for these species under Part 17 (species listed as endangered or threatened under the Endangered Species Act (ESA)) of this Chapter.


(b) Non-captive-bred species. [Reserved].


Dated: November 21, 1994.
George T. Frampton Jr.,
Assistant Secretary for Fish and Wildlife and Parks.
[FR Doc. 94-29673 Filed 12-1-94; 8:45 am]
BILLING CODE 4310-55-Pz

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 15

### RIN 1018–AC15

### Importation of Exotic Wild Birds to the United States; Final Rule Implementing the Wild Bird Conservation Act of 1992

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** On October 23, 1992, the Wild Bird Conservation Act of 1992 (WBCA) was signed into law, the purposes of which include promoting the conservation of exotic birds by: ensuring that all imports into the United States of species of exotic birds are biologically sustainable and not detrimental to the species; ensuring that imported birds are not subject to inhumane treatment during capture and transport; and assisting wild bird conservation and management programs in countries of origin. This final rule would implement procedures for establishment of an approved list of non-captive-bred (wild-caught) species listed in the Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES, or the Convention) that can be imported.

**DATES:** This rule is effective February 23, 1996.

**FOR FURTHER INFORMATION CONTACT:** Dr. Susan S. Lieberman, U.S. Fish and Wildlife Service, Office of Management Authority, 4401 N. Fairfax Drive, room 420C, Arlington VA 22203, telephone (703) 358–2093.

**SUPPLEMENTARY INFORMATION:** This final rule implements aspects of the WBCA, which was signed into law on October 23, 1992. This is the fourth of five rulemakings under the WBCA; the first final rulemaking under the WBCA was published in the Federal Register on November 16, 1993 (58 FR 60524). The second and third final rulemakings under the WBCA were published in the Federal Register on December 2, 1994 (59 FR 62255). The WBCA limits or prohibits imports of exotic bird species to ensure that their wild populations are not harmed by trade. It also encourages wild bird conservation programs in countries of origin by both ensuring that all imports of such species into the United States are biologically sustainable and not detrimental to the species, and by creating an Exotic Bird Conservation Fund to provide conservation assistance in countries of

origin. The final rule of November 16, 1993, implemented the prohibitions stipulated in the WBCA and provided permit requirements and procedures for some allowed exemptions.

During the one-year period immediately following enactment of the WBCA, from October 23, 1992, to October 22, 1993, import quotas were established for CITES-listed bird species. Those quotas were announced in the Federal Register on December 4, 1992 (57 FR 57510). A notice published on March 30, 1993 (58 FR 16644), solicited public comments and announced a public meeting, held April 15–16, 1993, to receive input from the public for the development of regulations to implement some of the provisions of the WBCA. Useful input was received from a broad cross-section of interested members of the public who participated in the meeting and submitted comments in writing; that input has been used to develop this final rule. A notice published on April 16, 1993 (58 FR 19840), announced species for which the quotas has been met and no further individual birds could be imported.

Since the publication of the final rule of November 16, 1993, imports of all CITES-listed birds (as defined in the final rule) are prohibited, except for (a) species included in an approved list; (b) specimens for which an import permit has been issued; (c) species from countries that have approved management plans for those species; or (d) specimens from approved foreign captive-breeding facilities. The U.S. Fish and Wildlife Service (Service) published a proposed rule in the Federal Register on March 17, 1994 (59 FR 12784), that would implement procedures for approval of foreign captive-breeding facilities, establishment of an approved list of captive-bred species listed in the CITES Appendices that can be imported without a WBCA permit and establishment of criteria for including non-captive-bred (wild-caught) species in the approved list.

As a result of a lawsuit filed on February 15, 1994, by the Humane Society of the United States and Defenders of Wildlife, and a resultant District Court Order that found a portion of the regulation in the November 16, 1993, Federal Register invalid, the Service, consistent with that Court Order, announced in the Federal Register on May 24, 1994 (59 FR 26810), that all exotic birds listed in Appendix III of CITES are covered by the automatic import moratorium of the WBCA, regardless of their country of origin. A proposed rule was published

on June 3, 1994 (59 FR 28826), to promulgate that regulatory change and the final rule was published on Dec. 2, 1994 (59 FR 62254).

On Dec. 2, 1994 (59 FR 62255), a final rule was published which implemented procedures for the establishment of an approved list of captive-bred species listed in the CITES Appendices that may be imported without a WBCA permit; those approved captive-bred species were those for which it has been determined that trade involves only captive-bred specimens.

This rule addresses the proposals made in the Federal Register of March 17, 1994, for the criteria for including species in the approved list of non-captive-bred species, with some modifications based on comments received and further analysis by the Service. This final rule establishes regulations called for in the WBCA that will accomplish the following: (1) For wild-caught CITES-listed birds to be on an approved list, the Service must determine that: CITES is being effectively implemented for the species for each country of origin from which imports will be allowed; CITES-recommended measures are implemented; there is a scientifically based management plan for the species that provides for the conservation of the species and its habitat, includes incentives for conservation, ensures that the use of the species is biologically sustainable and maintained throughout its range at a level consistent with its role in its ecosystem, and addresses factors that include illegal trade, domestic trade, subsistence use, disease, and habitat loss; and that the methods of capture, transport, and maintenance of the species minimize the risk of injury or damage to health.

### Comments and Information Received

The Service received roughly 1500 comments from the public, including over 1409 form letters from private aviculturists (bird breeders) and comments from 12 conservation and/or animal welfare organizations, 1 zoological organization, 4 scientific organizations, 1 representative of the pet industry, 2 private companies, 5 avicultural organizations, and 1 falconry/raptor breeder organization; the remaining comments were from other private individuals.

### Comments of a General Nature

The Service proposed to consider only sustainable use management plans for Appendix II and III species since trade for primarily commercial purposes is not permitted under the Convention for Appendix I species. If specimens of

an Appendix I species are required for zoological, scientific, or breeding purposes, individuals or institutions desiring such import may apply for a permit under Subpart C of this Part 15.

Few comments were received opposing such a consideration for sustainable use. A few aviculturists objected because they consider Appendix I species to be the species most in need of conservation attention, and believe that the Service should allow for imports of Appendix I species under this provision of the WBCA. The Service recognizes the need to conserve these threatened and endangered species, and agrees that they are of the highest conservation priority. The Service notes however that approval to import wild-caught birds under a sustainable use management plan will allow commercial trade, and as such is inconsistent with both the intent and the requirements of CITES Appendix I. The Service disagrees that scientifically-based management plans can be submitted for commercial exports of Appendix I listed species. If individuals or organizations wish to import wild-caught specimens of an Appendix I species for zoological, scientific, or cooperative breeding programs, they already may apply for a permit for such an import under Subpart C of this Part 15.

Comments Pertaining to Section 15.30: Definitions

The Service has modified the definition of trend and the new language reflects the need to evaluate past experience as well as future projections in determining trend.

The Service notes that in the development of its definition of 'sustainable use' it drew upon IUCN draft guidelines for 'An Initial Procedure for Assessing the Sustainability of Uses of Wild Species'. These draft guidelines recommend that assessing the impacts of use should cover three factors: (1) Demographic sustainability or the impact of the use on the population being used (the use must be at a rate that is within the population's capacity for renewal); (2) ecological sustainability or the compatibility of a use with the quality and native diversity of the ecosystem; and (3) impacts of other factors (human activities and/or natural events) on the ecosystem. The Service has incorporated these concepts into a working definition of sustainable use.

Several commenters supported the definition of sustainable use while numerous commenters, including the pet industry, avicultural, animal welfare, and conservation organizations

disagreed with the Service's proposed definition—''the use of a species in a manner and at a level such that populations of the species are maintained at optimal levels for the long term and involves a determination of the productive capacity of the species and its ecosystem, in order to ensure that utilization does not exceed those capacities or the ability of the population to reproduce and maintain itself''. They objected that the Service's use of ''optimal'' was vague and left the definition open-ended and subject to interpretation by the reader. The Service recognizes the extreme importance of the term ''sustainable use'' since the WBCA requires that the import of wild-caught birds must be biologically sustainable. The Service has modified its definition to remove any ambiguity, by replacing the term ''optimal levels'' with the term ''biologically viable levels''.

One conservation organization objected to the phrase ''long term'' in the sustainable use definition, arguing that interpretation of the phrase is open to debate as to the exact length of time meant in the definition. They would prefer a modifier ''biased toward the indefinite maintenance of viability, such as in perpetuity'' be added to the definition. The Service disagrees, in that such a modifier would be unnecessarily confusing. The phrase ''long term'' is sufficiently clear, as it refers to many generations and indeed many, many years. The Service considers it too extreme to require exporting countries to implement management plans that are designed to maintain a species at biologically viable levels in perpetuity.

Comments Pertaining to Section 15.32: Criteria for Including Non-Captive-bred Species in the Approved List

This section establishes the criteria for the inclusion of non-captive-bred (wild-caught) bird species in the approved list, thereby allowing their importation into the U.S. under the WBCA without needing WBCA import permits under Subpart C of this Part 15. Pursuant to Section 106 of the WBCA, the Secretary is required to publish a list of species of exotic birds that are listed in an Appendix to CITES and that are not subject to a prohibition or suspension of importation otherwise applicable under the WBCA. For non-captive-bred birds to be imported from other countries and therefore, for such birds to be listed in an approved list, the Service is required by the WBCA to ''use the best scientific information available, and to consider the adequacy of regulatory and enforcement mechanisms in all countries of origin for the species,

including such mechanisms for control of illegal trade.''

The WBCA requires the Service to make the finding that CITES is being effectively implemented, by making each of the following findings specified in Section 106, paragraph (c) of the WBCA:

(1) That the country of origin has established a Scientific Authority or other equivalent authority;

(2) That the requirements of Article IV of the Convention are implemented with respect to that species;

(3) That remedial measures recommended by the Parties to the Convention with respect to that species are implemented;

(4) That a scientifically-based management plan has been developed for the species which provides for the conservation of the species and its habitat and includes incentives for conservation (section 106, paragraph (c)(2)(A) of the WBCA);

(5) That a scientifically-based management plan has been developed for the species which ensures that the use of the species is biologically sustainable and maintained throughout the range of the species in the country to which the plan applies at a level that is consistent with the role of the species in the ecosystem and is well above the level at which the species might become threatened with extinction (Section 106, paragraph (c)(2)(B) of the WBCA);

(6) That a scientifically-based management plan has been developed for the species which addresses factors relevant to the conservation of the species, including illegal trade, domestic trade, subsistence use, disease, and habitat loss (section 106, paragraph (c)(2)(C) of the WBCA);

(7) That the management plan is implemented and enforced (Section 106, paragraph (c)(3) of the WBCA); and

(8) That the methods of capture, transport, and maintenance of the species minimize the risk of injury or damage to health, including inhumane treatment (Section 106, paragraph (c)(4) of the WBCA).

The Service notes that Congress in the WBCA used the terminology ''scientifically-based management plan'' and it has retained this phrase in this final rule. However, the Service recognizes that preferable phrasing is ''science-based'' or ''scientifically-sound'' management plan and notes that this is the objective of a sustainable use management plan under the WBCA. Some animal welfare and conservation organizations recommended that the Service insert the word ''scientific'' throughout the criteria, such as ''scientific study'' or scientific

methodology. The Service is making no changes based on these comments, since this wording is redundant and already incorporated in the phrase ''scientifically-based''.

Numerous comments were received on the criteria which the Service proposed for making the above findings and these comments are addressed in the following sections.

General Comments on the Criteria

The pet industry representative and several avicultural organizations and aviculturists objected to the amount of scientific information required under the proposed regulations because they believe such information is impossible to obtain in developing countries because of scientific, logistical and financial constraints. They oppose the adoption of the proposed criteria because they consider them to be too complex and unattainable for the underdeveloped countries of the world. The Service strongly disagrees. In particular, the Service disagrees that range states that may be interested in exporting wild-caught birds are incapable of developing management plans based on scientific information.

The WBCA requires that the management plans be ''scientifically-based'' and that the imports of wild-caught birds be biologically sustainable and non-detrimental to the survival of the species in the wild. Therefore, the Service is required to receive and review scientific data that will ensure such findings can be made. The Service notes that such scientific studies are currently being undertaken in several developing countries by nationals from these countries. Some examples include the Blue-fronted Amazon (*Amazona aestiva*) sustainable use project in Argentina; the study of three Amazon parrot species in Mexico; the study of the Yellow-crowned Amazon (*Amazona ochrocephala*) and its potential sustainable use in Guatemala; the study of parrot populations in Venezuela; the study of Atlantic coastal forest Amazon parrots in Brazil; the study of macaws and other parrot species in Manu National Park, Peru; the study of psittacine populations in Cuba; and the study of cockatoo species in Indonesia. These studies are not just brief censuses, but often multi-year studies addressing a spectrum of biological questions integral to the development of comprehensive management plans. In addition to the scientific data collected during these projects, these research projects serve an invaluable function in training ecologists and conservation biologists in these countries. The WBCA encourages such studies and the Service

is willing to offer technical expertise to those countries requesting assistance. The Service hopes that development agencies, consumers (industry and avicultural groups) and the conservation communities will join efforts with the Service to provide support and expertise to sustainable use projects that address the use of exotic birds.

One animal welfare organization opposed the use of the phrase ''sustainable use'' throughout Section 15.32 and commented that the term ''sustainable use has become a buzzword, conjuring up images of carefully planned and strictly controlled use of wildlife that will not harm wild populations or their ecosystems''. They requested that the term ''scientifically-based'' management plan be substituted for sustainable use management plan. The Service disagrees and will retain the use of this terminology. However, the Service believes that any valid sustainable use management plan must be scientifically-based. The WBCA requires that imports of wild-caught birds be ''biologically sustainable'' and therefore, the management plans submitted must provide information that addresses such use and must be scientifically-based. A management plan based only on commercial interests or market demand would be considered inadequate.

Comments on Specific Requirements for Scientifically-Based Sustainable Use Management Plans

*Section 15.32(a)(1)   Background Information*

One avicultural organization opposed the requirement to provide ''a summary of the country's export legislation related to this species, implementing the Convention, and where appropriate, a summary of implementing regulations; and a summary of the country's enforcement and monitoring mechanisms to ensure compliance with the management plan''. The Service disagrees. Such information is required under the WBCA to evaluate the implementation of CITES in the exporting country and to make the required non-detriment finding that the import of wild-caught birds will not affect the survival of the species throughout its range. The Service requires such information to ensure that wild-caught birds from neighboring range countries are not being laundered through an exporting country's sustainable use management plan. A copy of a country's export legislation would be extremely useful in assisting importing countries as it would help the Service in smuggling interdiction efforts

and identification of fraudulent documents.

Some animal welfare organizations requested that a scientific study within the previous three years be required for information on a species' distribution and status. The Service disagrees and does not believe the WBCA mandates such a requirement. The Service recognizes that such information needs to be current and factual, but will allow the exporting country to chose a time frame for the information submitted. The Service is requesting that information on distribution be ''recent''.

One animal welfare organization suggested also requiring the following background information: Summaries, prepared by the Management Authority of each country of origin of the species, addressing the legislation related to this species, implementation and enforcement of CITES. The Service disagrees. Should the Service require such information to evaluate the management plan for a species with a multi-country distribution, the Service can obtain such information directly from the CITES Management Authority for these countries or the CITES Secretariat. It would be an unfair administrative burden for an exporting country to have to submit such summaries.

*Section 15.32(a)(2)   Habitat Information*

The pet industry representative and several avicultural organizations and individuals opposed the requirement for the submission of habitat information, which they consider to be irrelevant and unavailable. The Service strongly disagrees. The WBCA requires ''that a scientifically-based management plan has been developed for the species which provides for the conservation of the species and its habitat and includes incentives for conservation'' (Section 106, paragraph (c)(2)(A) of the WBCA). In order to make this finding, the Service needs information on a species' ecological requirements and habitats. The Service also believes that the exporting country needs this information in order to develop a scientifically-based sustainable use management plan. The approval criteria incorporate this consideration in a number of ways, including requiring: (a) Information on species conservation status and distribution; and (b) habitat conservation information, including habitat requirements, habitat distribution and protection status, and habitat status and trends.

Scientific organizations and one zoo representative supported these requirements for habitat information.

Some animal welfare organizations requested that such information be provided from the results of a scientific study conducted within the previous three years prior to the submission of a sustainable use management plan. The Service disagrees, recognizing that such information needs to be current and factual; the Service will allow the exporting country to choose a time frame for the information submitted, as long as it reflects the current situation.

Some animal welfare organizations recommended an additional requirement that would request habitat information on reserves which provide protection for a species and management/enforcement information on those reserves. The Service recognizes the usefulness of this information in evaluating sustainable use plans, but does not believe that this calls for establishing a separate requirement. Rather, such information can be provided under § 15.32(a)(2)(ii), and the Service recommends its submission when available. The Service notes as well that in any application, any such additional information that demonstrates the scientific basis of a sustainable use management plan should be submitted in order to facilitate decision-making.

*Section 15.32(a)(3)   Information on the Role of a Species in its Ecosystem*

Conservation, scientific, and animal welfare organizations commented that it is not possible for a country of export to ensure that a species is being used in a sustainable manner when that species does not breed in the country of export. Since the breeding cycle is one of the most crucial stages in an organism's annual cycle and the one that provides data to assess reproductive output and population dynamics, it would not be possible to assess the affect of take on the population and evaluate the sustainable use of such a population according to these commenters. They argue that a scientifically-based management plan must address these concerns to be valid. The Service strongly agrees and has modified its criteria accordingly. Unless an exporting country can demonstrate that a management plan is scientifically valid and the export of a non-breeding species from the country is biologically sustainable and not detrimental to the species' survival in its breeding range, the Service will consider only management plans for species which breed in the exporting country. The Service does not believe that a species that breeds elsewhere than the exporting country can be managed sustainably in the absence of reproductive data unless

such management is a cooperative submission by both countries. The Service strongly encourages bilateral or multilateral cooperation in the case of such migratory species.

*Section 15.32(a)(4)   Population Dynamics of the Species*

In order to determine that any utilization proposed in the management plan is sustainable, the Service proposed to require evidence of how levels of sustainable use were determined, including either (1) adequate long-term population trends and take levels, or (2) population estimates, reproductive success, and estimation of the number exported from the country during the past 2 years, and estimation of the number of birds removed directly from the wild for export, domestic trade, illegal trade, subsistence use, and other purposes. The information should include the estimated number of birds to be removed from the wild from each area or region of take each year for all purposes, including age-class information for species, and a description of future plans to monitor the species in each area of take and to determine whether the number of birds taken has been sustainable. Throughout this rule, area or region of take refers to the area or region within the country of export where birds will be removed from the wild; the degree of specificity used will depend on the particular situation in the country of export. If the species is abundant throughout its range, the region of take could be the entire country; a species that is locally abundant but rare elsewhere might have a more restricted area of take.

This section generated extensive comments; the criteria listed in this section are essential to evaluate whether the proposed scientifically-based management plan is biologically sustainable. The proposed rule (59 FR 12784, March 17, 1994) required recent population data for the population of the species in the country of export, as well as population data from the population being harvested, derived from indices of relative abundance (such as catch per unit effort or call count surveys) or population estimates (if available), along with documentation for each estimate. These population data or estimates should be based on studies conducted for at least three separate years, or data for one year can be provided, with a description of survey plans for future years. Population assessments should have been conducted during the same season (breeding or non-breeding) of each year for which documentation is submitted.

For long-lived, more ''K-selected'' species (as listed in the proposed rule in § 15.32) the Service proposed requiring that the management plan (for species that breed in the country of export) include information on nesting ecology, and reproductive rates or mortality rates. Those ''K-selected'' species were defined as those not in one of 19 specified families of birds. The Service proposed more rigorous standards for the sustainable utilization of ''K-selected'' species, based on an awareness that their sustainable utilization is very difficult, and that they are extremely sensitive to population depletion.

For species included in one of the 19 families of birds specified in the proposed rule in § 15.32 (more ''r-selected'' species), the Service proposed that, instead of detailed demographic information, the management plan (for species that breed in the country of export) need include: An estimation (with documentation) of recent reproductive success; estimation of annual mortality or loss; or documentation of long-term population and offtake trends based on indices of relative abundance and measures of offtake and description of any long-term changes in other mortality factors. Reproductive success may be estimated using pre-breeding and post-breeding counts, wherever that is appropriate. For all birds, when the species occurs in the country of export only during the non-breeding season, the Service proposed to require documentation or a letter from the CITES Scientific Authority that the species does not breed there.

Two biologists supported the proposed regulations. Two scientific organizations who represent the ornithological community, and the animal welfare and conservation organizations opposed aspects of the proposed regulations regarding population dynamics. They considered the proposed regulations to be scientifically flawed. Representatives of the scientific community argued that ''the amount of information needed to prove sustainable use should be sufficient to demonstrate convincingly that the level of extraction is in proportion to the annual growth of the population.'' To determine if levels of use are sustainable, they recommend a minimum of four kinds of biological information: (1) Population size and trends; (2) annual reproductive success (number of young produced) per female by age groups; (3) annual rate of survival of males and females by age groups; (4) the number of birds harvested. They recommend that population trends and

levels of harvest should be measured and reported for each year of harvest. Reproductive and survival rates should be measured for 3 to 5 years, and periodically thereafter. They strongly disagree with the proposed regulations which require information on reproductive rates *or* survivorship rates. They recommend that both be measured for the scientific determination of quotas for sustainable use, and that this should be required for all species in trade, not only for K-selected species.

The scientific community, the zoo representative, and animal welfare and conservation organizations opposed the use of different requirements for "r- and K-"selected species. They argued that while it is generally true that K-selected species are more sensitive to overharvesting than r-selected species, "the population dynamics of long-lived, K-selected birds are usually most affected by (or sensitive to) changes in adult mortality rates. In contrast, r-selected species have shorter life spans and require frequent, successful reproduction for populations to be sustained. In other words, population dynamics of r-selected species are often equally influenced by changes in reproductive success and adult mortality. The proposed regulations do not delineate what age classes should be harvested for trade." Given that both adults and nestlings are likely to be traded, and the general lack of biological information that exists on species in international trade, the commenters argued that it is essential to require similar information for all species of birds. Lastly, they argued that the r-K dichotomy is of little use when comparing families of birds because within families, there is great variation in life history traits. They support the adoption of one set of standards for all birds, and that such standards should be strict and require information on all the population parameters discussed above as necessary to determine biologically sustainable use.

The pet industry and avicultural organizations opposed the requirements for "r- and K-"selected species. They argued that the reproductive information called for may not be necessarily relevant to the determination of sustainable use. They support the adoption of one set of standards for all birds, and that such standards be based on indices of relative abundance, and measures of offtake. A general one-time population study for certain species should be acceptable. The Service strongly disagrees and supports the use of population estimates, reproductive rates, survivorship rates, and mortality rates

in determining if a sustainable use management plan is biologically valid and non-detrimental to the species' survival. For many long-lived species, indices of abundance provide insufficient information to assess a population's status and determine measures of offtake. For many Amazon, cockatoo and macaw species, population numbers may be stable but without reproductive or mortality information, it is impossible to determine if the population is stable, declining or increasing over a limited time period. In the early 1950's the Puerto Rican Parrot population numbered around 200 birds in the wild but by 1968, it had crashed to less than 50 individuals. Population nesting success was so low that the recruitment rate for the population was zero.

The Service strongly believes that it is critical to require information on population dynamics which would allow the Service to be able to evaluate sustainable use management plans in a rigorous scientific manner. The Service has modified the final rule to require the minimum four types of biological information that the scientific ornithological community has suggested. However, should an exporting country be able to demonstrate that its management plan is scientifically valid without the submission of all the documentation required in § 15.32, the Service would consider such a plan. For example, a scientifically-based management plan for estrildid finches could be considered without documentation on annual reproductive success (number of young produced per female by age groups). The Service also recognizes that the theory of the biologically sustainable use of species is continually evolving and methodologies to measure population dynamics will change and become increasingly refined as theory is put into practice. Therefore, the Service wishes to allow some flexibility in evaluating a scientifically-based management plan.

The Service has reviewed the scientific information available on sustainable use and the biological underpinnings of such theory. The Service notes that the most successful projects currently in place for sustainable use involving international trade in CITES-listed species involve reptiles, particularly some lizards and crocodilians, and as such caution should be utilized in translating such projects to birds, particularly long-lived species such as psittacines. In developing the proposed criteria on which to base approval of sustainable use management plans, the Service

drew upon the model for sustainable use of parrot species by Beissinger and Bucher (1992) [Bioscience vol. 42, March 1992: Can parrots be conserved through sustainable harvesting?]. The scientific, animal welfare and conservation communities supported this model in their comments and urged the Service to adopt it. The Service has added an additional criterion to § 15.32(a)(4) to reflect sustainable use management options contained in this model where management operations are used to boost productivity and harvest levels of young are commensurate with such enhancement. In such a case, it is unnecessary to measure adult survival rates, provided there is baseline data upon which to compare population growth rates pre/post enhancement and to determine quotas for the harvesting of young birds.

## Section 15.32(a)(5)   Determination of Biologically Sustainable Use

The pet industry representative and an avicultural organization argued that the Service failed to "recognize the ability of countries to provide for alternative managed and sustainable use of pest species". They argue that the criteria for the determination of biologically sustainable use are excessive and unnecessary for pest species. "Pest species" are often subject to management control programs in exporting countries and exports of pest species are often used as a measure to reduce the population levels of these pest species.

Although Congress did not exempt pest species from the Wild Bird Conservation Act, the Service recognizes that some bird species in their country of origin may be pests and could be exceedingly abundant which allows for their sustainable use in high quantities. However, the mere designation of a species as a pest is insufficient to determine if exports are non-detrimental to the species. The Service notes that Congress, in the Committee Report on the WBCA, said that "the bill does not authorize the Secretary to include a species on the approved list by virtue of the fact that it is designated as a pest in the country of origin. Rather the Committee expects the Secretary to evaluate the management program based on the best scientific information available, and determine whether it effectively provides for the conservation of birds". These regulations accordingly reflect Congress' intent.

Several animal welfare organizations opposed the estimation of the number exported from a country of origin during the past 2 years. Animal welfare

organizations argued that such information should be provided for 3 years. The Service is making no change based on these comments. The Service believes that 2 years of data are adequate. Of course, more than 2 years of data are welcome. Furthermore, prior to approval, any proposed management plan will be the subject of a notice published in the Federal Register for public comment, at which time any interested organizations or members of the public may comment on the adequacy of data provided.

Some animal welfare organizations requested that the phrase ''under the management plan'' be inserted into § 15.32(a)(5)(ii) for the number of birds removed from the wild. The Service is making no change based on these comments. This phrase would not add anything, and might be confusing. Data on the numbers removed from the wild are necessary whether part of the management plan or due to other causes.

Some animal welfare organizations requested that § 15.32(a)(5)(iii) be modified to include a description of pre-export holding. The Service agrees and has modified this requirement.

Animal welfare, scientific and conservation organizations supported § 15.32(a)(5)(iv).

Several avicultural organizations and individuals opposed § 15.32(a)(5)(v), claiming that it was too broadly written and requires more information than is necessary to determine if CITES is being effectively implemented. The Service disagrees and is requiring this information to evaluate the scientific management plan and make the required non-detriment finding. Based on its experience in enforcement, the Service is concerned about the laundering of wild-caught birds taken from other areas being represented as birds coming from the areas proposed in the sustainable use management plan. The Service will work with exporting countries on means to prevent such laundering.

Several biologists and conservation organizations supported this requirement in its entirety while most animal welfare organizations and several individuals wish to have it strengthened and text inserted which ''ensures that the species is maintained throughout the range of the species in the country to which the plan applies at a level that is consistent with the role of the species in the ecosystem and is well above the level at which the species might become threatened with extinction''. The Service is making no changes based on these comments. These elements are addressed

adequately within the definition of sustainable use.

Some animal welfare organizations requested that the wording in § 15.32(a)(5)(vi) regarding monitoring plans be made clearer to the reader. The Service agrees and has changed its wording.

Some animal welfare organizations and one conservation organization recommended that two additional requirements be added to § 15.32(a)(5) as part of the determination of biologically sustainable use. One requirement would be monitoring of the population during use and how taking will be halted if it is determined that the number of birds taken is not sustainable. The Service disagrees with incorporating such a redundant requirement. Article IV paragraph 3 of the CITES treaty requires the Scientific Authority of the exporting country to monitor its exports, and limit exports when necessary to maintain species throughout their range at a level consistent with their role in their ecosystems and well above a level at which they might become eligible for inclusion in Appendix I. The Service in approving the sustainable use management plan will be evaluating the implementation of CITES by the exporting country, including its implementation of Article IV. The Service also notes that the Secretary may be petitioned at any time under the WBCA to remove a species from the approved list of non-captive bred species should information become available that the number of birds taken is not sustainable.

The other requirement would be ''a description of how the country of export has made Article IV determinations for each CITES listed species it has exported in the past 3 years, including the bird species that is the subject of the management plan under consideration''. While it would be useful to understand the functioning of a country's Scientific Authority, requiring submission of this information would be excessive and burdensome. The Service has not incorporated this recommended change.

### Section 15.32(a)(6)   Incentives for Conservation

Some animal welfare groups recommended that the wording of this requirement be changed to ''a demonstration of how export of the bird species to the United States will result in a verifiable improvement in the status of the species or its habitat in the country''. The Service is making no changes based on this comment. The Service recognizes that such information could be used to meet the requirement of ''how the sustainable use

management plan promotes the value of the species and its habitats''; however, this is not the only way to demonstrate a conservation incentive.

The pet industry representative, an avicultural organization and several aviculturists argued that ''pest species'' which are subject to management control programs in exporting countries need not demonstrate a conservation incentive for the species. For species where the scientifically based management plan provides documentation that such species is a pest in the country of origin, the Service has modified the requirements for a conservation incentive to allow for the consideration of pest species. However, the U.S. Department of Agriculture (USDA) commented that ''APHIS and its customers are very concerned about the careful importing of birds from other countries, particularly those that are already known to cause threats in agriculture, natural resources, facilities, or human health and safety in their countries of origin''. They requested that the Service consider these factors when approving species for importation. The Service agrees that these should be critical factors to consider. The Service is cognizant of the harm that non-indigenous species can do in the United States. However, the Wild Bird Conservation Act does not specifically restrict the import of pest bird species. Any applications involving the importation of pest species or species that are claimed to be pests in their country of origin will be forwarded to USDA for their comments, which will be taken into consideration.

### Section 15.32(a)(7)   Additional Factors

One zoological organization, 1 scientific organization, and 12 conservation and animal welfare organizations supported the additional requirements in this section. The pet industry representative and the avicultural organizations opposed the factor which asked for a description of the shipping methods and enclosures. The Service is making no changes based on these comments. The Service is required under Section 106(c) of the WBCA to determine that the methods of capture, transport, and maintenance of the species proposed for export in the sustainable use management plan minimize the risk of injury or damage to health, including inhumane treatment. Therefore, the Service is requiring such information, as it is necessary to evaluate the transport and maintenance of the species. The Service believes that exporting countries are capable of complying with U.S. and CITES humane transport standard. The Service's

primary concern in this regard is the humane and healthful transport of birds, in order to minimize or eliminate mortality and morbidity due to preparation for shipment and transport.

An avicultural organization opposed the requirement for a description of any captive-propagation program for the species carried out in the country as not relevant to the sustainable use management plan. The Service agrees that captive propagation has no bearing on sustainable use and has deleted this factor from the final rule.

A scientific organization for ornithology, one conservation organization and some animal welfare organizations requested that the Service add a requirement which would address how the exporting country will prevent the spread of disease from captured birds being held prior to export to wild populations. While the Service is aware that the birds taken for sustainable use may pose a disease risk to wild populations in the country of import and encourages exporting countries to minimize such risks, we are making no changes based on these comments. The Service is unaware of any reliable, documented examples of where captive-held birds have transmitted diseases to wild populations in the exporting country.

*Section 15.32(b)   Approval Criteria*

General Comments on the Approval Criteria

Some animal welfare and conservation organizations recommended that the Service strengthen the wording of the approval criteria to require the Director to ''determine whether or not an exotic bird species should be listed as an approved species for importation from the country of export, under Section 15.33. In making this determination, the Director shall make a finding that all of the approval criteria have been demonstrably satisfied''. The Service disagrees and is making no changes. The Service notes that Congress, in the Committee Report on the WBCA, said that ''the Committee expects the Secretary to evaluate the management program based on the best scientific information available, and determine whether it effectively provides for the conservation of birds. It is the intent of the Committee that the Secretary have wide discretion in reviewing management plans under this section. Clearly management plans for birds that are becoming rare should be much more stringent than those for birds that are very abundant and are subject to population control programs''. For

example, a sustainable use management plan for the CITES Appendix II-listed Blue-fronted Amazon (*Amazona aestiva*) which has declined in some parts of its range would be evaluated more stringently than a sustainable use management plan for the CITES Appendix III-listed red-billed waxbill (*Lonchura senegala*) which is abundant and widespread in its range. The approval criteria in Section 15.32(b) give the Director the flexibility and discretion needed to evaluate sustainable use management plans as Congress intended.

The pet industry representative, an avicultural organization and several aviculturists expressed their support for the proposal by the Service ''to give particularly positive consideration to situations wherein very conservative capture and export quotas are implemented prior to being able to obtain all of the biological information necessary for a more large-scale management plan (in effect, a preliminary approval)''. They recommended that such approval criteria be built into the regulations themselves. Several animal welfare and conservation organizations opposed such a ''preliminary approval''.

The Service notes that the criteria in Section 15.32 will be used to evaluate the sustainable use management plans submitted by an exporting country but that the Director has flexibility and discretion in approving plans, as Congress intended. The Service is aware that the criteria for approval of sustainable use plans may appear rigorous, and although desirable and scientifically valid, they may be difficult for some exporting countries. The Service will evaluate each sustainable use plan and the information provided within on its own scientific and conservation merit. The Service may give positive consideration to plans wherein very conservative capture and export quotas are implemented prior to being able to obtain all of the biological information necessary for a more large-scale management plan, if the country can demonstrate that such conservative capture and export quotas are non-detrimental to the species survival in the wild. There is precedent among CITES Parties to impose such conservative quotas when some scientific data is available and a species' status is known while the firmer scientific database is being developed. While some of the biological information in the sustainable use management plan may be lacking, the plan must address all the other approval criteria requiring the effective implementation of CITES in the

exporting country. The Service notes that Congress, in the Committee Report on the WBCA, said that ''the Committee expects the Secretary to consider the extent to which a country's Scientific Authority is technically capable of carrying out the duties described by CITES.'' It directs the Secretary to review whether a country is effectively implementing remedial measures recommended by the Parties to CITES.

One scientific organization commented that the Service should be required to establish an ''advisory board of scientists chosen for their competence in demography'' to review management plans and make recommendations to the Service on the approval of such plans. The Service strongly disagrees. The Service makes non-detriment findings routinely and has the expertise and competency to evaluate sustainable use management plans. The Service shall publish notice in the Federal Register of sustainable use management plan applications. Interested parties, including the scientific community, are invited to submit comments regarding these plans.

A few animal welfare organizations and individuals commented in opposition to the duration of approval of 3 years and requested that the Service approve sustainable use programs for 1 year only. The Service strongly disagrees and is making no changes. Given the amount of data and information required by the Service to evaluate sustainable use management plans, an approval for only 1 year would be excessive and burdensome to an exporting country and would not allow an exporting country to develop long-term sustainable use and conservation management programs. The Service notes that the Secretary may be petitioned at any time under the WBCA to remove a species from the approved list of non-captive bred species should information become available that the number of birds taken is not sustainable.

General Comments Pertaining to Section 15.33: Species Included in the Approved List for Non-Captive-Bred Species

No comments were received on the proposed organization of this subpart. This subpart is established in this rule; actual text will be proposed as sustainable use management plans are received and approved.

Effects of the Rule

The Service has determined that this final rule is categorically excluded under Departmental procedures in complying with the National Environmental Policy Act (NEPA). See

516 DM [Departmental Manual] 2, Appendix 1 Paragraph 1.10. The regulations are procedural in nature, and the environmental effects, while crafted to carry out the benign purposes of the WBCA, are judged to be minimal, speculative, and do not lend themselves to meaningful analysis. Future regulations and permitting decisions implementing the WBCA may be subject to NEPA documentation requirements, on a case-by-case basis.

## Executive Orders 12866, 12612, and 12630 and the Regulatory Flexibility Act

This rule was not subject to Office of Management and Budget review under Executive Order 12866. This action is not expected to have significant taking implications for United States citizens, as per Executive Order 12630. It has also been certified that these revisions will not have a significant economic effect on a substantial number of small entities as described by the Regulatory Flexibility Act. Since the rule applies to importation of live wild birds into the United States, it does not contain any Federalism impacts as described in Executive Order 12612.

## Paperwork Reduction Act

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the U.S. Fish and Wildlife Service has received approval for this collection of information, with approval number 1018–0084, with the expiration date of August 31, 1996.

This collection of information will be achieved through the use of USFWS Application Form 3–200, which will be modified pursuant to 50 CFR 13.12(b), to address the specific requirements of this final rule. This collection information will establish whether or not the applicant can include a given species of exotic bird in the approved list of non-captive-bred species.

The likely respondents to this collection of information will be foreign governments who wish to include a given species of exotic bird in the approved list of non-captive-bred species. This information will be needed by the USFWS to determine whether a given species of exotic bird can be managed in a scientifically based sustainable manner, thus warranting inclusion in the approved list of non-captive-bred species. A species and country of export will be approved for three (3) years, at which time renewal of approval will be considered by the USFWS. The annual burden of reporting and record keeping should be between five (5) and ten (10) hours per response. The estimated number of likely respondents is less than ten (10), yielding a total annual reporting and recordkeeping burden of one hundred (100) hours or less.

## List of Subjects in 50 CFR Part 15

Imports, Reporting and recordkeeping requirements, Transportation, and Wildlife.

## Regulation Promulgation

Accordingly, 50 CFR part 15 is amended as follows:

## PART 15—WILD BIRD CONSERVATION ACT

1. The authority citation for Part 15 continues to read as follows:

Authority: Pub. L. 102–440, 16 U.S.C. 4901–4916.

2. Amend Part 15, subpart A, section 15.3 by adding the following definitions, in alphabetical order:

### §15.3   Definitions.

\*       \*       \*       \*       \*

*Documentation* means a description of how scientific information was collected, including the methodologies used; names and institutions of individuals conducting the work; dates and locations of any study; and any published results or reports from the work.

\*       \*       \*       \*       \*

*Life cycle* means the annual processes involved with breeding, migration, and all other non-breeding activities.

\*       \*       \*       \*       \*

*Status* means a qualitative measure of the vulnerability to extinction or extirpation of a population at a given time (e.g., endangered, threatened, vulnerable, non-threatened, or insufficiently known).

*Sustainable use* means the use of a species in a manner and at a level such that populations of the species are maintained at biologically viable levels for the long term and involves a determination of the productive capacity of the species and its ecosystem, in order to ensure that utilization does not exceed those capacities or the ability of the population to reproduce, maintain itself and perform its role or function in its ecosystem.

*Trend* means a long-term assessment of any change in the absolute or relative size of a species' population or habitat over time (e.g., increasing, decreasing, at equilibrium, insufficiently known).

\*       \*       \*       \*       \*

3. Section 15.32 is amended by adding text to read as follows:

### §15.32   Criteria for including species in the approved list for non-captive-bred species.

Upon receipt of a completed sustainable use management plan for a country of export, the Director may approve a species listed in Appendices II or III of the Convention for importation from that country. Such approval shall be granted in accordance with the issuance criteria of this section. All approved species and countries of export will be listed in section 15.33.

(a) Requirements for scientifically-based sustainable use management plans. Sustainable use management plans developed by the country of export should be submitted for species which breed in the country of export. If the species does not breed in the country of export, the Service will consider sustainable use management plans only when the plan is scientifically valid and nesting (breeding) information can be provided from countries in which the species breeds. Sustainable use management plans shall include the following information, and any other information that may be appropriate:

(1) Background information, including the following:

(i) The scientific and common name of the species;

(ii) Letters from the country of export's Management and Scientific Authorities transmitting the management plan of this species;

(iii) A summary of the country of export's legislation related to this species and legislation implementing the Convention, and, where appropriate, a summary of implementing regulations;

(iv) A summary, from the country of export's Management Authority, of the country's infrastructure and law enforcement and monitoring mechanisms designed to ensure both enforcement of and compliance with the requirements of the management plan, and that the number of birds removed from the wild or exported will be consistent with the management plan;

(v) Recent information on the distribution of the species within the country of export, including scientific references and maps, and historical information on distributions, if relevant; and

(vi) The species' status and its current population trend in the country of export, including scientific references and copies of the most recent non-detriment findings made by the exporting country's Scientific Authority.

(2) Habitat information, including:

(i) A general description of habitats used by the species for each portion of the life cycle completed within the country of export;

(ii) Recent information on the size and distribution of these habitats throughout the country of export and in each area or region of take, including scientific references and maps. The approximate location of any reserves that provide protection for this species should be indicated on the accompanying map(s), along with a brief description of how reserves are protected and how that protection is enforced;

(iii) Status and trends of the important habitats used by the species in the country of export as a whole whenever available and within each area or region of take, including scientific references;

(iv) Factors, including management activities, favoring or threatening the species' habitat in the foreseeable future within each area or region of take, and throughout the country of export whenever available, including scientific references; and

(v) A list of management plans that have been or are being planned, developed, or implemented for the species' important habitats, if any.

(3) Information on the role of the species in its ecosystem, including:

(i) A description of the part(s) of the species' life cycle completed within the country of export;

(ii) A description of nest sites and/or plant communities that are most frequently used for placement of nests and, if applicable, nesting habits;

(iii) A general description of the species' diet and where the species forages (aerial feeder, tree canopy, tree trunk, midstory, understory, open water or other), and seasonal changes in foraging habits, including, when available, scientific references; and

(iv) Information on any species or plant community which is dependent on the occurrence of the exotic bird species.

(4) Population dynamics of the species, including:

(i) Recent population data for the population of the species in the country of export, as derived from indices of relative abundance or population estimates, along with documentation for each estimate;

(ii) Within each area or region of take, documentation for recent population data or estimates, conducted for at least 3 separate years or 1 year with a description of survey plans for future years. These population assessments should have been conducted during the same season (breeding or non-breeding) of each year for which documentation is submitted (i.e., be methodologically comparable—both temporally and spatially);

(iii) Within each area or region of take, a scientific assessment (with

documentation) of recent reproductive (nesting) success. This assessment should include information on the number of young produced per egg-laying female per year or per nesting pair, or if scientifically appropriate for the species to be exported, estimates on the number of young produced per year from pre-breeding and post-breeding surveys conducted within the same annual cycle;

(iv) Within each area or region of take, estimation (with documentation) of annual mortality or loss including natural mortality and take for subsistence use, export trade, and domestic trade in each area of take; or

(v) When appropriate, information (with documentation) on the number of young which can be taken from the area, as a result of a conservation enhancement program.

(5) Determination of biologically sustainable use:

(i) Estimation of the number exported from the country during the past 2 years, and the number of birds removed from the wild for export, domestic trade, illegal trade, subsistence use, and other purposes (specify) for the country of export during the past 2 years;

(ii) The estimated number of birds that will be removed from the wild from each area of take each year for all purposes (export trade, domestic trade, illegal trade, and subsistence use), including a description of age-classes (nestlings, fledglings, sub-adults, adults, all classes), when applicable;

(iii) For the projected take addressed in the management plan, a description of the removal process, including, but not limited to, locations, time of year, capture methods, means of transport, and pre-export conditioning;

(iv) Documentation of how each projected level of take was determined;

(v) Explanation of infrastructure and law enforcement and monitoring mechanisms that ensure compliance with the methodology in the management plan and that the species will be removed at a level that ensures sustainable use; and

(vi) Description of how species in each area or region of take will be monitored in order to determine whether the number and age classes of birds taken is sustainable.

(6) (i) For species that are considered "pests" in the country of origin: documentation that such a species is a pest, including a description of the type of pest,—e.g., agricultural, disease carrier; a description of the damage the pest species causes to its ecosystem; and a description of how the sustainable use management plan controls population levels of the pest species.

(ii) For non-pest species: A description of how the sustainable use management plan promotes the value of the species and its habitats. Incentives for conservation may be generated by environmental education, cooperative efforts or projects, development of cooperative management units, and/or activities involving local communities.

(7) Additional factors:

(i) Description of any existing enhancement activities developed for the species, including, but not limited to, annual banding programs, nest watching/guarding, and nest improvement; and

(ii) Description, including photographs or diagrams, of the shipping methods and enclosures proposed to be used to transport the exotic birds, including but not limited to feeding and care during transport, densities of birds in shipping enclosures, and estimated consignment sizes.

(b) Approval criteria. Upon receiving a sustainable use management plan in accordance with paragraph (a) of this section, the Director will decide whether or not an exotic bird species should be listed as an approved species for importation from the country of export, under section 15.33. In making this decision, the Director shall consider in addition to the general criteria in part 13 of this subchapter, all of the following factors for the species:

(1) Whether the country of export is effectively implementing the Convention, particularly with respect to:

(i) establishment of a functioning Scientific Authority;

(ii) the requirements of Article IV of the Convention;

(iii) remedial measures recommended by the Parties to the Convention with respect to this and similar species, including recommendations of permanent committees of the Convention; and

(iv) Article VIII of the Convention, including but not limited to establishment of legislation and infrastructure necessary to enforce the Convention, and submission of annual reports to the Convention's Secretariat;

(2) Whether the country of export has developed a scientifically-based management plan for the species that:

(i) provides for the conservation of the species and its habitat(s);

(ii) includes incentives for conservation unless the species is a documented pest species;

(iii) is adequately implemented and enforced;

(iv) ensures that the use of the species is:

(A) sustainable;

(B) maintained throughout its range at a level that is consistent with the species' role in its ecosystem; and

(C) is well above the level at which the species might become threatened;

(v) addresses illegal trade, domestic trade, subsistence use, disease, and habitat loss; and

(vi) ensures that the methods of capture, transport, and maintenance of the species minimize the risk of injury, damage to health, and inhumane treatment; and

(3) If the species has a multi-national distribution:

(i) Whether populations of the species in other countries in which it occurs will not be detrimentally affected by exports of the species from the country requesting approval;

(ii) Whether factors affecting conservation of the species, including export from other countries, illegal trade, domestic use, or subsistence use are regulated throughout the range of the species so that recruitment and/or breeding stocks of the species will not be detrimentally affected by the proposed export;

(iii) Whether the projected take and export will not detrimentally affect breeding populations; and

(iv) Whether the projected take and export will not detrimentally affect existing enhancement activities, conservation programs, or enforcement efforts throughout the species' range.

(4) For purposes of applying the criterion in paragraph (b)(2)(iv) of this section, the Director may give positive consideration to plans wherein very conservative capture and export quotas are implemented prior to being able to obtain all of the biological information necessary for a more large-scale management plan, if the country can demonstrate that such conservative capture and export quotas are non-detrimental to the species survival in the wild under the criterion in paragraph (b)(2)(iv) of this section.

(c) Publication in the Federal Register. The Director shall publish notice in the Federal Register of the availability of each complete sustainable use management plan received under paragraph (a) of this section. Each notice shall invite the submission from interested parties of written data, views, or arguments with respect to the proposed approval.

(d) Duration of approval. A species and country of export listed in section

15.33 as approved shall be approved for 3 years, at which time renewal of approval shall be considered by the Service.

4. Section 15.33(b) is revised to read as follows:

### § 15.33   Species included in the approved list.

\*     \*     \*     \*     \*

(b) Non-captive-bred species. The list in this paragraph includes species of non-captive-bred exotic birds and countries for which importation into the United States is not prohibited by section 15.11. The species are grouped taxonomically by order, and may only be imported from the approved country, except as provided under a permit issued pursuant to subpart C of this Part.

Dated: November 7, 1995.

George T. Frampton, Jr.,

*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 96–795 Filed 1–23–96; 8:45 am]

**BILLING CODE 4310–55–P**



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

### 5275 Leesburg Pike, MS: IRTM
### Falls Church, VA 22041



December 11, 2018

In Reply Refer To:
FWS/AIA/DSA/FOIA: 2019-00161

David A. Garcia
Organization of Professional Aviculturists
3191 Coral Way, Suite 607
Miami, Florida 33145
E-mail address: dgarcia@pradaurizar.com

Dear Mr. Garcia:

The U.S. Fish and Wildlife Service Headquarters FOIA Office received your Freedom of
Information Act (FOIA) request, dated October 15, 2018, and assigned it control number: FWS-
2019-00161.  Please cite this number in any future communications with our office regarding
your request.  You requested the following:

> *"The OPA is requesting all information related to FWS's obligations to issue
> regulations under the Wild Bird Conservation Act. Particularly, we are requesting
> information relating to the agencies failure to include additional species on the
> approved list for captive-bred species."*

The Wild Bird Conservation Act (WBCA) of 1992 (H.R. 5013 9/30/1992) is available on the
Internet at: https://www.congress.gov/bill/102nd-congress/house-bill/5013.

The U.S. Statues for the WBCA is available on the Internet at:
https://www.fws.gov/le/USStatutes/WBCA.pdf.

The Code of Federal Regulations (CFR) for the Fish and Wildlife Service (Service) to implement
the WBCA is Title 50: Wildlife and Fisheries, Part 15: Wild Bird Conservation Act.  The 50
CFR Part 15 is available on the Internet at: https://www.ecfr.gov/cgi-
bin/retrieveECFR?gp=&SID=df97a004f5ffdae40d4a4f7bcf9afcac&mc=true&n=pt50.1.15&r=P
ART&ty=HTML#se50.1.15_11.

After a thorough search of our files, it has been determined that the Service has no other records
responsive to your request.  All requested information under the FOIA and Privacy Act
regulations has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request.

We use Multitrack Processing to process FOIA requests. The Simple track is for requests that can be processed in one to five workdays. The Normal track is for requests that can be processed in six to twenty workdays. The Complex track is for requests that can be processed in twenty-one to sixty workdays. The Exceptional/Voluminous track is for requests requiring more than sixty workdays for processing. The Expedited track is for requests that have been granted expedited processing. Within each track, requests are usually processed on a first-in, first-out basis. We placed your request into the Complex processing track.

You may appeal this response to the Department's FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing**. You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email. All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the USFWS' response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS' response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

*DOI FOIA/Privacy Act Appeals Office Contact Information*

Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240

Attn: FOIA/Privacy Act Appeals Office

Telephone: 202- 208-5339
Fax: 202-208-6677
Email: FOIA.Appeals@sol.doi.gov

2

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA & Privacy Act Appeals Officer.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.** If you have questions relating to this response, please contact Ms. Pat For, Division of Scientific Authority, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (phone: 703-358-2494; e-mail: patricia_ford@fws.gov).

Sincerely,

CARRIE
HYDE-
MICHAELS

Digitally signed by
CARRIE HYDE-
MICHAELS
Date: 2018.12.11
11:00:35 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer





# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041

IN REPLY REFER TO:
FWS-2019-00162

March 4, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 17, 2018 and received October 15, 2018, for the following information:

> *"....The OPA is requesting all information, relating to the approval of permits for personal pets."*

Per the electronic email of November 19, 2018, you narrowed/clarified the request to *"The OPA limits its requests to guidance for approving the export of CITES-listed avian species from the U.S. under the Personal Pet exemption. Specifically, what criteria are used by the Service to determine whether an export is "commercial.""*

DMA follows applicable law/treaty/regulation for approving export of CITES-listed avian species, including the CITES implementing regulations at 50 CFR part 23. The following are publicly accessible links:

https://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SID=c4a9e0ababf66afe6bdac8c07c8c2eaf&mc=true&n=pt50.9.23&r=PART&ty=HTML

https://www.ecfr.gov/cgi-bin/text-idx?SID=f7bf04246983a9c834620d1dda7acef1&mc=true&node=se50.9.23_15&rgn=div8

https://www.fws.gov/permits/ltr/ltr.html

https://www.fws.gov/international/travel-and-trade/traveling-with-your-pet-bird.html

All information under the FOIA and Privacy Act regulations (43 CFR 2) has been provided. DMA has not created nor does it have any internal guidance; therefore there are no records responsive to your request. The information in the links above is provided as a courtesy to you.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request

You may appeal this response to the Department of the Interior's (Department) FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

2

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email.

All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the U.S. Fish and Wildlife Service's (USFWS) response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS's response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy
Act Appeals Officer needs additional information or clarification of your appeal.

DOI FOIA/Privacy Act Appeals Office Contact Information
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240
Attn: FOIA/Privacy Act Appeals Office

Telephone: (202) 208-5339
Fax: (202) 208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing and appeal with the Department's FOIA and Privacy Act Appeals Officer. You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

3

**This completes our response.** If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703) 358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

CARRIE HYDE-MICHAELS
Digitally signed by
CARRIE HYDE-MICHAELS
Date: 2019.03.01 15:50:40
-05'00'

Carrie Hyde-Michaels
FWS FOIA Officer





# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041

IN REPLY REFER TO:
FWS-2019-00163

March 4, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 15, 2018 and received October 17, 2018, for the following information:

> "....all internal documents, memoranda, policy manuals, guidance, training manuals, etc. relating to the approval of permits for import or export of exotic avian species into or out of the United States."

DMA does not have any internal documents, memoranda, policy manuals, guidance, training manuals, etc., relating to the approval of permits for import or export of exotic avian species into or out of the United States. DMA uses the Wild Bird Conservation Act (WBCA) and its implementing regulations to determine and guide the process and approval of WBCA permits. The following are links to the law and regulations:

50 CFR part 15 regulations https://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&sid=a1d34199d1ab36c8b78ecd06a7fa5180&tpl=/ecfrbrowse/Title50/50cfr15_main_02.tpl and the WBCA https://www.law.cornell.edu/uscode/text/16/4901. All information under the FOIA and Privacy Act regulations (43 CFR 2) has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request

You may appeal this response to the Department of the Interior's (Department) FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email.

All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the U.S. Fish and Wildlife Service's (USFWS) response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS's response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

2

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

DOI FOIA/Privacy Act Appeals Office Contact Information
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240
Attn: FOIA/Privacy Act Appeals Office

Telephone: (202) 208-5339
Fax: (202) 208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA and Privacy Act Appeals Officer. You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels, at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.** If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703-358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

CARRIE HYDE-MICHAELS
Digitally signed by CARRIE HYDE-MICHAELS
Date: 2019.03.01 16:03:22 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041



IN REPLY REFER TO:
FWS-2019-00443

March 4, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 15, 2018 and received February 19, 2019, for the following information:

> "....from FWS all documents relating to its interpretation of its obligations under WBCA."

DMA does not have internal documents relating to the interpretation of obligations under the Wild Bird Conservation Act (WBCA). Our office uses the WBCA and its implementing regulations to implement the WBCA. The following are links to the law and regulations: https://www.law.cornell.edu/uscode/text/16/4901 and https://www.law.cornell.edu/cfr/text/50/part-15. All information under the FOIA and Privacy Act regulations (43 CFR 2) has been provided.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected. *See 43 C.F.R. § 2.37(g)*. Therefore, there is no billable fee for the processing of this request

You may appeal this response to the Department of the Interior's (Department) FOIA/Privacy Act Appeals Officer. If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter. Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.** You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email.

All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL." You must include an explanation of why you believe the U.S. Fish and Wildlife Service's (USFWS) response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS's response. Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

2

DOI FOIA/Privacy Act Appeals Office Contact Information
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240
Attn: FOIA/Privacy Act Appeals Office

Telephone: (202) 208-5339
Fax: (202) 208-6677
Email: FOIA.Appeals@sol.doi.gov

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA and Privacy Act Appeals Officer. You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels, at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.** If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703-358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

CARRIE HYDE-MICHAELS
Digitally signed by CARRIE HYDE-MICHAELS
Date: 2019.03.01 16:03:52 -05'00'

Carrie Hyde-Michaels
FWS FOIA Officer