## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 19-20195-KING

**ORGANIZATION OF PROFESSIONAL AVICULTURISTS, INC.,**

       Plaintiff,

    **v.**

**MARGARET EVERSON,** in her official capacity as Principal Deputy Director Exercising the Authority of the Director of U.S. Fish and Wildlife Service; and **U.S. FISH AND WILD-LIFE SERVICE;**

       Defendants.

_____/

### PLAINTIFF'S OPPOSITION TO
### <u>DEFENDANT'S MOTION TO DISMISS COMPLAINT AS MOOT</u>

The plaintiff, Organization of Professional Aviculturists, Inc. (OPA), by and through undersigned counsel, files this opposition to Defendant's Motion to Dismiss Complaint as Moot (D.E. 8), and in support thereof, states as follows:

### ARGUMENT

**I.**    **Whether the plaintiff has failed to exhaust administrative remedies as to the four requests that were satisfied before it filed suit is irrelevant to this case.**

In the complaint (D.E. 1), it was alleged that the plaintiffs had appealed four FOIA requests (FWS-2019-00157, FWS-2019-00158, FWS-2019-00160, and FWS-2019-00161) to which a response was received before this lawsuit was filed. However, as also stated in the plaintiff's complaint, these requests are not being challenged in this lawsuit. (D.E. 1, at ¶53.) Therefore, whether or not they are exhausted is irrelevant to this lawsuit. These appeals were

solely mentioned in the plaintiff's complaint for the purpose of explaining the procedural history, and in anticipation of the possibility of an amended complaint in the future.

That said, the defendants correctly state in their motion to dismiss (D.E. 8, at 7) that they have not received an appeal from the plaintiffs in relation to these four FOIA requests.  Upon reading the defendants' motion to dismiss, the plaintiff reviewed the appeals it had filed and discovered that they had been erroneously sent to FOIA.Appeal@sol.doi.gov.[1]  Therefore, on April 22, 2018, between 4:13 and 4:17 P.M., the administrative appeals were timely[2] submitted to the corrected address of FOIA.Appeals@sol.doi.gov.

Although the appeals were not filed prior to the initiation of this lawsuit, they are currently pending and should be decided no later than the period between May 20, and June 4, 2019. 5 U.S.C. §552(a)(6)(ii).[3]  As such, the plaintiff will seek leave to consolidate these FOIA appeals into this case, if necessary, when they have been administratively exhausted.

## II.    This case is not moot because the defendants have not adequately searched for responsive records relating to FOIA request #7, tracking number FWS-2019-00159, and FOIA request #2, tracking number FWS-2019-00156.

The plaintiff's case, as it relates to Request #7—Blue Fronted Amazon, tracking number FWS-2019-00159, and Request #2—CITES I Consortiums, tracking number FWS-2019-00156, is not moot, and the Court can and should retain jurisdiction over the entirety of these two FOIA

---

[1] The plaintiff did not realize their error until reviewing the defendant's motion to dismiss because the government's server did not return the originally submitted appeals as undeliverable and because the error was inconspicuous, specifically, the omission of an "s" from the email address.

[2] Since the regulation states, "workdays" it is plaintiff's position that there were no workdays from 12/22/2018 - 01/25/2019.  However, even if the period in which federal funding had lapsed still constitutes workdays, the deadline for filing the administrative appeals would fall on April 22, 2019, the day on which the appeals were filed.  Thus, in either scenario, the plaintiff's appeals are timely under 43 CFR §2.58(a).

[3] The deadline for the agency response to the plaintiff's appeals could be a tolled if a request for information is made by the agency. 5 U.S.C. §552(a)(6)(ii)(I).

requests.  *Pollack v. Dep't of Justice*, 49 F. 3d 115, 119 (CA4 1995).  Nor is the plaintiff required

to administratively appeal the outcome of these FOIA requests given that the answers to them

were produced during litigation:

> Once an agency fails to respond timely to a request, FOIA permits
> the requester immediately to file an enforcement suit and author-
> izes the district court to "retain jurisdiction and allow the agency
> additional time to complete its review of the records," assuming
> that "exceptional circumstances exist and that the agency is exer-
> cising due diligence in responding to the request."  5 U.S.C. §
> 552(a)(6)(C).

*Id.* Since this Court is statutorily authorized to retain jurisdiction over Requests #7 and #2, the

plaintiff's case is not moot because the defendants did not adequately search their records, as ex-

plained below, for responsive records relating to request #7 and #2.  Further, if the agency can

meet its burden to establish exceptional circumstances, the Court may grant it additional time to

complete its review while retaining jurisdiction over the matter.

For an agency to have adequately searched it records, it must have made "a good faith ef-

fort to conduct a search for the requested records."  *Oglesby v. U.S. Dep't of Army,* 920 F. 2d 57,

68 (CADC 1990).  The fundamental question is "whether the search for [responsive] documents

was adequate."  *Steinberg v. DOJ*, 23 F. 3d 548, 551 (CADC 1994).  This is a circumstance spe-

cific question, asking whether the search was "tailored to the nature of the request."  *Rugiero v.*

*DOJ*, 257 F. 3d 534, 547 (CA6 2001).  A request is not reasonable if the agency interpretation of

the request is too narrow.  *Charles v. Office of the Armed Forces Med. Exam'r,* 730 F. Supp. 2d.

205, 213 (D.D.C. 2010).  In sum, the agency must conduct a search that is responsive to the spe-

cific request.

Further, to prove the adequacy of its search, the agency should rely on declarations which

should be "relatively detailed and nonconclusory and submitted in good faith."  *Ground Saucer*

*Watch, Inc. v. CIA*, 629 F. 2d 770, 771 (CADC 1981).  The declarations must show that the search methods were reasonably calculated to uncover all relevant documents and must be explained in sufficiently detailed descriptions.  *Compare Dolin, Thomas & Solomon LLP v. DOL*, 719 F. Supp. 2d 245, 255 (W.D.N.Y. 2010) (determining search was adequate where "DOL has attested to multiple thorough searches for responsive documents, describing in detail the scope of the search, and listing files and persons from whom information was sought."); *with Rodriguez v. McLeod*, No. 08-0187, 2008 WL 5156653, at *4 (E.D. Cal. Dec. 9, 2008) (holding that agency's declaration was conclusory and failed to provide descriptions of files searched and search procedures).

The burden is on the agency to demonstrate the adequacy of its search.  "[S]imply stating that 'any and all records' were searched is insufficient." *Bennett v. DEA*, 55 F. Supp. 2d 36, 40 (D.D.C. 1999).  If the agency can overcome this burden, then it is on the plaintiff to demonstrate that the search was not made in good faith.  *Maynard v. CIA*, 986 F. 2d 547 (CA1 1993).

     **a)  The defendants have not adequately searched their records for responsive documents relating to the plaintiff's Request #7—Blue Fronted Amazon, tracking number FWS-2019-00159.**

On October 18, 2018, the plaintiff filed a FOIA request stating as follows: "The OPA request all information relating to the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon."  On November 19, 2018, Ms. Brenda Tapia, an agent of the defendant, contacted the plaintiffs to inform that:

> This request is very broad and the search results will be voluminous.  It could take an estimated 8 months to complete since we may need to go to the off site storage facility to retrieve numerous boxes, which would then have to be reviewed by hand.  We would suggest that you narrow the scope to a more specific timeframe, such as the past two years.  The cost of processing this request will be more than the $100 you have indicated you are willing to pay.

4

(D.E. 1-2, at 35-39) (Compl. Appx., Exh. L).  At this prompting the plaintiff narrowed its request as follows:

> The OPA request all information relating to the attempt by the Argentinian CITES authority to petition the USFWS to allow for sustainable import of blue front amazon.
>
> The OPA is specifically requesting information as to why the final proposed rule relating to the listing of wild harvested Blue Fronted Amazons published in the Federal Register at 68 FR 46559 on August 6, 2003 was never finalized or issued.  And why it was ultimately withdrawn on December 21, 2015, 80 FR 79300.
>
> The OPA's request is limited to all non-publicly available information relating to this issue.  This includes internal communications between the relevant USFWS employees that resulted in a decision to not issue the final rule.  As well as communications and negotiations between USFWS and the Argentinian Management Authorities.

(D.E. 1-2, at 43) (Compl. Appx., Exh. N). This narrowed request specifically referenced the fact that the Argentinian request was first publicized in August 6, 2003, and ultimately withdrawn on December 21, 2015, over twelve years later.  However, the Argentinian action was brought under 16 U.S.C. §4909, which statutorily requires a decision from the agency within two hundred and forty days.

The plaintiff requested any internal communications that resulted in the decision to not issue the final rule under §4909.  Therefore, the plaintiff's request must be properly construed as requesting documents that explain the details of this excessive delay and ultimate lack on decision, in contravention of the clearly established statutory timeline. *Nation Magazine v. U.S. Customs Serv.*, 71 F. 3d 885, 890 (CADC 1995) (An agency must "construe a FOIA request liberally.").  This request should not have been difficult even though the Argentinian petition was originally filed in 2003.  The Argentinian petition was not ultimately closed until December 15, 2015, only two years and nine months

5

prior to the plaintiff's FOIA request.  The documents relating to this petition are not the sort of records that should be difficult to find on account of age.

On March 12, 2019, after the commencement of this litigation, and seventy-six workdays after the filing of the original request,[4] the defendants' produced seven pages of documents.  The released documents amounted to:

1) A two-page undated document by Roddy R. Gabel, Chief of Division of Management Authority, which requested information from the Argentinian government relating to *Proyecto Ele*[5] which had been pending for over 10 years before the USFWS.  The letter stated, without explanation, that USFWS could neither approve nor deny the request.  It further stated that because the request had been pending for 10 years, that the USFWS was likely to deny the request, and suggested that the Argentinians withdraw the request before it was denied.

2) A one-page document dated October 24, 2014, in Spanish from the Argentinian government.

3) A one-page paraphrased translation of the previous document which stated that, based on Mr. Gabel's letter, that the request was being withdrawn.

4) A three-page publicly available print out from the Federal Register's website which outlined the timeline for Argentinian's request, and stated that because the USFWS did not think they would be able to approve the request, it was recommended that the request be withdrawn.

This was the totality of the records released by the USFWS in relation to the plaintiff's request.

---

[4] This calculation excludes the period during which federal funding had lapsed.

[5] Proyecto Ele is the name given to the program by the Argentinian CITES authority to sustainably export wild-caught Blue Fronted Amazons to the United States.

It appears that the defendants interpreted the plaintiff's narrowed FOIA request as literally asking for the closing documents in the file.  However, in requesting information as to why the request was never finalized, and the communications relating to the decision to never issue a final rule, it is clear that the plaintiff was requesting more than the file's closing letters.  It appears that the defendants have chosen to purposefully interpret the plaintiff's request in an excessively narrow fashion to avoid its obligation to disclose under the FOIA.  An agency must consider the nature of each request, and give a reasonable interpretation of its terms and overall content.  *LaCedra v. Executive Office for U.S. Attorneys*, 317 F. 3d 345 (CADC 2003).  To not do so would constitute a failure to make "a good faith effort to conduct a search for the requested records," *Oglesby,* 920 F. 2d, at 68, as has occurred here.

Upon reviewing these documents, the plaintiff contacted Mr. Roddy R. Gabel, former Chief of Division of Management Authority, and author of one of the provided documents, to request his input on the released records.  Mr. Gabel informed the plaintiff's agent that he had worked on the Argentinian Blue Fronted Amazon petition, *Proyecto Ele*.  He also informed the plaintiff's agent that the issue was concern over "double-dipping," which refers to the practice of removing offspring from the same nest site multiple times in one breeding season, and that this resulted in protracted negotiation between USFWS and the Argentinian government.  To Mr. Gabel's recollection, the records of this request were sent to "archives or storage."  Exh. A.  Unfortunately, Mr. Gabel could only provide the plaintiff his recollections, because the records had remained with the USFWS at the end of his tenure.

The seven pages of documents released to the plaintiff included no reference to double-dipping, or the protracted negotiations mentioned by Mr. Gabel.  Records of such issues would have been responsive to the plaintiff's narrowed FOIA request.  Further, the defendants were

aware of these records because in Ms. Tapia's November 19, 2018, e-mail correspondence with the plaintiff, she stated "we may need to go to the off site storage facility to retrieve numerous boxes, which would then have to be reviewed by hand."  (D.E. 1-2, at 38) (Compl. Appx., Exh. L).

 However, in the defendants' Declaration of Cathy Willis, there is no reference to reviewing the offsite storage records.  The declaration includes the conclusory statement, "the subject matter expert searched all of WTCB's WBCA records in all forms available to the subject matter expert." (D.E. 8-1, at 5.)  Yet, the endeavors of this unnamed subject-matter expert yielded only a publicly available Federal Register Notice, and a single e-mail by Roddy Gabel.  (D.E. 8-1 at 5-6.)  The search detailed in this declaration does not meet the defendants' burden of establishing that the search for responsive documents was adequate.  Further, the declaration does not state why the defendants failed to review the offsite documents referenced by Ms. Tapia, nor does it explain why only a single preserved e-mail of Mr. Gabel was searched, and not those of his subordinates who would theoretically have managed the daily tasks related to this request—or the e-mails of anyone that would have worked on such a large project.

 The statements provided by the agency can only be described as conclusory, and lacking in detail.  While the defendants' do not need to provide every single responsive document, the statements of Mr. Roddy R. Gabel, former Chief of Division of Management Authority, and Ms. Brenda Tapia, in conjunction demonstrate that a large cache of likely responsive documents exist which do not appear to have been searched by the defendants.  Even if when the defendant's statements are given the most optimistic reading, they do not establish that the USFWS has met its burden.

Therefore, respectfully, the search conducted by the defendants, after being prompted to action by this lawsuit, are far from adequate, and still in need of resolution through this litigation.

> **b)** **The defendants have not adequately searched their records for responsive documents relating to the plaintiff's Request #2—CITES I Consortiums, FWS-2019-00156.**

On October 18, 2018, the plaintiff filed a FOIA request stating as follows: "1) The OPA is also requesting all information, relating to the approval of permits for consortium/cooperative breeding agreements. 1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species." On November 19, 2018, Ms. Brenda Tapia, an agent of the defendant, contacted the plaintiffs to inform that:

> This is a very broad request. We estimate that it would take 4 months or longer to process. Suggestions to narrow: Are you looking for the looking for cooperate breeding agreements that are current and not expired? Would a spreadsheet be acceptable? Would the agreement letter be acceptable? What species are you looking for? What timeframe are you looking for? If you can narrow the scope and clarify, this request may be completed in a shorter time frame of estimated 2 months. The cost of this request as written will also be more than $100 per what you are willing to pay.

(D.E. 1-2, at 35-39) (Compl. Appx., Exh. L).

At this prompting the plaintiff's narrowed their request as follows:

1) The OPA is also requesting all information, relating to the approval of permits for consortium/cooperative breeding agreements.

1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species."

The OPA will limit its requests to the time period since 10/05/2016 - 11/01/2018. Agreement letters would be acceptable. A spreadsheet would also be acceptable if it lists all submitted requests and their outcomes within the proposed period, as well as processing times. The OPA would also like to know whether the cooperative breeding agreements ultimately

> approved by the Service resulted from *negotiated agreements* or were ap-
> proved as submitted.  Also requested are any non-publically [(sic)] availa-
> ble guidance related to how the Service decides to approve such agree-
> ments.  The information requested is limited to agreements for approval of
> CITES Appendix 1 species.

(D.E. 1-2, at 42-44) (Appx., Exh. N) (emphasis added).

On March 4, 2019, after the commencement of this litigation and seventy-four workdays after the filing of the original request,[6] the defendants' produced twenty-nine pages of documents which included a series of approval and renewal requests for cooperative breeding agreements for CITES Appendix 1 species.  However, none of the responsive documents included any information relating to whether the approved agreements were negotiated with the relevant parties by the USFWS, nor was there any guidance relating to the granting of these cooperative breeding agreements provided.  In the defendant's Declaration of Cathy Willis, it is stated that:

> The subject matter expert searched the International Affairs shared electronic
> folders, which house the relevant program information (DMA program folders,
> cooperative breeding program folder, which contains all cooperative breeding
> programs approved for Appendix-I species). The subject matter expert searched
> all of WTCB's WBCA Appendix I records in all forms available to the subject
> matter expert.

(D.E. 8-1, at 6.)

Again, an unnamed subject matter expert searched "all forms available."  This lacks specificity which denies the Court the ability to review the adequacy of this search, and fails to meet the governments burden.  An additional issue with the adequacy of the search is the failure of agency to state the particular search terms used.  Again, the Court has no ability to review the adequacy of the search conducted by the agency in this case.

---

[6] This calculation excludes the period during which federal funding had lapsed.

However, the clearest evidence of a lack of adequate search is the fact that the defendants did not search the emails of Laura Noguchi, Eleanora Babij, Ph.D., or of Monica A. Horton, the USFWS officers who are listed as approving the provided documents.  Exh. B.  As the approving officers, their e-mails are the most likely location to discover information relating to negotiated settlements, as well as the e-mails of their direct subordinates.

The plaintiffs have requested this information because they are currently involved in the solicitation for a new cooperative breeding program (CBP) for an Appendix I species from the USFWS.  Understanding the full details on how USFWS adjudicates such applications, and whether negotiation is involved, is therefore essential to the plaintiffs.

### III.   The plaintiff is concedes the mootness of Request #3, FWS-2019-00162, Request #4, FWS-2019-00163, and Request #5, FWS-2019-00443, if the defendants concede that they are not entitled to *Chevron* or *Auer/Seminole Rock* deference in any future litigation with the plaintiff were the WBCA and CITES is at issue.

The defendants' in the Declaration of Cathy Willis, given under penalty of perjury under 28 U.S.C. §1746, stated that:

> With regard to request FWS-2019-00443, which sought records regarding "[FWS's] interpretation of its obligations under WBCA". . . that DMA does not have any written internal documents concerning its interpretation and obligations under the WBCA, as DMA follows the WBCA and CFR regulations for the issuance of permits under the WBCA.

(D.E. 8-1, at 8.)  The defendants similarly stated that:

> With regard to request FWS-2019-00163, which sought "all internal documents, memoranda, policy manuals, guidance, training manuals, etc. relating to the approval of permits for import or export of exotic avian species into or out of the United States," the DMA provided the Internet URL address for 50 CFR 15 regulations, which are the regulations that implement the WBCA.  According to the Chief of DMA's Branch of Permits, DMA does not have any internal documents, memoranda, policy manuals, guidance, or training manuals, relating to the approval of permits for import or export of exotic avian species into or from the United

States.  The DMA implements the WBCA according to the lan-
guage of the Act of 1992 and the regulations of 50 CFR Wildlife
and Fisheries, Part 15: Wild Bird Conservation Act to determine
and guide the process and approval of WBCA permit.

(D.E. 8-1, at 7.)  The defendants likewise declared that in relation to,

Request FWS-2019-00162 [which] the requester narrowed/clari-
fied the request to "The OPA limits its requests to guidance for ap-
proving the export of CITES-listed avian species from the U.S. un-
der the Personal Pet exemption.  Specifically, what criteria are
used by the Service to determine whether an export is 'commer-
cial.' "  Ms. Tapia discussed the narrowed request with the subject
matter expert, the Chief of DMA's Branch of Permits, who indi-
cated that "DMA follows applicable law/treaty/regulation for ap-
proving export of CITES-listed avian species, including the CITES
implementing regulations at 50 CFR part 23."

(D.E. 8-1, at 7.)

The plaintiff understands the defendants' position to be that it applies Wild Bird Conser-
vation Act, 16 USC §§4901-4916, and the related obligations under the Convention on Interna-
tional Trade in Endangered Species of Wild Fauna and Flora (CITES), based on the plain language
of the statute, treaty, and/or regulations.  This response also seems to suggest that the agency has
determined that Congress has left no gaps in its statutes, and that the agency has left no gaps in its
regulations, that have not yet been interpreted in a manner that carries with it the force of law.

The plaintiff's purpose in soliciting these particular FOIA requests was an attempt to un-
derstand the potential level, and form of deference that the USFWS would claim in future potential
litigation relating to these sources of law.  Therefore, the plaintiff is willing to concede as moot
these FOIA requests, if the defendants' affirmatively state that, in any future litigation against
plaintiff, that the USFWS will claim nothing more than *Skidmore* deference to its interpretations
of: (1)  the WBCA where not interpreted by binding regulations; (2) the CITES where not inter-
preted by regulations; and (3) its interpretation of the relevant regulations.  Stated inversely, the

USFWS appears to be disclaiming *Chevron* deference to its interpretations relating to these provisions of law, where not interpreted by the regulation, and is disclaiming *Auer* and *Seminole Rock* deference to its interpretation of its relevant regulations. This is the implicit deduction made from a reading of the defendants' declaration.

If the defendants refuse to concede this position, then the plaintiff asserts that the agency has failed to perform an adequate search in response to these three requests. That is because, if the agency claims that it has interpretations of the treaty, the statute, or of its own regulations that would merit something more than *Skidmore* deference, that would necessarily imply that there are additional responsive records that the agency is aware of, and has refused to produce. If that is the case, the agency has not responded to these three requests in good faith, and it has therefore failed to perform an adequate search in violation of law—and perhaps perjurously so.

<u>Conclusion</u>

Based on the foregoing, the plaintiff requests that the Court dismiss the defendant's motion to dismiss as moot.

<u>s/ Mark Andrew Prada</u>
MARK ANDREW PRADA
Fla. Bar No. 91997
Prada Urizar, PLLC
3191 Coral Way, Suite 607
Miami, FL 33145
Dir.:   (786) 238-2222
Ofc.:   (786) 703-2061
Fax:   (786) 708-9508
mprada@pradaurizar.com

April 30, 2019                                    *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 30, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

Carlos Raurell
Assistant United States Attorney
Florida Bar No. 529893
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel.: 305.961.9243 / Fax: 305.530.7139
Email: Carlos.Raurell@usdoj.gov

s/ Mark Andrew Prada
MARK ANDREW PRADA
Fla. Bar No. 91997
Prada Urizar, PLLC
3191 Coral Way, Suite 607
Miami, FL 33145
Dir.:   (786) 238-2222
Ofc.:  (786) 703-2061
Fax:   (786) 708-9508
mprada@pradaurizar.com

April 30, 2019                                              *Counsel for Plaintiff*

14

# Exhibit A



David Garcia <dgarcia@pradaurizar.com>

---

## David Garcia Organization of Professional Aviculturists

5 messages

---

**David Garcia** <dgarcia@pradaurizar.com>          Thu, Mar 21, 2019 at 11:58 AM
To: Former_Zygote@hotmail.com

Hello Mr. Gabbel,

My name is David Garcia and I am with the Organization of Professional Aviculturists. I received your email address from John Aynes who is on our Board, he told me you might be willing to help with an issue I am having getting information from the USFWS relating to a project you worked on.

The OPA is interested in understanding what happened with the proposed import plan of Blue Fronted Amazon's from Argentina under the WBCA.

Idk how much information from your work you are allowed to discuss, but I was wondering if I could ask you some questions bout the topic?

Thank you,
David Garcia

--
Thank you,
David A. Garcia
Law Clerk

# PRADA URIZAR
### IMMIGRATION & NATIONALITY ATTORNEYS

3191 Coral Way, Suite 607 | Miami, Florida 33145
T: **(786) 703-2061** | F: **(786) 708-9508** | D: **(786) 238-2222**
**www.pradaurizar.com**

This e-mail, as well as any attachments to same, is covered by the Electronic Communications Privacy Act, 18 U.S. C. §§ 2510-2521 and is legally privileged under federal and state laws, including but not limited to laws applicable to the attorney-client privilege and other private matters. The information contained in this e-mail is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, please destroy the email after advising by reply that you erroneously received this. The receipt by anyone other than the designated recipient does not waive the attorney-client privilege, nor will it constitute a waiver of the work-product doctrine.

---

**Roddy Gabel** <former_zygote@hotmail.com>          Thu, Mar 21, 2019 at 8:42 PM
To: David Garcia <dgarcia@pradaurizar.com>

Hi, David--I'd have to refresh my memory on all details because it's been so many years since I dealt with this, but my recollection is that we could not get information from Argentina to assure us that they were not "double-dipping" on the harvest of juveniles. By this I mean that we were concerned that they could not provide assurance that the same population from which nestlings were taken from nest trees was

**From:** David Garcia <dgarcia@pradaurizar.com>
**Sent:** Thursday, March 21, 2019 11:58 AM
**To:** Former_Zygote@hotmail.com
**Subject:** David Garcia Organization of Professional Aviculturists

[Quoted text hidden]

---

**Roddy Gabel** <former_zygote@hotmail.com>           Thu, Mar 21, 2019 at 8:58 PM
To: David Garcia <dgarcia@pradaurizar.com>

Sorry--message completed below.

---

**From:** Roddy Gabel <former_zygote@hotmail.com>
**Sent:** Thursday, March 21, 2019 8:42 PM
**To:** David Garcia
**Subject:** Re: David Garcia Organization of Professional Aviculturists

Hi, David--I'd have to refresh my memory on all details because it's been so many years since I dealt with this, but my recollection is that we could not get information from Argentina to assure us that they were not "double-dipping" on the harvest of juveniles. By this I mean that we were concerned that they could not provide assurance that the population from which nestlings were taken from nest trees was not the same population from which they also wanted to harvest juveniles from citrus-growing areas. If this was the case, they would have been over-harvesting young birds from the population. I don't remember all the details, but after some back and forth, the Government of Argentina withdrew their request for approval of U.S. imports so that they could study the species further to try to address our concerns. You can find where we withdrew the proposed rule at:

https://www.fws.gov/policy/library/2015/2015-32054.html

I hope this answers your questions.

Regards,

Roddy Gabel

[Quoted text hidden]

---

**David Garcia** <dgarcia@pradaurizar.com>           Thu, Mar 21, 2019 at 9:30 PM
To: Roddy Gabel <former_zygote@hotmail.com>

Hey Mr. Gabbel, thank you that is very helpful.

I actually filed a FOIA request on this topic and the Service stonewalled me, so I ended up filing a lawsuit after they told me it would take years to find the documents in the archives.

Last week they "complied" with my foia by giving me a letter written by you telling Argentina that they should withdraw their application, but they provided nothing else.

My goal is to go get the Service to release as much information as possible so I will be challenging the release in court to get more from them.

Now I know I'm not wasting my time.

Thank you

Sent from my iPhone

Case 1:19-cv-20195-JLK   Document 9   Entered on FLSD Docket 04/30/2019   Page 18 of 51

[Quoted text hidden]

---

**Roddy Gabel** <former_zygote@hotmail.com>                                    Thu, Mar 21, 2019 at 10:11 PM
To: David Garcia <dgarcia@pradaurizar.com>

David, just to let you know, they may have difficulty accessing the records because the agency moved offices several years ago, and many of the records were sent to archives or storage somewhere. To complicate things, some of us who worked on this issue have since retired, and remaining staff may not have much, if any, familiarity with it.

You can find other Federal Register documents pertaining to this by going to www.fws.gov and putting "blue-fronted amazon" in the search bar.

Good luck!

Roddy

---

**From:** David Garcia <dgarcia@pradaurizar.com>
**Sent:** Thursday, March 21, 2019 9:30 PM
**To:** Roddy Gabel
[Quoted text hidden]

[Quoted text hidden]

# Exhibit B

# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

5275 Leesburg Pike, MS: IA
Falls Church, VA 22041

IN REPLY REFER TO:
FWS-2019-00159

March 4, 2019

David A. Garcia
Organization of Professional Aviculturist (OPA)
3191 Coral Way Suite 607
Miami, FL 33145
Email: dgarcia@pradaurizar.com

Dear Mr. Garcia:

This is the Division of Management Authority's (DMA) **final** response to your Freedom of Information Act (FOIA) request dated October 17, 2018 and received October 15, 2018, for the following information:

> *"....1) The OPA is also requesting all information, relating to the approval of permits for consortium/cooperative breeding agreements.*
>
> *1a) This includes but is not limited to all information, relating to the approval of permits of consortium/cooperative breeding agreements of CITES appendix 1 listed species."*

Per the electronic email of November 19, 2018, you narrowed/clarified the request to *"will limit its requests to the time period since 10/05/2016 - 11/01/2018. Agreement letters would be acceptable. A spreadsheet would also be acceptable if it lists all submitted requests and their outcomes within the proposed period, as well as processing times. The OPA would also like to know whether the cooperative breeding agreements ultimately approved by the Service resulted from negotiated agreements or were approved as submitted. Also requested are any non-publically available guidance related to how the Service decides to approve such agreements. The information requested is limited to agreements for approval of CITES Appendix 1 species."*

We have enclosed 29 pages of records responsive to your FOIA request, which we are releasing to you in part. Portions of these materials are being withheld under FOIA Exemption 6; *See 5 U.S.C. § 552 (b)(6)*.

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  We are withholding 4 pages in part under Exemption 6.

The phrase "similar files" covers any agency records containing information about a particular individual that can be identified as applying to that individual.  To determine whether releasing records containing information about a particular individual would constitute a clearly unwarranted invasion of personal privacy, we are required to balance the privacy interest that would be affected by disclosure against any public interest in the information.

Under the FOIA, the only relevant public interest to consider under the exemption is the extent to which the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.  The burden is on the requester to establish that disclosure would serve the public interest.  When the privacy interest at stake and the public interest in disclosure have been determined, the two competing interests must be weighed against one another to determine which the greater result of disclosure is: the harm to personal privacy or the benefit to the public.  The purposes for which the request for information is

made do not impact this balancing test, as a release of information requested under the FOIA constitutes a release to the general public.

The information that has been withheld under Exemption 6 consists of personal information such as mailing street addresses and zip codes; we have determined that the individuals to whom this information pertains have a substantial privacy interest in withholding it.  Additionally, you have not provided information that explains a relevant public interest under the FOIA in the disclosure of this personal information and we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties. Because the harm to personal privacy is greater than whatever public interest may be served by disclosure, release of the information would constitute a clearly unwarranted invasion of the privacy of these individuals and we are withholding it under Exemption 6.

We reasonably foresee that disclosure would harm an interest protected by one or more of the nine exemptions to the FOIA's general rule of disclosure.

Carrie Hyde-Michaels, FWS FOIA Officer, is responsible for this partial denial.  Larry Mellinger and Russell Husen, Attorney-Advisors, in the Office of the Solicitor were consulted.

We do not bill requesters for FOIA processing fees when their fees are less than $50.00, because the cost of collection would be greater than the fee collected.  *See 43 C.F.R. § 2.37(g)*.  Therefore, there is no billable fee for the processing of this request and there is no need for us to address your request for a fee waiver.

You may appeal this response to the U.S. Department of Interior's (Department) FOIA/Privacy Act Appeals Officer.  If you choose to appeal, the FOIA/Privacy Act Appeals Officer must receive your FOIA appeal **no later than 90 workdays** from the date of this letter.  Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

**Your appeal must be made in writing.**  You may submit your appeal and accompanying materials to the FOIA/Privacy Act Appeals Officer by mail, courier service, fax, or email.  All communications concerning your appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL."  You must include an explanation of why you believe the U.S. Fish and Wildlife Service's (USFWS) response is in error. You must also include with your appeal copies of all correspondence between you and the USFWS concerning your FOIA request, including your original FOIA request and the USFWS's response.  Failure to include with your appeal all correspondence between you and the USFWS will result in the Department's rejection of your appeal, unless the FOIA/Privacy Act Appeals Officer determines (in the FOIA/Privacy Act Appeals Officer's sole discretion) that good cause exists to accept the defective appeal.

Please include your name and daytime telephone number (or the name and telephone number of an appropriate contact), email address and fax number (if available) in case the FOIA/Privacy Act Appeals Officer needs additional information or clarification of your appeal.

DOI FOIA/Privacy Act Appeals Office Contact Information
Department of the Interior
Office of the Solicitor
1849 C Street, N.W.
MS-6556 MIB
Washington, DC 20240
Attn: FOIA/Privacy Act Appeals Office

Telephone: (202) 208-5339
Fax: (202) 208-6677
Email: FOIA.Appeals@sol.doi.gov

3

The 2007 FOIA amendments created the Office of Government Information Services (OGIS) to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. You may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740-6001

E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Fax: 202-741-5769
Toll-free: 1-877-684-6448

Please note that using OGIS services does not affect the timing of filing an appeal with the Department's FOIA and Privacy Act Appeals Officer.  You may also seek dispute resolution services from our FOIA Public Liaison, Carrie Hyde-Michaels at (703) 358-2291 or at Carrie_Hyde-Michaels@fws.gov.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

**This completes our response.**  If you have any questions, please contact Ms. Brenda Tapia, Division of Management Authority, Branch of Permits, MS: IA, 5275 Leesburg Pike, Falls Church, Virginia 22041 (703-358-1989 or via e-mail at Brenda_Tapia@fws.gov).

Sincerely,

Carrie Hyde-Michaels
FWS FOIA Officer

Attached



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA  22041-3803

IN REPLY REFER TO:
FWS/DMA/CB004

JAN 2 3 2018

Ms. Bethany McMartin
(b) (6)
Port Angeles, Washington (b) (6)

Dear Ms. McMartin:

This letter is formal notification that your application for renewal of the Washington Falconers
Association Cooperative Breeding Program (CB004) under the Wild Bird Conservation Act of
1992, dated December 8, 2016, has been approved under 50 CFR Section 15.26, as outlined
below. This approval will be effective for two (2) years from the date of this letter. Please
ensure that all current and prospective members of your cooperative breeding program are fully
informed of their obligations under this program.

We are denying your request to include Gary Maul as a member in the request dated December
17, 2014, as sufficient documentation has not been provided. In your e-mail dated October 5,
2017, you have stated that Gary Maul is a non-member. According to information you provided,
Gary Maul is in possession of birds in violation of the conditions for this cooperative and these
birds need to be returned to approved members of the cooperative. **Please respond within sixty
days of the date of this letter regarding the disposition of the program birds in his
possession. Failure to comply with our request may jeopardize the continued approval for
this cooperative.**

We are approving your request in your letter dated September 24, 2017, to transfer five
Aplomado falcons (Peru Band #'s 209, 226, 238, 352, 469) to Robert Probst. We also are
approving your request to transfer four Aplomado falcons (Peru Band #'s 071, 074, 085, 179) in
your later dated November 26, 2017, to James Seaman. We find that your reasons for wishing to
remove these nine birds from the cooperative breeding program (i.e., age) are justified, and
therefore, we approve your request.

**Cooperative Breeding Program Name:** Washington Falconers Association Cooperative
Breeding Program

**Oversight Organization:** Washington Falconers Association

**Cooperative breeding program application #:** CB004

Ms. Bethany McMartin                                                                  2

**Species:** Eurasian sparrowhawk (*Accipiter nisus*), northern goshawk (*Accipiter gentilis*), aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*), Barbary falcon (*Falco pelegrinoides)* (synonymous with *Falco peregrinus babylonicus*), ornate hawk-eagle (*Spizaetus ornatus*).

**Program Members**: Lester Boyd, Brian Sullivan, Jim Nelson, Barry Ollette, Doug Alton, Dan Pike, Ron Tokar, Chuck Arnold, Brad Wood, Danny Ertsgaard, Matthew Mitchell, Wayne Lippert, Dave Knutson, Jeff Rossey, Geoff Hirschi, Bill Meeker, Brad Felger, Dave Baker, Gregg Zerbe, Dennis Grisco, Thomas Coulson, Jennifer Coulson, Bill Murphy, John Brenan, Jim Adamson, Troy Morris, Jim Ingram, Tim Hickok, Connie Stanger, Jeff Novak, Christopher Lynn, Jimmy Bathke, Jason Hausman, Raul Ramirez, Keith Hix, Darryl Perkins, Jeff Kisak, Patrick Rummins, Joe Terry, Justin Rondeau, Bethany Rondeau, and Justin Stoval.

**Falconry Members**: Harry McElroy, Tom Gleason, Aaron Smith, Jeremy Roselle, Cliff Robinson, Randy Landis, Phil Smith, Simone Cook, and Marilyn Musser.

This approval is subject to the general conditions below **and** the conditions in the enclosed Division of Scientific Authority finding. We have determined that all of the issuance criteria contained in 50 CFR Section 15.26 have been met, therefore amendment of this program has been granted.

Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15.

**Conditions:** Please be aware that, since *Falco pelegrinoides* is listed in Appendix 1 of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of that species may only be imported for commercial purposes from a CITES-registered breeding operation. Also, Migratory Bird Treaty Act (MBTA) authorization is required in order to import, possess, and sell specimens of *Falco femoralis femoralis*, *Falco femoralis pichinchae*, *Accipiter gentilis*, and *Falco pelegrinoides*. Additional information on the MBTA can be found at http://www.fws.gov/migratorybirds/.

All birds imported for this cooperative breeding program must remain within a Service-approved cooperative breeding program for these species unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the

Ms. Bethany McMartin                                                                 3

oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application of May 10, 1994. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your program, you must submit a written request to this office and provide several years of breeding records for each proposed individual. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals to whom specimens will be loaned for any purpose, including falconry, must become members of the cooperative breeding program. You may designate them as non-breeding members. To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., falconry permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for non-breeding members.

The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the U.S. Fish and Wildlife Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles the members of this cooperative breeding program who are listed above as Program Members to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR 15.11. Enclosed you will find an application to import birds under an approved cooperative breeding program. Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

Ms. Bethany McMartin                                                                                   4

If you have any questions regarding this renewal, please feel free to contact Biologist Clifton A. Horton of this office at: 5275 Leesburg Pike, Falls Church, VA 22041-3803; telephone 703-358-1908; email: clifton_horton@fws.gov.

Sincerely,

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosure

WILD BIRD CONSERVATION ACT
RECORD OF FINDINGS ON APPLICATION
FOR APPROVAL OF COOPERATIVE BREEDING PROGRAM
U. S. FISH & WILDLIFE SERVICE

Application number: CB004 (PRT# 14694C)       Applicant: Bethany McMartin Rondeau

Oversight Organization:   Washington Falconers Association (WFA)

| Previously Approved Species: | Specimens approved: |
|---|---|
| European sparrowhawk (*Accipiter nisus*) | 4.4 |
| Red-naped shaheen (*Falco peregrinus babylonicus*) | 6.6 |
| Ornate Hawk-eagle (*Spizaetus ornatus*) | 10.10 |
| European goshawk (*Accipiter gentilis*) | 15.15 |
| Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*) | 20.20 (combined) |

Background:

The original request for establishing Cooperative Breeding Program (CBP) #004 was first approved on November 29, 1994, for European sparrowhawk (*Accipiter nisus*) and European goshawk (*Accipiter gentilis*). Subsequent amendments to the cooperative breeding program included the addition of three species: Red-naped shaheen (*Falco peregrinus babylonicus*), Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*), and Ornate Hawk-eagle (*Spizaetus ornatus*). According to Wild Bird Conservation Act of 1992 implementing regulations (50 CFR Section 15.26, paragraph (e)), cooperative breeding programs are approved for two years, at which time applicants may apply to the Service for renewal of a program's approval. CB004 was renewed on December 11, 1995, December 8, 1998, February 13, 2002, August 3, 2004, December 21, 2006, May 1, 2009, August 1, 2011, and May 14, 2014. However, the CBP did not submit an application to renew the program's approval prior to the May 14, 2016, expiration date, at which point the previously issued approval expired. As a result, the applicant, Ms. Bethany McMartin Rondeau, was requested to submit an application to establish a new CBP, which she did on December 9, 2016. Ms. McMartin Rondeau is the Lead Cooperator for this cooperative breeding program (CBP).

According to the applicant, the purpose of the CBP is to establish and maintain a viable captive breeding population of native and non-native raptors. To accomplish this goal, the CBP expects cooperation among multiple breeders for each of the species being maintained. The Washington Falconers Association (WFA) has established three classes of CBP membership through their administrative policies (included with application):

- Active Breeding Members: consists of licensed and experienced raptor propagators who have been approved by six affirmative votes of the WFA Board admission. Active breeding members vote of the admission of new breeding members and on other CBP affairs.

- Inactive Breeding Members: consists of active breeding members who are no longer actively participating in the CBP. These members are not authorized to import raptors through the CBP, cannot request new species be added to the approved list, and cannot vote on CBP affairs including admission of new members.
- Non-breeding Members: consists of licensed falconers and others with legal authorization to possess Migratory Bird Treaty Act (MBTA) protected birds of prey who may receive CBP raptors on long term loan so they can be exercised through falconry or other means in preparation for their use in the CBP.

The WFA CBP policy guidelines state that individuals wishing to be added to the CBP must submit to the chair of the CBP all paperwork that is required by the Service for adding new CBP members. Once the WFA receives the required documents, the CBP permit co-coordinator and the president of the WFA draft and jointly sign a letter to the Service indicating that the applicant has been approved by the WFA. All required materials are then submitted to Service for final approval.

### Current Status of the Program:

The CBP application currently includes a list of WFA CBP Approved Breeders and non-voting Falconry members. The following individuals were previously approved as members of the cooperative breeding program (CB004):

*Program Members*: Lester Boyd, Brian Sullivan, Jim Nelson, Barry Ollette, Doug Alton, Dan Pike, Ron Tokar, Chuck Arnold, Brad Wood, Danny Ertsgaard, Matthew Mitchell, Wayne Lippert, Dave Knutson, Jeff Rossey, Geoff Hirschi, Bill Meeker, Brad Felger, Dave Baker, Gregg Zerbe, Dennis Grisco, Thomas Coulson, Jennifer Coulson, Bill Murphy, John Brenan, Jim Adamson, Troy Morris, Jim Ingram, Tim Hickok, Connie Stanger, Jeff Novak, Christopher Lynn, Jimmy Bathke, Jason Hausman, Raul Ramirez, Keith Hix, Darryl Perkins, Jeff Kisak, Patrick Rummins, Joe Terry, Justin Rondeau, Bethany Rondeau, and Justin Stovall.

*Falconry Members*: Harry McElroy, Tom Gleason, Aaron Smith, Jeremy Roselle, Cliff Robinson, Randy Landis, Phil Smith, Simone Cook, and Marilyn Musser.

The applicant reported the following information regarding CBP imported birds, breeding success, mortalities, and disposition of birds:

| Species | Total Quantity Approved for Import | Total Quantity Imported under the CBP (to date) | Offspring produced (F1) | Mortalities | Disposition of Birds |
|---|---|---|---|---|---|
| European sparrowhawk (*Accipiter nisus*) | 4.4 | 5 | 2002-2004: 12 offspring<br>2005-2006: eggs only | 3 imported birds died (1 in quarantine, 2 killed by mate)<br>2 F1 died (killed by mate) | 2 imported birds retained<br>Remaining birds transferred to CB005 in 2006; Currently no birds in CB004 |

| Species | Total Quantity Approved for Import | Total Quantity Imported under the CBP (to date) | Offspring produced (F1) | Mortalities | Disposition of Birds |
|---|---|---|---|---|---|
| Red-naped shaheen (*Falco peregrinus babylonicus*) | 6.6 | 7 | 2001-2017: 51 offspring | 4 imported died (old age)<br><br>2 F1 died (1 from heatstroke, 1 from owl predation)<br><br>1 F1 lost | 3 imported retained<br><br>24 F1 and F2 retained, 21 transferred outside CBP |
| Ornate Hawk-eagle (*Spizaetus ornatus*) | 10.10 | 1.0 (1) | 2007-2017: 21 eggs; no offspring | | 1 imported retained |
| European goshawk (*Accipiter gentilis*) | 15.15 | 17 | 2001-2017: 37 offspring | 3 imported birds killed by mate, 1 lost, 1 killed by raccoon, 1 died of old age.<br><br>8 F1 died: 2 aspergillosis, 1 from carbon monoxide, 1 from window strike, 1 sour crop, 1 horned owl predation, 1 raccoon predation. | 8 imported retained, 2 non-breeding birds moved (approval was requested from DMA)<br><br>15 F1 retained, 12 moved outside program<br><br>1 imported and 1 F1 moved to CBP014 |
| Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*) | 20.20 | 20.21 (41) | 2002-2017: 444 offspring | 16 imported died, 1 lost<br><br>[see table included in applicant's additional response for F1 data] | 21 imported retained, 3 removed from CBP due to inability to breed (all received approval from DMA)<br><br>[see table included in applicant's additional response for F1 data] |

## Species Information:

**European sparrowhawk (*Accipiter nisus*):** The Eurasian sparrowhawk has a very broad distribution throughout Eurasia and Africa. This species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016a). It was listed in CITES

Appendix II in 1977 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017). The European population is estimated at 403,000-582,000 pairs, which is roughly 805,000-1,160,000 mature individuals (BirdLife International 2016a). Europe forms approximately 36% of the global range and a preliminary estimate of the global population size is 2,240,000-3,220,000 mature individuals, although further validation of this estimate is needed. The population trend at present appears stable (BirdLife International 2016a). Historically, widespread persecution, especially from gamekeepers, in the 20th century caused large numbers of the birds to be killed (del Hoyo *et al.* 1994; Ferguson-Lees and Christie 2001). Sharp declines in Europe in the 1950s-1960s were driven by the use of harmful organochlorine pesticides, which causes direct mortality of adults as well as reduced breeding success. The species is still trapped by the thousands annually in Turkey, where it is used by falconers, but habitat alteration is thought to be the major contemporary threat (del Hoyo *et al.* 1994). It is also highly vulnerable to the impacts of potential wind energy developments (Strix 2012). Ingestion of prey containing lead shot is an additional threat (BirdLife International 2016a).

According to the CITES trade database, there were 35 live *Accipiter nisus* in trade between 2006 and 2016 as reported by importing countries (66 reported by exporting countries). Of those, 23 were sourced from the wild (27 as reported by exporters) (UNEP-WCMC 2017b).

**Red-naped shaheen (*Falco peregrinus babylonicus*):** The Red-naped shaheen, or Barbary falcon, is one of ~19 currently recognized subspecies of Peregrine falcon (White *et al.* 2017; White *et al.* 2013). *Falco peregrinus babylonicus* is distributed in central Asia from eastern Iran to Mongolia (White *et al.* 2017). The global population of the nominate species is estimated at c.140,000 individuals which equates to 93,300 mature individuals. The European population is estimated at 14,900-28,800 pairs, which equates to 29,700-57,600 mature individuals (BirdLife International 2016c). Europe forms approximately 13% of the global range, so a preliminary estimate of the global population size is 228,000-443,000 mature individuals, although further validation of this estimate is needed (BirdLife International 2016c). Over the last 100 years, the species has suffered severe population declines due to persecution (19th and 20th centuries), and drastically reduced reproduction and increased mortality of adults associated with pesticide contamination. The species is also used extensively in falconry although the impact of this activity on population numbers is unknown (Ferguson-less and Christie 2001; BirdLife International 2016c). The global population is currently thought to be stable (BirdLife Interanational 2016c).

*Falco peregrinus babylonicus* was listed in CITES Appendix I in 1975. On a species level, *Falco peregrinus* was listed in Appendix I in 1977 (UNEP-WCMC 2017a). *Falco peregrinus* is listed as Least Concern on the IUCN Redlist, while the subspecies *F. p. babylonicus* does not have a unique IUCN listing.

According to the CITES trade database, between 2006 and 2016 there were 26 live *F. p. babylonicus* registered in trade by importing countries (42 recorded by exporting countries). All individuals were reported as captive-bred (UNEP-WCMC 2017).

**Ornate Hawk-eagle (*Spizaetus ornatus*):**  The Ornate hawk-eagle is a neotropical endemic distributed from Mexico to Paraguay and northern Argentina (BirdLife International 2016e). The species is also found on Trinidad and Tobago (Canuto 2008). There are two currently recognized subspecies: *S. o. ornatus*, which is restricted to South America (Northern Columbia to northern Argentina); and *S. o. vicarious*, from Central America to northern Columbia and Ecuador (Ferguson-Lees and Christie 2001).

The Ornate hawk-eagle is typically a bird of dense forest although observations have been made in dry forest as well (Cerqueira *et al.* 2015). In Brazil, the species has declined in areas of heavy deforestation and it is known to have also declined in Argentina (BirdLife 2016e). Recent surveys in Mexico suggest that the Ornate hawk-eagle may be increasingly rare due to tropical deforestation and poaching (de Labra *et al.* 2013), and the species appears to be very sensitive to habitat fragmentation, edges and human presence (Canuto 2008).

Although population numbers throughout the species entire range have not been quantified, population estimates exist throughout parts of its range. In one forest site in French Guiana, density was estimated at 13 individuals/10,000 hectare (ha) (del Hoyo *et al.* 1994). In Petén, Guetemala, density was estimated at ten nests per 100 square kilometers (km²) and a total of c. 50 pairs in Tikal National Park (Bierregaard *et al.* 2016b).

*Spizaetus ornatus* was listed in CITES Appendix II in 1979 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017a). *S. ornatus* was recently uplisted to 'Near Threatened' on the IUCN Red List (BirdLife International 2016e). Based on a model of future forest loss in the Amazon basin (40% loss of the species' habitat), coupled with past habitat loss and ongoing persecution, it is suspected that the population of this species may decline by 25-30% over the next three generations (Bird *et al.* 2011; BirdLife International 2016e).

According to the CITES trade database, between 2006 and 2016 there were 9 live *S. ornatus* in international trade as reported by importing countries (23 recorded by exporting countries). All were reported as captive-bred (UNEP-WCMC 2016b).

**European goshawk (*Accipiter gentilis*):**  The European goshawk is distributed widely throughout North America, Europe, northern Asia and parts of South and Southeast Asia (Orta & Marks 2017). This species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016b). It was listed in CITES Appendix II in 1977 as part of a broader order listing for Falconiformes (UNEP-WCMC 2017a). The current population trend is unknown (BirdLife International 2016b). The European population is estimated at 166,000-220,000 pairs, which equates to 332,000-440,000 mature individuals. Europe forms approximately 26% of the global range and an estimate of global population size is 1,280,000-1,690.000 mature individuals, although further validation of this estimate is needed (BirdLife International 2016b). Significant declines in Europe in the 19th-20th centuries are thought to have resulted from persecution and deforestation, with later declines in the 1950s-1960s a result of poisoning from pesticides and heavy metals. Persecution continues to be a threat, as is nest robbing for falconry (Orta & Marks 2014). The species is also highly vulnerable to the impacts of potential wind farm developments (Strix 2012).

According to the CITES trade database, between 2006 and 2016 there were 1,136 live *Accipiter gentilis* reported in trade by importing countries (1266 reported by exporting countries). Of those, 320 were wild caught (382 as recorded by exporting countries) (UNEP-WCMC 2017b).

**Aplomado falcon (*Falco femoralis femoralis* and *Falco femoralis pichinchae*):** There are three recognized subspecies of Aplomado falcon with the following distributions (Bierregaard *et al.* 2017):

- *F. f. septentrionalis*: Northern Mexico and south locally to Guatemala.
- *F. f. femoralis*: Southeast Honduras and northeast Nicaragua; Panama; Colombia east to the Guianas, and south through eastern Bolivia and Brazil to Argentina, extending south to Tierra del Fuego.
- *F. f. pichinchae*: Temperate zones of southwest Colombia, Ecuador, Peru and western Bolivia south to central Chile and northwest Argentina (Tucumán).

As a whole the species is not globally threatened and is listed as Least Concern on the IUCN Redlist (BirdLife International 2016c). The species was listed in CITES Appendix II in 1975 as part of a broader family listing for Falconidae (UNEP-WCMC 2017a). Although the population globally is suspected to be in decline, populations in some regions may be increasing due to deforestation and the opening up of new grassland habitat. However, more data is needed (Bierregard *et al.* 2017). For poorly understood reasons, the species was virtually eliminated in the southern United States and in northern Mexico with declines potentially starting at the turn of the 20th century (Bierregard *et al.* 2017).

According to the CITES trade database, between 2006 and 2016, there were 172 live *F. femoralis* in trade as reported by importing countries (221 reported by exporting countries); all were reported as captive-bred (except for 2 reported by exporting countries) (UNEP-WCMC 2017b).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Findings relevant to issuance criteria of 50 CFR 15.26:

CB004 has been an approved cooperative breeding program since 1994. The applicant was requested to submit an application to establish a new CBP because their previously issued approval had expired without the program submitting an application to renew their approval prior to the expiration date.

We previously found that this cooperative breeding program met all of the criteria necessary for approval. Based on the summary report included with the application, as well as additional information submitted by Bethany McMartin Rondeau, Lead Cooperator, on activities conducted under the Cooperative Breeding Program and since no major changes to the CBP have been requested by the applicant, we believe that the program continues to fulfill the purposes of the Wild Bird Conservation Act and meet the criteria for approval.

Overall, the program has been able to successfully produce progeny from four of the raptor species the CBP has previously imported, as well as achieve egg production with an imported male Ornate hawk-eagle (*Spizaetus ornatus*). In addition, according to the applicant, the program

has been working with other Service-approved cooperative breeding programs for European goshawk, European sparrowhawk, and Red-naped shaheens.

Therefore, we recommend approval of this application with the following conditions:

1. Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

2. Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed. Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program. With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a bird produced in a cooperative breeding program, the bird must be made available to other Service-approved programs for the species.

3. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. If the individuals do not plan to breed the specimens, the lead cooperator may designate these individuals as non-breeding members. To include these individuals in an approved cooperative breeding program, the lead cooperator must provide the Division of Management Authority with their names, contact information, and qualifications. In contrast to program members who will be undertaking breeding, we will not require a letter of endorsement from the oversight organization for non-breeding members.

4. Individuals who will be engaged in breeding birds may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add an individual to the program, the lead cooperator must submit a written request to the Division of Management Authority and provide several years of breeding records for the proposed individual. In addition, the oversight organization specified in the cooperative breeding program application must submit written notification indicating that the individual has met the established criteria for acceptance into the cooperative breeding program, as specified in the application for approval.

5. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. Each program member must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, the cooperative breeding program must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, the cooperative breeding program must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be submitted when the lead cooperator requests the renewal of the cooperative breeding program or upon request of the Division of Management Authority.

6. For cooperative breeding programs that include species listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of those species may only be imported for commercial purposes from a CITES-registered breeding operation. A directory of CITES-registered breeding operations, including U.S. operations, can be found at http://www.cites.org/common/reg/e_cb.html. For those species covered under the U.S. Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess, and sell specimens of those species. Additional information on the MBTA can be found at http://www.fws.gov/migratorybirds/.

7. Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired. If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

- - -

### Literature Cited

Bierregaard, R.O., Jr & Kirwan, G.M. (2017). Aplomado Falcon (*Falco femoralis*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53230 on 28 August 2017).

Bird, J. P.; Buchanan, J. M.; Lees, A. C.; Clay, R. P.; Develey, P. F.; Yépez, I.; Butchart, S. H. M. (2011). Integrating spatially explicit habitat projections into extinction risk assessments: a reassessment of Amazonian avifauna incorporating projected deforestation. *Diversity and Distributions*: doi: 10.1111/j.1472-4642.2011.00843.x.

BirdLife International. (2016a) *Accipiter nisus*. The IUCN Red List of Threatened Species 2016: e.T22695624A93519953. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22695624A93519953.en; accessed on August 25, 2017.

BirdLife International. (2016b). *Accipiter gentilis*. The IUCN Red List of Threatened Species 2016: e.T22695683A93522852. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22695683A93522852.en; accessed on August 25, 2017.

BirdLife International. (2016c). *Falco peregrinus*. The IUCN Red List of Threatened Species 2016: e.T45354964A95143387. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T45354964A95143387.en; accessed on on August 28, 2017.

BirdLife International. (2016d). *Falco femoralis*. The IUCN Red List of Threatened Species 2016: e.T22696450A93562619. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22696450A93562619.en; accessed on August 28, 2017.

BirdLife International. (2016e). *Spizaetus ornatus*. The IUCN Red List of Threatened Species 2016: e.T22696197A93548774. http://dx.doi.org/10.2305/IUCN.UK.2016-3.RLTS.T22696197A93548774.en; accessed on August 28, 2017.

Canuto, M. (2008) Observations of two Hawk-Eagle species in a humid lowland tropical forest reserve in central Panama, *Journal of Raptor Research*, 42(4):287-292.

Cerqueira, Pablo Vieira, et al. (2015) First record of the ornate Hawk-Eagle (*Spizaetus ornatus*) from the Brazilian Caatinga. *The Wilson Journal of Ornithology*, 127(1):153.

del Hoyo, J.; Elliott, A.; Sargatal, J. (1994). *Handbook of the Birds of the World, vol. 2: New World Vultures to Guineafowl*. Lynx Edicions, Barcelona, Spain.

de Labra, M.A., Escalante, P., Monterrubio-Rico, T. (2013). Diurnal raptors in los Tuxtlas Biosphere Reserve, Mexico: Current presence and relative abundance, *Journal of Raptor Research*, 47(4):392-399.

Ferguson-Lees, J. and Christie, D.A. (2001). *Raptors of the world*. Christopher Helm, London.

Orta, J. & Marks, J.S. (2017). Northern Goshawk (*Accipiter gentilis*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53089 on August 25, 2017).

STRIX (2012). Developing and testing the methodology for assessing and mapping the sensitivity of migratory birds to wind energy development. BirdLife International, Cambridge.

UNEP-WCMC (2017a). United Nations Monitoring Programme-World Conservation Monitoring Centre. Accessed 28 August 2017. UNEP-WCMC Species+ Database: CITES-Listed

Species.

UNEP-WCMC (2017b). United Nations Monitoring Programme-World Conservation Monitoring Centre. Accessed 28 August 2017. UNEP-WCMC Species Database: CITES trade database.

White, C.M., Christie, D.A., de Juana, E. & Marks, J.S. (2017). Peregrine Falcon (*Falco peregrinus*). In: del Hoyo, J., Elliott, A., Sargatal, J., Christie, D.A. & de Juana, E. (eds.). *Handbook of the Birds of the World Alive*. Lynx Edicions, Barcelona. (retrieved from http://www.hbw.com/node/53247 on 28 August 2017).

White, C., Sonsthagen, S., Sage, G., Anderson, C., & Talbot, S. (2013). Genetic relationships among some subspecies of the Peregrine Falcon (Falco peregrinus L.), inferred from mitochondrial DNA control-region. *The Auk,* 130(1), 78-87. doi:10.1525/auk.2012.11173

- - -

Monica A. Norton   11/14/2017

Monica A. Horton
Biologist (CITES Specialist)
Division of Scientific Authority

Eleanora Babij   11/14/17

Eleanora Babij, Ph.D.
Chief, Branch of Consultation and Monitoring
Division of Scientific Authority



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 17 2017

IN REPLY REFER TO:
FWS/DMA/CB030

David Kanellis
(b) (6)
Las Vegas, Nevada (b) (6)

Dear Mr. Kanellis:

This letter is formal notification that your application for renewal of the Raptor Cooperative Breeding Program (CB030) under the Wild Bird Conservation Act of 1992 (WBCA), dated September 25, 2016, has been approved under 50 CFR Section 15.26, as outlined below. This approval will be effective for two (2) years from the date of this letter. Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15. This letter also serves as official notification that Joel Knutson, Rebecca O'Connor, Nicole Perretta, and Charles Browning have been added as falconry members and Shane U. Phitides and Edward Elguezabal have been removed as falconry members of CB030.

**Cooperative Breeding Program Name:** Raptor Cooperative Breeding Program

**Oversight Organization:** California Hawking Club

**Cooperative breeding program application #:** CB030

**Species:** black goshawk (*Accipiter melanoleucus*), Eurasian (European) sparrowhawk (*Accipiter nisus*), Lanner falcon (*Falco biarmicus*), saker falcon (*Falco cherrug*), red-necked falcon (*Falco chicquera*), African hawk-eagle (*Hieraaetus spilogaster*), African fish-eagle (*Haliaeetus vocifer*), African crowned eagle (*Stephanoaetus coronatus*), Northern goshawk (*Accipiter gentilis*), Steppe eagle (*Aquila nipalensis*), Verreaux's eagle (*Aquila verreauxii*), Martial eagle (*Polemeatus bellicosus*), ornate hawk-eagle (*Spizaetus ornatus*), Bonelli's eagle (*Hieraaetus fasciatus*), African goshawk (*Accipiter tachiro*), Eurasian eagle-owl (*Bubo bubo*), Ural owl (*Strix uralensis*), Peregrine falcon *(Falco peregrinus*)

**Program Members:** Stuart Rossell, Randy Landis, Sonny (Donald) Squiciarino, Mark Moglich, David Kanellis, Martin Stiasny, Bill Murphy, Robert F. Kennedy, Jr., William G. Meeker, Gary D. Boberg, Ryan Moglich, Lewis R. Souder, Los Angeles Zoo

**Falconry Members:** Ronald E. Brown, Lew Souder, Steve Layman, Jim Tigan, Vasken Kevorkian, Vince Piccioni, Civon Gewelber, John Pallavicini, Ryan Moglich, Margaret D.

Mr. David Kanellis                                                                                    2

Cullen, Duane Zobrist, Duane Zobrist Jr., Thomas J. Cullen IV, Michael J. Clark, Vang Vang,
Titus Plomaritis Jr., Chase Delles, Gary D. Boberg, Anthony C. Suffredini, Corey J. Dalton,
David Myers, Joel Knutson, Rebecca O'Connor, Nicole Perretta, Charles Browning

**Expiration Date:** February 17, 2019

**Conditions:**

All birds imported for this cooperative breeding program must remain within a Service-approved
cooperative breeding program for these species and may not be loaned, sold or transferred for any
reason unless otherwise authorized by this office. An imported bird may only be disposed of
outside a Service-approved program for reasons such as the genetic line is well represented by
offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird
outside the program, you must make it available to other Service-approved programs for the
species. To dispose of an imported bird outside an approved program, you must submit a written
request to this office that includes justification for disposing of the bird and a statement of how
the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to
removal of the bird from the program. Additionally, the oversight organization for the program
must send a letter indicating its agreement with the decision to remove the imported bird from
the program.

With regard to birds produced within the program, a sufficient number of offspring produced
must be retained within the program to fulfill the goals of the cooperative breeding program as
outlined in your original approval application. As with imported birds, prior to disposing of a
bird produced in your cooperative breeding program, you must make it available to other
Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they
have demonstrated breeding success with the same or similar species. To add individuals to your
program, you must submit a written request to this office and provide several years of breeding
records for each proposed individual. In addition, we must receive official notification from the
oversight organization specified in the cooperative breeding program application, indicating that
each additional individual has met the established criteria for acceptance into the cooperative
breeding program. Individuals, to whom specimens will be loaned for any purpose, must become
members of the cooperative breeding program. You may designate individuals who will not be
breeding birds as non-breeding members. To include these individuals in the cooperative
breeding program, you must provide this office with their names, contact information, and
qualifications (e.g., FWS migratory bird permit number). In contrast to program members who
will be undertaking breeding, we do not require a letter of endorsement from the oversight
organization for non-breeding members.

All individuals of the cooperative breeding program must maintain records of all birds that come into their possession through the cooperative breeding program. These records must be made available to the U.S. Fish and Wildlife Service upon our request. All imported birds must meet Mr. David Kanellis                                                                                                                     3

all United States import requirements. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the U.S. Fish and Wildlife Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles members of this cooperative breeding program who are listed above as Program Members, to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR Section 15.11. Please be aware that 50 CFR Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this part that violates a condition of said permit.* Enclosed you will find an application to import birds under an approved cooperative breeding program. Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

If you have any questions regarding this renewal, please feel free to contact Biologist Clifton A. Horton of this office at: 5275 Leesburg Pike, Falls Church, VA 22041-3803; telephone 703-358-1908; email: clifton_horton@fws.gov.

Sincerely,

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosure



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA 22041-3803

IN REPLY REFER TO:
FWS/DMA//CB030

OCT 1 9 2018

David Kanellis
(b) (6)
Las Vegas, Nevada (b) (6)

Dear Mr. Kanellis:

This letter is formal notification that your application for renewal of the Raptor Cooperative Breeding Program (CB030) under the Wild Bird Conservation Act of 1992 (WBCA), dated February 24, 2018, has been approved under 50 CFR Section 15.26, as outlined below. This approval is subject to the general conditions **and** the Division of Scientific Authority conditions below. This approval will be effective for two (2) years from the date of this letter, and replaces the current approval letter dated February 17, 2017, which is no longer valid. Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15. This letter also serves as official notification that Rebecca Searle, Justin Searle, Troy D. Taylor, Lauren McGough, Steve Hoddy, Adam Chavez, David Dixon, and Erland Renslo have been added as falconry members of CB030, and that your request to amend the quantities of previously approved species under the cooperative breeding program has been approved as follows:

| Species | Quantity |
|---|---|
| Black goshawk (*Accipiter melanoleucus*) | 15.15 |
| Eurasian (European) sparrowhawk (*Accipiter nisus*) | 15.15 |
| Lanner falcon (*Falco biarmicus*) | 11.11 |
| Saker falcon (*Falco cherrug*) | 15.15 |
| Northern goshawk (*Accipiter gentilis*) | 15.15 |
| African crowned eagle (*Stephanoaetus coronatus*) | 10.10 |
| Eurasian eagle-owl (*Bubo bubo*) | 10.10 |

Cooperative Breeding Program Name: Raptor Cooperative Breeding Program

Oversight Organization: California Hawking Club

Cooperative breeding program application #: CB030

Species: black goshawk (*Accipiter melanoleucus*), Eurasian (European) sparrowhawk (*Accipiter nisus*), Lanner falcon (*Falco biarmicus*), saker falcon (*Falco cherrug*), red-necked falcon (*Falco chicquera*), African hawk-eagle (*Hieraaetus spilogaster*), African fish-eagle (*Haliaeetus vocifer*), African crowned eagle (*Stephanoaetus coronatus*), Northern goshawk (*Accipiter gentilis*), Steppe eagle (*Aquila nipalensis*), Verreaux's eagle (*Aquila verreauxii*), Martial eagle (*Polemeatus bellicosus*), ornate hawk-eagle (*Spizaetus ornatus*), Bonelli's eagle (*Hieraaetus fasciatus*), African goshawk (*Accipiter tachiro*), Eurasian eagle-owl (*Bubo bubo*), Ural owl (*Strix uralensis*), Peregrine falcon (*Falco peregrinus*)

Program Members: Stuart Rossell, Randy Landis, Sonny (Donald) Squiciarino, Mark Moglich, David Kanellis, Martin Stiasny, Bill Murphy, Robert F. Kennedy, Jr., William G. Meeker, Gary D. Boberg, Ryan Moglich, Lewis R. Souder, Los Angeles Zoo

Falconry Members: Ronald E. Brown, Steve Layman, Jim Tigan, Vasken Kevorkian, Vince Piccioni, Civon Gewelber, John Pallavicini, Margaret D. Cullen, Duane Zobrist, Duane Zobrist Jr., Thomas J. Cullen IV, Michael J. Clark, Vang Vang, Titus Plomaritis Jr., Chase Delles, Anthony C. Suffredini, Corey J. Dalton, David Myers, Joel Knutson, Rebecca O'Connor, Nicole Perretta, Charles Browning, Rebecca Searle, Justin Searle, Troy D. Taylor, Lauren McGough, Steve Hoddy, Adam Chavez, David Dixon, Erland Renslo

**General Conditions:** All birds imported for this cooperative breeding program must remain within a cooperative breeding program approved by the U.S. Fish and Wildlife Service (Service) for these species and may not be loaned, sold or transferred for any reason including breeding purposes unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program.

With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in your original approval application. As with imported birds, prior to disposing of a bird produced in your cooperative breeding program, you must make it available to other Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add individuals to your

program, you must submit a written request to this office and provide several years of breeding records for each individual proposed. In addition, we must receive official notification from the oversight organization specified in the cooperative breeding program application, indicating that each additional individual has met the established criteria for acceptance into the cooperative breeding program. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. You may designate them as "non-breeding members." To include these individuals in the cooperative breeding program, you must provide this office with their names, contact information, and qualifications (e.g., FWS migratory bird permit number). In contrast to program members who will be undertaking breeding, we do not require a letter of endorsement from the oversight organization for "non-breeding members."

All individuals of the cooperative breeding program must maintain records of all birds that come into their possession through the cooperative breeding program. These records must be made available to the Service upon our request. All imported birds must meet all U.S. import requirements. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. For each program participant, you must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be made available to the Service upon our request, and when you submit a request for the renewal or amendment of the cooperative breeding program.

**Division of Scientific Authority Conditions:** Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed. Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program. With regard to birds produced within the program, a sufficient number of offspring produced must be retained within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a

Mr. David Kanellis                                                                                          4

bird produced in a cooperative breeding program, the bird must be made available to other Service-approved programs for the species.

Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. If the individuals do not plan to breed the specimens, the lead cooperator may designate these individuals as non-breeding members. To include these individuals in an approved cooperative breeding program, the lead cooperator must provide the Division of Management Authority with their names, contact information, and qualifications. In contrast to program members who will be undertaking breeding, we will not require a letter of endorsement from the oversight organization for non-breeding members.

Individuals who will be engaged in breeding birds may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add an individual to the program, the lead cooperator must submit a written request to the Division of Management Authority and provide several years of breeding records for the proposed individual. In addition, the oversight organization specified in the cooperative breeding program application must submit written notification indicating that the individual has met the established criteria for acceptance into the cooperative breeding program, as specified in the application for approval.

The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. Each program member must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, the cooperative breeding program must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, the cooperative breeding program must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be submitted when the lead cooperator requests the renewal of the cooperative breeding program or upon request of the Division of Management Authority.

For cooperative breeding programs that include species listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of those species may only be imported for commercial purposes from a CITES-registered breeding operation. A directory of CITES-registered breeding operations, including U.S. operations, can be found at Register of Captive-Breeding Operations (http://www.cites.org/common/reg/e_cb.html). For those species covered under the U.S. Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess, and sell specimens of those species. Additional information on the MBTA can be found at MBTA (http://www.fws.gov/migratorybirds/).

Mr. David Kanellis                                                                                              5

Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired.  If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

This notice entitles members of this cooperative breeding program who are listed above as Program Members, to apply for permits to import the exotic bird species listed above that are otherwise prohibited from import under 50 CFR Section 15.11.  Please be aware that 50 CFR Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States to engage in any activity with an exotic bird imported under a permit issued pursuant to this part that violates a condition of said permit.*  Enclosed you will find an application to import birds under an approved cooperative breeding program.  Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

Please feel free to direct any inquiries regarding this matter to Biologist Clifton A. Horton of this office at:  5275 Leesburg Pike, MS-IA, Falls Church, VA 22041; telephone 703-358-1908; email: clifton_horton@fws.gov.

                                            Sincerely,

                                            L.S. Noguchi

                                            Laura S. Noguchi, Chief
                                            Wildlife Trade and Conservation Branch
                                            Division of Management Authority


Enclosure



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
International Affairs
5275 Leesburg Pike, MS: IA
Falls Church, VA  22041-3803

**APR 1 8 2018**

IN REPLY REFER TO:
FWS/DMA//CB040

Mr. John Aynes
(b) (6)

Oklahoma City, Oklahoma (b) (6)

Dear Mr. Aynes:

This letter is formal notification that your application for renewal of the Cooperative Breeding Program (CBP) for Captive Breeding Program for African Grey Parrots (CB040) under the Wild Bird Conservation Act of 1992 (WBCA), dated January 4, 2018, has been approved under 50 CFR Section 15.26, as outlined below. This approval is subject to the general conditions below **and** the conditions in the enclosed Division of Scientific Authority finding. This approval will be effective for two (2) years from the date of this letter. Please ensure that all current and prospective members of your cooperative breeding program are fully informed of their obligations under this program, including compliance with 50 CFR Parts 13 and 15.

**Cooperative Breeding Program Name:**  Captive Breeding Program for African Grey Parrots

**Oversight Organization:**  Zoological Association of America (ZAA)

**Cooperative Breeding Program #:**  CB040

**Species:**  African grey parrot (*Psittacus erithacus*) and Cape parrot (*Poicephalus robustus*)

**Program Members:**  John Aynes, Susan Clubb, Walter Frey

**General Conditions:** All birds imported for this cooperative breeding program must remain within a cooperative breeding program approved by the U.S. Fish and Wildlife Service (Service) for these species and may not be loaned, sold or transferred for any reason including breeding purposes unless otherwise authorized by this office. An imported bird may only be disposed of outside a Service-approved program for reasons such as the genetic line is well represented by offspring retained in the program or the bird is unable to breed. Prior to disposing of a bird outside the program, you must make it available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, you must submit a written request to this office that includes justification for disposing of the bird and a statement of how

Mr. John Aynes                                                                                     2

the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to
removal of the bird from the program. Additionally, the oversight organization for the program
must send a letter indicating its agreement with the decision to remove the imported bird from
the program.

With regard to birds produced within the program, a sufficient number of offspring produced
must be retained within the program to fulfill the goals of the cooperative breeding program as
outlined in your original approval application. As with imported birds, prior to disposing of a
bird produced in your cooperative breeding program, you must make it available to other
Service-approved programs for the species.

Additional individuals may be added to the cooperative breeding program provided that they
have demonstrated breeding success with the same or similar species. To add individuals to your
program, you must submit a written request to this office and provide several years of breeding
records for each individual proposed. In addition, we must receive official notification from the
oversight organization specified in the cooperative breeding program application, indicating that
each additional individual has met the established criteria for acceptance into the cooperative
breeding program. Individuals to whom specimens will be loaned for any purpose must become
members of the cooperative breeding program. You may designate them as "non-breeding
members." To include these individuals in the cooperative breeding program, you must provide
this office with their names, contact information, and qualifications (e.g., FWS migratory bird
permit number). In contrast to program members who will be undertaking breeding, we do not
require a letter of endorsement from the oversight organization for "non-breeding members."

All individuals of the cooperative breeding program must maintain records of all birds that come
into their possession through the cooperative breeding program. These records must be made
available to the Service upon our request. All imported birds must meet all U.S. import
requirements. The cooperative breeding program must maintain records containing the number,
species, and sex of all birds imported for the program, as well as dates of import, countries of
origin, and disposition of the imported birds. For each program participant, you must also
maintain a record of breeding activity, including the number of eggs and progeny produced, and
the disposition of any progeny.

Finally, you must maintain a record of mortality experienced within the program that includes
the location of the bird when it died and the cause, if known. For birds that died in quarantine,
you must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary
Services office. These records must be made available to the Service upon our request, and
when you submit a request for the renewal or amendment of the cooperative breeding program.

This notice entitles members of this cooperative breeding program who are listed above as
Program Members, to apply for permits to import the exotic bird species listed above that are
otherwise prohibited from import under 50 CFR Section 15.11. Please be aware that 50 CFR
Part 15.11(f) states: *It is unlawful for any person subject to the jurisdiction of the United States
to engage in any activity with an exotic bird imported under a permit issued pursuant to this part
that violates a condition of said permit.* Enclosed you will find an application to import birds

Mr. John Aynes                                                                          3

under an approved cooperative breeding program.  Please be advised that the estimated processing time for these import permit applications is sixty (60) days.

Please feel free to direct any inquiries regarding this matter to Biologist Clifton A. Horton o^ this office at: 5275 Leesburg Pike, MS-IA, Falls Church, VA 22041; telephone 703-358-1908; e nail: clifton_horton@fws.gov.

Sincerely,

Laura S. Noguchi, Chief
Wildlife Trade and Conservation Branch
Division of Management Authority

Enclosures

WILD BIRD CONSERVATION ACT
RECORD OF FINDINGS ON APPLICATION
FOR APPROVAL OF COOPERATIVE BREEDING PROGRAM
U. S. FISH & WILDLIFE SERVICE

**\*\*Renewal\*\***

Application number:  CB040  (PRT# 76975B)        Applicant:  John Aynes

Oversight organization:  Zoological Association of America (ZAA)

| Species: | Specimens approved: |
|---|---|
| African grey parrot (*Psittacus erithacus*) | 75.75 |
| Cape parrot (*Poicephalus robustus*) | 30.30 |

Background:

On January 10, 2018, the USFWS Division of Management Authority (DMA) received an application from Mr. John Aynes requesting renewal of CB040, the Captive Breeding Program for African Grey Parrots.  Mr.Aynes is the Lead Cooperator for this cooperative breeding program (CBP).

The original request for establishing the Captive Breeding Program for African Grey Parrots (CB040) was approved on March 16, 2016, for 75.75 African grey parrot (*Psittacus erithacus*). A subsequent amendment was issued on May 25, 2016, with the addition of 30.30 Cape parrot (*Poicephalus robustus*).

Current Status of the Program:

The current members approved under this cooperative breeding program (CB040) include: John Aynes, Susan Clubb, and Walter Frey.

Below is a summary of the total number of birds imported under the Cooperative Breeding Program (CB040), at the time of this renewal request, as reported by the Lead Cooperator:

| Species Approved | Total Quantity Approved for Import | Total Quantity Imported under the CBP |
|---|---|---|
| African grey parrot (*Psittacus erithacus*) | 75.75 **(150)** | 75.75 **(150)** |
| Cape parrot (*Poicephalus robustus*) | 30.30 **(60)** | 0.0 **(0)** |

*Mortality*: In the renewal application and prior information submitted to the Service on September 26, 2016, Mr. Aynes indicated that there have been some mortalities of birds imported under the cooperative breeding program.  Details for the reported mortalities are as follows:

- African grey parrot (*Psittacus erithacus*) – 6 deaths. Two birds were deceased when they arrived into the United States from South Africa (the country of export), during the original import. Three birds died while in quarantine. One bird died, under the care of John Aynes, from flying into the wire in a large flight cage.

***Breeding:*** According to the Lead Cooperator, no eggs/hatchlings have been produced from imported birds due to the young age of the imported birds. The program expects the imported birds to start breeding in the next couple of years. In the meantime, the imported birds remain in flight cages to socialize until they are ready to breed.

***Cooperation with existing breeding programs:*** Although the applicant is not aware of an African grey parrot cooperative breeding program in the United States or internationally, he is aware of numerous individual breeders of the species. The applicant states that he collaborates with many people around the world when information or advice is requested of him, not only for African grey parrots but also various cockatoo and other species. Examples of recent communications with various individuals around the world regarding a range of topics including diet, husbandry, and facilities, were also provided by the applicant to demonstrate his willingness to assist whenever he can.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We previously found that this cooperative breeding program met all of the criteria necessary for approval.

Based on the summary report included with the renewal, as well as additional information submitted by John Aynes, Lead Cooperator, on activities conducted under the Cooperative Breeding Program, we believe that the program continues to fulfill the purposes of the Wild Bird Conservation Act and meet the criteria for approval. Therefore, we recommend approval of this renewal application with the following conditions:

1. Birds imported under the cooperative breeding agreement must remain within a Service-approved cooperative breeding program and may not be loaned, sold, or transferred to individuals outside an approved breeding program for any reason including breeding purposes, unless otherwise authorized by the Division of Management Authority.

2. Imported birds may only be disposed of outside a Service-approved cooperative breeding program if the specimens are deemed to be genetic surplus or are unable to breed. Prior to disposing of a bird outside the program, the bird must be made available to other Service-approved programs for the species. To dispose of an imported bird outside an approved program, the lead cooperator must submit a written request to the Division of Management Authority that includes justification for disposing of the bird and a statement of how the bird will be disposed of (e.g., donated to a zoo, sold to a private individual, etc.), prior to removal of the bird from the program. Additionally, the oversight organization for the program must send a letter indicating its agreement with the decision to remove the imported bird from the program. With regard to birds produced within the program, a sufficient number of offspring produced must be retained

within the program to fulfill the goals of the cooperative breeding program as outlined in the original approval application. As with imported birds, prior to disposing of a bird produced in a cooperative breeding program, the bird must be made available to other Service-approved programs for the species.

3. Individuals to whom specimens will be loaned for any purpose must become members of the cooperative breeding program. If the individuals do not plan to breed the specimens, the lead cooperator may designate these individuals as non-breeding members. To include these individuals in an approved cooperative breeding program, the lead cooperator must provide the Division of Management Authority with their names, contact information, and qualifications. In contrast to program members who will be undertaking breeding, we will not require a letter of endorsement from the oversight organization for non-breeding members.

4. Individuals who will be engaged in breeding birds may be added to the cooperative breeding program provided that they have demonstrated breeding success with the same or similar species. To add an individual to the program, the lead cooperator must submit a written request to the Division of Management Authority and provide several years of breeding records for the proposed individual. In addition, the oversight organization specified in the cooperative breeding program application must submit written notification indicating that the individual has met the established criteria for acceptance into the cooperative breeding program, as specified in the application for approval.

5. The cooperative breeding program must maintain records containing the number, species, and sex of all birds imported for the program, as well as dates of import, countries of origin, and disposition of the imported birds. Each program member must also maintain a record of breeding activity, including the number of eggs and progeny produced, and the disposition of any progeny. Finally, the cooperative breeding program must maintain a record of mortality experienced within the program that includes the location of the bird when it died and the cause, if known. For birds that died in quarantine, the cooperative breeding program must obtain documentation indicating such from the appropriate USDA/APHIS/Veterinary Services office. These records must be submitted when the lead cooperator requests the renewal of the cooperative breeding program or upon request of the Division of Management Authority.

6. For cooperative breeding programs that include species listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), specimens of those species may only be imported for commercial purposes from a CITES-registered breeding operation. A directory of CITES-registered breeding operations, including U.S. operations, can be found at Register of Captive-Breeding Operations (http://www.cites.org/common/reg/e_cb.html). For those species covered under the U.S. Migratory Bird Treaty Act (MBTA), MBTA authorization is required in order to import, possess, and sell specimens of those species. Additional information on the MBTA can be found at MBTA (http://www.fws.gov/migratorybirds/).

7. Any application to import these species must include information from the exporter on the origin of the specimens, and copies of CITES export permits from the range country to show that the specimens were legally acquired. If the specimens to be imported are captive bred, documentation must be provided to demonstrate legal acquisition of the parental stock from which the specimens were derived.

8. Members must demonstrate cooperation with the existing captive breeding programs that are developing sustainable populations of these species (e.g., sharing breeding stock, progeny, records, techniques) in order to more rapidly develop sustainable captive populations. Such communication should be documented in the renewal application materials that the applicant will submit to the Division of Management Authority.

* * * * *

Monica A. Horton 4/12/2018
Monica A. Horton
Biologist (CITES Specialist)
Division of Scientific Authority

Eleanora Babij 4/12/18
Eleanora Babij, Ph.D.
Chief, Branch of Consultation and Monitoring
Division of Scientific Authority